**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAJI WAZIR, *et al.* | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil Action No. 1:06-cv-01697 (RBW) |
| | ) |
| ROBERT GATES, Secretary, United States | ) |
| Department of Defense, *et al.*, | ) |
| | ) |
| | ) |
| Respondents. | |

## DECLARATION OF COLONEL CHARLES A. TENNISON

I, Colonel Charles A. Tennison, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-101 ("CJTF-101"), as well as Commander of Detention Operations, CJTF-101. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. CJTF-101 is headquartered at Bagram Airfield in the Islamic Republic of Afghanistan ("Afghanistan"). CJTF-101, along with Afghan National Security Forces, conducts full spectrum operations to defeat al Qaeda, the Taliban, and their affiliates and supporters. CJTF-101 integrates joint, interagency, and multinational forces partnered with the Afghans in order to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.

3. Task Force Guardian, a subordinate unit of CJTF-101, is under United States national command and control. Task Force Guardian is responsible for operating the Bagram Theater Internment Facility ("BTIF"), a Department of Defense ("DoD")

detention facility in support of Operation Enduring Freedom (OEF), located at the Bagram Airfield. I have served as the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-101, since November 16, 2007. In this position, I am responsible for all aspects of detention operations for CJTF-101.

4. I have reviewed the Petition for Writ of Habeas Corpus filed in this action.

### Bagram Airfield, Afghanistan

5. Bagram Airfield is located approximately forty miles north of Kabul in the Parwan province of Afghanistan. In the military campaign against al Qaeda and the Taliban regime in Afghanistan, American forces were deployed to the base starting in late 2001 and early 2002, along with multinational armed forces, and had priority use of the airfield for coalition operations. The United States' use of Bagram Airfield was and is necessitated by its ongoing military operations against al Qaeda, the Taliban and their affiliates and supporters.

6. OEF coalition and International Security Assistance Force ("ISAF") military operations are conducted from Bagram Airfield. Currently, the United States' use of Bagram Airfield is pursuant to an Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America, executed on September 28, 2006. A copy of this Agreement is attached as Exhibit A. This agreement follows similar such arrangements dating back to at least 2003. Under this Agreement, which was executed "in consideration of the mutual benefits to be derived therefore," Afghanistan, as the "host nation," consigns all facilities and land located at Bagram Airfield "for use by the United States and coalition forces for military purposes." This Agreement continues until the United States (or a successor)

determines that the premises are no longer required for its use.

7. A significant multinational presence exists at Bagram Airfield as part of CJTF-101's mission. The commander of CJTF-101 also serves as the commander of Regional Command, East, which is a command under ISAF. ISAF operates in Afghanistan pursuant to United Nations Security Council Resolution 1776. The following nations have a presence on the airfield as part of ISAF: France, the Czech Republic, Turkey, Poland, the United Kingdom, New Zealand, Australia, Italy, Romania, Bulgaria, and Canada. Furthermore, the following nations have a presence on Bagram Airfield as part of Operation Enduring Freedom: Egypt, S. Korea, and Pakistan. Although the United States secures Bagram Airfield, some of these nations control access to their own compounds on the airfield.

8. Afghan citizens enter Bagram Airfield on a daily basis. These Afghans range from local nationals performing contracted work (such as cleaning services) to representatives of the Afghan government.

### The Bagram Theater Internment Facility

9. The United States and its multinational partners are conducting an ongoing military campaign against al Qaeda, the Taliban regime, and their affiliates and supporters in Afghanistan. During the execution of this campaign, the U.S. Armed Forces and allied forces have detained thousands of individuals believed to be members or supporters of either al Qaeda or the Taliban. Since military operations began in Afghanistan, the United States has screened and released many individuals. A small percentage of the total number of individuals captured by the United States or transferred to United States control are or have been held at the BTIF. The detention of these

3

unlawful enemy combatants prevents them from returning to the battlefield and denies

the enemy the fighters needed to conduct further attacks and perpetrate hostilities against

innocent civilians, U.S. and coalition forces, and the Government of Afghanistan. The

United States also gathers important intelligence from the unlawful enemy combatants

during their detention, which in turn enables the United States to prevent future attacks.

10.  DoD has registered individuals held under its control at the BTIF with the

National Detainee Reporting Center ("NDRC") -- which accounts for persons who

receive Internment Serial Numbers issued by the U.S. Department of Defense while in

DoD's custody -- and with the International Committee of the Red Cross ("ICRC"). The

ICRC has regular access to this facility and conducts private interviews with detainees.

Additionally, representatives of the Government of Afghanistan have access to Afghan

detainees at the BTIF.

### Assessment of Enemy Combatants in Afghanistan

11.  Detainees under DoD control in Afghanistan are subject to a review process

that validates whether an individual is an unlawful enemy combatant. Status as an enemy

combatant is usually initially determined at the initial point of DoD control.

12.  By direction of the Secretary of Defense, within 90 days of a detainee being

brought under DoD control, the detaining combatant commander, or his designee, shall

review the initial enemy combatant determination made in the field. This review is based

on all relevant information reasonably available on the date of the review and may be

subject to further review based upon newly discovered evidence or information. If

necessary for a proper review, the detaining combatant commander, or his designee, may

interview reasonably available witnesses, provided that such interviews would not affect

4

combat, intelligence gathering, law enforcement, or support operations. The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. After the initial 90-day status review, the detaining combatant commander, or his designee, is required, on an annual basis, to reassess the status of each detainee. If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released.

13. In Afghanistan, this review process is conducted by the Commanding General, CJTF-101, under the authority delegated by the Secretary of Defense through the combatant commander. Barring operational requirements, the detainee is notified of the general basis of his detention within the first two weeks of in-processing into the BTIF. As noted above, Secretary of Defense guidance requires a review of the detainee's enemy combatant status by the 90-day point and annually thereafter. At the BTIF, however, such reviews are usually conducted within 75 days of a detainee being in-processed into the BTIF, and every six months thereafter. CJTF-101 is responsible for establishing the Unlawful Enemy Combatant Review Board ("UECRB") to accomplish these reviews.[1] The UECRB is a panel of three commissioned officers who evaluate the detainees' status and make a recommendation by majority vote to the Commanding General, CJTF-101, or his designee, as to the detainees' status. UECRB recommendations are based on information derived from a variety of sources, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee. Detainees who are being screened for the first time have

---

[1] The Board was previously known as the Enemy Combatant Review Board.

the opportunity to make a written statement, and since April 2008 have the opportunity to appear before the board.  Detainees are also given the opportunity to make new written statements for each subsequent six-month review.  The specific implementing guidance for the UECRBs is classified, as are the documents prepared regarding the UECRB's evaluations of the detainees' status.

### The Release and Transfer of Unlawful Enemy Combatants at the BTIF

14.  Even if an individual is determined to be an unlawful enemy combatant following the reviews discussed above, there are several other ways in which DoD could relinquish custody and control of the detainee.

15.  The Government of Afghanistan sponsors a national reconciliation program designed to allow Afghan combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives in Afghan society.  The UECRB process described above nominates Afghan detainees from the BTIF for entry into the reconciliation program.  Once nominated, individuals are vetted and selected by a Government of Afghanistan commission for return to their village elders and reintegration into Afghan society.  After DoD releases detainees to the custody of the Government of Afghanistan for participation in this program, the United States no longer exercises any custody or control over these former detainees.

16.  In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, a significant percentage of the Afghan detainees at the BTIF is expected to be transferred to the Government of Afghanistan.  The United States funded the renovation of an Afghan prison, known as the Afghan National Detention Facility.  The United States also provides other assistance to the Government of

Afghanistan regarding the operation of this detention facility, both to facilitate these transfers and to ensure an Afghan detention capability that meets international standards. The detention facility is owned and operated by the Government of Afghanistan.

17.  Under certain circumstances, the detaining combatant commander is authorized by the Secretary of Defense to transfer certain unlawful enemy combatants (including citizens of Afghanistan) from the BITF to their home countries.  The criteria and procedures for that program are classified.  Following the release of these individuals to their home countries, the United States no longer exercises any custody or control over these former detainees.

18.  Some Afghan detainees and detainees who are nationals of third countries are expected to remain in DoD custody, subject to periodic administrative review, until such time that they are no longer deemed to pose a threat to the United States, coalition forces, or the Government of Afghanistan.

### Petitioner Haji Wazir

19.  Our records reflect that we are currently detaining at the BTIF a Afghan citizen whose name is the same as or closely similar to Petitioner's name and whose father's name is the same as or closely similar to the name of Petitioner's father.

20.  The detainee was captured in Karachi, Pakistan.  The UECRB last reviewed his unlawful enemy combatant status on July 17, 2008.  Following that review, his status as an unlawful enemy combatant was validated by the Commanding General, CJTF-101, or his designee.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___3___ October 2008.

CHARLES A. TENNISON
Colonel, U.S. Army
Commander, Task Force Guardian
Commander of Detention
Operations, Combined / Joint Task
Force-101

**Exhibit A to Tennison Declaration**

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

ACCOMMODATION CONSIGNMENT AGREEMENT

FOR LANDS AND FACILITIES AT

BAGRAM AIRFIELD

BETWEEN

THE ISLAMIC REPUBLIC OF AFGHANISTAN

REPRESENTED BY

HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE

AND

THE UNITED STATES OF AMERICA

This **ACCOMMODATION CONSIGNMENT AGREEMENT** made and entered into this 28th day of September 2006, by and between **THE ISLAMIC REPUBLIC OF AFGHANISTAN, REPRESENTED BY HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK, MINISTER OF DEFENSE, OF THE OFFICE OF THE MINISTRY OF DEFENSE**, hereinafter referred to as the **HOST NATION**, and The **UNITED STATES OF AMERICA**, hereinafter referred to as the **LESSEE**, or the **UNITED STATES**:

WITNESSETH THAT:

**WHEREAS:** The **UNITED STATES** and the **HOST NATION**, hereinafter referred to jointly as the **PARTIES**, wish to enter into an Accommodation Consignment Agreement, hereinafter referred to as the Agreement, whereby the **HOST NATION** consigns all facilities and land located at **BAGRAM AIRFIELD, PARWAN** owned by the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, for use by the **UNITED STATES** and Coalition Forces for military purposes; and,

**WHEREAS:** The **MINISTER OF DEFENSE**, is the bona fide representatives of the **HOST NATION** for all Real Estate matters legal or otherwise pertaining to or occurring at **PARWAN PROVINCE;** and has authority to execute Real Estate documents on behalf of **THE ISLAMIC REPUBLIC OF AFGHANISTAN;** and

**WHEREAS:** The **PARTIES** further desire that all previous Real Estate and use agreements at **PARWAN PROVINCE**, between the **UNITED STATES** and the **HOST NATION**, or **PARWAN PROVINCE, or PRIVATE INDIVIDUALS, or OTHERS**, will be terminated upon the execution of this Agreement by both **PARTIES**.

**NOW THEREFORE**, in accordance with the desires of the **PARTIES** and in consideration of the mutual benefits to be derived therefrom, the **PARTIES** hereto mutually covenant and agree as follows:

1. The **HOST NATION** hereby consigns to the **UNITED STATES** to have and to hold for the exclusive use of the **UNITED STATES** Forces land, facilities, and appurtances currently owned by or otherwise under the control of the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, at **PARWAN PROVINCE**, hereinafter referred to as "the Premises" described as: One parcel

HN_____

US_____

**PARWAN PROVINCE**

DACA-AED-5-06-6559
BAGRAM AIRFIELD

of land containing approximately 8082 jeribs (approximately 16,164,248 square meters) located within PARWAN Province, Afghanistan, and more particularly described as located within the following grid coordinates:

42SWD2165165842
42SWD2220765799
42SWD2285465102
42SWD2297564547
42SWD2297263721
42SWD2301863125
42SWD2309363085
42SWD2371563710
42SWD2437965919
42SWD2506864666
42SWD2653864898
42SWD2787565943
42SWD2722267302
42SWD2561568407
42SWD2587668650
42SWD2575668797
42SWD2609869452
42SWD2573668823
42SWD2549369261
42SWD2482269430
42SWD2481868906
42SWD2441469060
42SWD2420468236
42SWD2356868275
42SWD2265766138
42SWD2240365893
42SWD2274064648
42SWD2371364596
42SWD2384764764
42SWD2382964921
42SWD2275065491
42SWD2257165535
42SWD2248166374
42SWD2311267244
42SWD2430968936
42SWD2669664709
42SWD2701864970
42SWD2369868338

as shown in purple in Exhibit "A", attached hereto and made a part of this agreement, to be used for LESSEE'S purposes.

2. The **UNITED STATES** shall have the right to assign this agreement to a successor nation or organization. This agreement in its entirety shall apply to the **UNITED STATES** and the successor nations or organizations, hereinafter referred to as "the Successor."

3. The **UNITED STATES** shall have the right to enter into a Lease or Local Administrative Agreement with successor nations or organizations for any and all fixtures, additions, alterations, improvements, or structures owned by the **UNITED STATES** and located on the property which is the subject of this agreement.

4. The term of this Agreement shall commence the earlier the date of execution by the **HOST NATION**, or 31 days from the date of this Agreement and shall continue until the **UNITED STATES** or its successors determine that the Premises are no longer required for its use.

HN_____

US_____

**PARWAN PROVINCE**

DACA-AED-5-06-6559
BAGRAM AIRFIELD

5. The **HOST NATION** makes the Premises available to the **UNITED STATES** without rental or any other consideration for use of the Premises.

6. The **UNITED STATES** shall be responsible for obtaining and making payment of all other charges for utilities and services it deems necessary to its operations. including but not limited to heat, electricity, hot water, refuse collection, annual cleaning and adjustment of heating systems. Arrangements and payments of utilities and services used shall be made by separate contract.

7. The **UNITED STATES** shall have the right, during the existence of this Agreement, to make alterations and additions, including, but not limited to grade, condition, installing drainage facilities, place gravel or hard stand, attach fixtures, erect improvements and structures or signs, and remove all obstructions which may constitute a hindrance, in or upon the Premises. Any such fixtures, additions, alterations, improvements or structures. so placed in upon or attached to the said Premises, shall remain the property of the **UNITED STATES** and, at the option of the **UNITED STATES**, may be left in place, removed or otherwise disposed of by the **UNITED STATES**, except as otherwise directed in this Agreement. If the **UNITED STATES** elects to leave in place any or all of the said additions, fixtures, structures or improvements, it shall have no further obligation with respect to restoration of any of the Premises to the previous condition. Any such fixtures, structures or improvements abandoned by the **UNITED STATES** shall become the property of the **HOST NATION**.

8. The **MINISTER OF DEFENSE** hereby warrants and guarantees that the **HOST NATION** is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises. The **HOST NATION** will hold the **UNITED STATES** harmless against any claim arising out of the **UNITED STATES'** possession of land encompassed by the Premises. Any person that brings a claim for possession of land encompassed by the Premises will be directed to the **HOST NATION** through the **MINISTRY OF DEFENSE** or its representative. who shall process the claim and make a decision to accept the claim or deny the claim, whichever the **HOST NATION** deems appropriate. In cases where the **HOST NATION** makes a decision to honor the claim, the **HOST NATION** is responsible for payment. While **HOST NATION** adjudicates any claim by any third party, **HOST NATION**, authorizes the **UNITED STATES** to continue to with operations and maintain exclusive control of the area described in this Agreement

9. The **HOST NATION** covenants and warrants that the **UNITED STATES** shall have exclusive, peaceable. undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The **UNITED STATES** shall hold and enjoy the Premises during the period of this agreement without any interruption whatsoever by the **HOST NATION** or its agents.

10. Any notice under the terms of this consignment agreement, including by the **UNITED STATES** to give notice of its intent to terminate the Agreement, shall be in writing signed by a duly authorized representative of the party giving such notice, and if given by the **UNITED STATES**, or the Successor in possession, a copy shall be addressed to:

**HE GENERAL ABDUL RAHIM WARDAK**
**MINISTER OF DEFENSE**
**OF THE OFFICE OF THE MINISTRY OF DEFENSE**
**THE ISLAMIC REPUBLIC OF AFGHANISTAN**
**KABUL, AFGHANISTAN**

and if given by the **HOST NATION**, shall be addressed to:

**ATTN: CREST**                                           **U. S. ARMY CORPS OF ENGINEERS**
**CJTF76 CJ7**                                            **SAVANNAH DISTRICT**
**BAGRAM AIRFIELD, AFGHANISTAN**      or,     **ATTN: SASRE**
                                                                        **100 WEST OGLETHORPE STREET**
                                                                        **P.O. BOX 889**
                                                                        **SAVANNAH, GEORGIA  31402-0889**

HN_____

US _____

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

11. The **UNITED STATES** or the Successor in possession of the Premises shall have the right to terminate this agreement in whole or in part by providing **HOST NATION** written notice of its intent. If the Agreement is terminated in part, the terms and conditions of the Agreement remain in full force and effect for the remaining Premises.

12. If any Successor elects to terminate this Agreement, in whole or in part, during its use of the Premises, the **UNITED STATES** shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use of the surrendered Premises to the **HOST NATION**. The **UNITED STATES** shall have use of the surrendered Premises on the date of its notice to the **HOST NATION**. If the **UNITED STATES** does not provide said notice, the surrendered Premises shall revert to the possession of the **HOST NATION**.

13. This Agreement supersedes all previous agreements between the **UNITED STATES** and **HOST NATION** for the use of Bagram Airfield, including, but not limited to Accommodation Consignment Agreement numbered DACA-AED-5-06-472 dated 30 AUGUST 2006.

14. This Agreement is executed in English. A courtesy translation may be furnished to the **HOST NATION**. In the event of inconsistency between any terms and conditions of this Agreement and its translation, the English language version shall have precedence and control.

IN WITNESS WHEREOF, the **PARTIES** hereto have hereunto subscribed their names.

FOR THE ISLAMIC REPUBLIC OF AFGHANISTAN:

Witness: _____

HE GENERAL ABDUL RAHIM WARDAK        (DATE)
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
KABUL, AFGHANISTAN


AND


FOR THE UNITED STATES OF AMERICA:

9-26-2006        Witness: _____

CHRISTOPHER D. DIRR        (DATE)
REALTY CONTRACTING OFFICER
CONTINGENCY REAL ESTATE SUPPORT TEAM (CREST)
PURSUANT TO AUTHORITY GRANTED BY THE SECRETARY OF THE ARMY
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN
DSN: (318) 231-2925


HN____
US____

# Reference Map: Bagram



Afghanistan 1:1,000,000

Orientation Map

**Projected Coordinate System:**
WGS 1984 UTM Zone 42N
Projection: Transverse Mercator
False Easting: 500000.00000000
False Northing: 0.00000000
Central Meridian: 69.00000000
Scale Factor: 0.99960000
Latitude Of Origin: 0.00000000
Linear Unit: Meter
Geographic Coordinate System:
GCS WGS 1984
Datum: WGS 1984
Prime Meridian: 0
Angular Unit: Degree
Source Data: CJ7 Database

**Legend**

**Cities**
**Classification**
☆ National Capital
◉ Province Capital
○ District Center
● Major City

**Road Infrastructure**
**Road Class**
▬▬ National Highway
▬▬ Primary Road
▬▬ Secondary Road
- - - Tertiary Road

**1:1,000,000**

N
W    E
S

0   12.5   25      50      75      100
Kilometers

**Reference Map**

Produced On 25SEP06

**Exhibit 2**

## CERTIFICATION OF TRUE COPY

Transitional Islamic State of Afghanistan  )
                                             )
City and Province of Kabul            )  ss:
                                             )
Embassy of the United States of America  )

       I certify that the annexed document is a true and faithful copy of the original, and that it has been carefully examined by me, compared with said original, and found to agree with it word for word and figure for figure.

       The original was delivered to the Ministry of Foreign Affairs of the Transitional Islamic State of Afghanistan on September 26, 2002.



Amber M. Baskette

Consul of the United States of America

November 14, 2002



*Embassy of the United States of America*

# *DIPLOMATIC NOTE*

No. 202

The Embassy of the United States of America presents it compliments to the Ministry of Foreign Affairs of the Islamic Transitional Government of Afghanistan, and has the honor to refer to discussions between representatives of our two governments regarding issues related to United States military and civilian personnel of the United States Department of Defense who may be present in Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and civic assistance, military training and exercises, and other activities.

The Embassy proposes, without prejudice to the conduct of ongoing military operations by the United States, that such personnel be accorded a status equivalent to that accorded to the administrative and technical staff of the Embassy of the United States of America under the Vienna Convention on Diplomatic Relations of April 18, 1961; that United States personnel be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, driving licenses or permits issued by the appropriate United States authorities to United States personnel for the operation of vehicles; and that such personnel be authorized to wear uniforms while performing official duties and to carry weapons when their orders call for it.

The Embassy further proposes that vehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan; however, the United States armed forces shall pay reasonable charges for services requested and received. Aircraft and vehicles of the United States shall be free of inspections.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel shall not be liable to pay any tax or similar charge assessed within Afghanistan.

The Government of the United States of America, its military and civilian personnel, contractors and contractor personnel may import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training or services required to implement this agreement. Such importation, exportation and use shall be exempt from any inspection, license, other restrictions, customs duties, taxes or any other charges assessed within Afghanistan. The governments of the United States of America and Afghanistan shall cooperate in taking such steps as shall be necessary to ensure the security of United States personnel and property in Afghanistan.

In the event that the government of the United States of America awards contracts for the acquisition of articles and services, including construction, such contracts shall be awarded in accordance with the laws and regulations of the Government of the United States of America. Acquisition of articles and services in the republic of Afghanistan by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes, customs duties or similar charges in Afghanistan.

The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

The Government of Afghanistan recognizes that it shall be necessary for United States personnel and systems to use the radio spectrum. The United States Government shall be allowed to operate its own telecommunication systems (as telecommunication is defined in the 1992 Constitution of the International Telecommunication Union). This shall include the right to utilize such means and services as required to assure full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of radio spectrum shall be free of cost.

Finally, the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to, or loss or destruction of, property owned by each party, or death or injury to any military or civilian personnel of the armed forces of either party, arising out of activities in Afghanistan under this agreement. Claims by third parties arising out of the acts or omissions of any United States personnel may, at the discretion of the United States Government, be dealt with and settled by the United States Government in accordance with United States law.

If the foregoing is acceptable to the Government of Afghanistan, the Embassy proposes that this note, together with the Ministry's reply to that effect, shall constitute an agreement between the two governments which shall enter into force on the date of the Ministry's reply.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan the assurances of its highest consideration.

Embassy of the United States of America

Kabul. September 26, 2002



Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

America and Canada Political Affairs Division                Document No. 93
                                                            Date: May 28, 2003

To the Embassy of the United States of America in Kabul:

Pursuant to Note No. 791, dated December 12, 2002, regarding the conclusion of an agreement for application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States Department of Defense present in Afghanistan for the useful campaign against terrorism, humanitarian assistance, and other activities, the Ministry of Foreign Affairs declares its concurrence with the terms of Note No. 202, dated September 26, 2002, which reads as follows.

(The Embassy of the United States of America without prejudice to the ongoing military operations by the United States, proposes that such personnel be given the status equivalent to the one given to the administrative and technical staff of the United States Embassy under the Vienna Convention on Diplomatic Relations of April 18, 1961; that the personnel of the United States be permitted to enter and exit Afghanistan with United States identification and with collective movement or individual travel orders; that Afghan authorities shall accept as valid, without a driving fee or test, the licenses and permits issued by the appropriate authorities of the United States to the personnel of the United States for operating vehicles; and that while performing official duties, the personnel should be authorized to wear uniforms and carry weapons when needed.

The Embassy also proposes that vehicles and airplanes owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan. However, the United States armed forces shall pay reasonable charges for service requested or received. US planes and vehicles of the United States shall be free of inspection.

The Government of the United States, its military and civilian personnel, contractors and contractor personnel shall not be liable for any kind of tax or other similar fees assessed within Afghanistan.

The Government of the United States, its military and civilian personnel, contractors and contractors personnel may import and export any personal property, equipment, supplies, materials, technology, training services that are required for the implementation of this agreement and use them in Afghanistan. Such importation, exportation and use should be exempt from any inspection, license, other limitations, tariffs or any other rental charges assessed in Afghanistan. If necessary, the Governments

of the United States and Afghanistan shall cooperate for takings steps to ensure the security of the United States personnel and property in Afghanistan.

If at any time the Government of the United States of America awards contracts to acquire materials and services, including construction, they should be awarded in accordance with the law and regulations of the Government of the United States. The acquisition of material and services in Afghanistan by the Government of the United States of America or on its behalf in implementation of this agreement shall not be subject to any taxes, tariffs or similar charges in Afghanistan.

The government of Afghanistan recognizes the particular importance of disciplinary control by the United States military authorities over United States personnel and the Government of Afghanistan authorizes the United States of America to exercise its criminal jurisdiction over the personnel of the United States. The Government of Afghanistan and the Government of the United States confirms that without the explicit consent of the Government of the United States, such personnel may not be surrendered to, or otherwise transferred to the custody of an international tribunal or any other entity or State.

The Government of Afghanistan recognizes the right of use of the radio spectrum for the personnel and systems of the United States. The United States shall be allowed to operate its own telecommunication systems (as defined in the constitution of the International Telecommunication Union). This shall include the right to use such means and services as required, assuring full ability to operate telecommunication systems, and the right to use all necessary radio spectrum for this purpose. Use of the radio spectrum shall be free of cost.

Finally the Embassy proposes that, other than contractual claims, the parties waive any and all claims against each other for damage to or loss or destruction of property owned by either party, or death or injury to any military or civilian personnel of the armed forces of either party, as a result of activities in Afghanistan under this agreement. Claims by third parties that will arise as a result of the actions or omissions of United States personnel should, at the discretion of the United States Government, be dealt with and settled in accordance with United States law).

With reference to the content of the above Note of the esteemed Embassy, the Ministry of Foreign Affairs declares that this document shall enter into force upon signature.

Respectfully,

[Signature]

Doctor Abdullah
Minister of Foreign Affairs of the
Transitional Islamic State of Afghanistan

Transitional Islamic State of Afghanistan
Ministry of Foreign Affairs

[SEAL]

Fifth Political Department

Document No. 791
Date: December 12, 2002

---

**Note**

The Ministry of Foreign Affairs of the Transitional Islamic Government of Afghanistan respectfully informs the Embassy of the United States of America:

Following the negotiations between the Honorable Minister of Foreign Affairs and the American side that took place in Washington, the Ministry of Foreign Affairs declares its concurrence with the content of Note No. 202 dated, September 26, 2002, of the esteemed Embassy regarding the application of the provisions of the 1961 Vienna Convention to the civilian and military personnel of the United States of America.

The Ministry of Foreign Affairs avails itself of this opportunity to reiterate the assurances of its consideration.

[Stamp of the Ministry of Foreign Affairs]

To the Embassy of the United States of America in Kabul