## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------x

HAJI WAZIR, )
    Detainee, )
    United States Air Base at )
    Bagram, Afghanistan; and )
     )
MOHAMMAD SHARIF, )
    As the Next Friend of HAJI WAZIR, )
     )       1:06-CV-01697   (RBW)
    Petitioners/Plaintiffs, )
     )    ORAL ARGUMENT SCHEDULED
v. )    FOR DECEMBER 18, 2008
     )
ROBERT GATES, )
    Secretary of Defense )
    U.S. Department of Defense )
    1000 Defense Pentagon )
    Washington, D.C.  20301-1000; )
     )
JOHN DOE 1, )
    Custodian of Petitioner; and )
     )
JOHN DOE 2, )
    Custodian of Petitioner, )
     )
    Respondents/Defendants. )
     )
Respondents are all sued in their official )
capacities. )

-----------------------------------------------------------------x

## PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO DISMISS
## FOR LACK OF JURISDICTION

## Table of Contents

**Preliminary Statement**.................................................................................................... 1

**Statement of Facts**....................................................................................................... 5
  A.   Petitioner Haji Wazir ...................................................................................... 5
  B.   Bagram Air Base............................................................................................... 7

**Legal Background** ........................................................................................................ 9
  A.   The *Boumediene v. Bush* Decision.............................................................. 13

**ARGUMENT** ............................................................................................................... 14

**I.   PETITIONER IS ENTITLED TO DISCOVERY AND A JUDICIAL
     DETERMINATION OF THE CONTESTED LEGALLY SIGNIFICANT
     JURISDICTIONAL FACTS     14**

**II.  THIS COURT HAS JURISDICTION TO HEAR PETITIONER'S CHALLENGE TO
     THE LEGALITY OF HIS DETENTION  16**
  A.   The Court Has Jurisdiction under 28 U.S.C. §2241 .................................... 16
  B.   Both Article III and the Suspension Clause Protect Petitioner's Right to Habeas
       Corpus Review of the Lawfulness of His Detention .................................... 20
  C.   Section 7 of the MCA Does Not Apply to this Action ................................ 29

**III. *BOUMEDIENE* MAKES CLEAR THAT JURISDICTION LIES WITH THIS COURT
     AND THAT PETITIONER MAY INVOKE THE WRIT     31**
  A.   Consideration of the *Boumediene* "Status and Process" Factor Supports Petitioner's
       Contention.................................................................................................... 32
  B.   The U.S. Government has Exclusive Jurisdiction and Control over Bagram............. 42
  C.   There Are No Practical Obstacles Inherent in Providing Mr. Wazir with Access to a
       Neutral Tribunal to Hear His Petition....................................................... 51

**IV. THE U.S. GOVERNMENT HAS VIOLATED PETITIONER'S CONSTITUTIONAL,
     STATUTORY, AND INTERNATIONAL RIGHTS  55**
  A.   Petitioner's Seizure and Detention Violates the Rule of Law .................... 55
  B.   Petitioner's Seizure and Imprisonment Violates the Due Process Clause................. 56
  C.   Respondents' Detention of Petitioner Violates International Law ............................ 59

**Conclusion** .................................................................................................................. 62

## Table of Authorities

### CASES

*Bell v. Hood*, 327 U.S. 678 (1946)........................................................................................ 11

*Boumediene v. Bush,* 128 S. Ct. 2229  (2008) ................................................................. passim

*BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp.2d 73 (D.D.C. 2003)................................. 15

*Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814)........................................................... 27

*Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344 (K.B.).................................................. 27

*Chicago v. Morales,* 527 U.S. 41 (1999) .................................................................................. 37

*Darnel's Case* (1627) 3 How. St. Tr. 1 (K.B.)............................................................................. 2

*Dorr v. United States*, 195 U.S. 138 (1904)............................................................................. 23

*Downes v. Bidwell*, 182 U.S. 244 (1901) ................................................................................. 23

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)............................. 15

*England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411 (1964) .................................................. 21

*Ex parte Bollman*, 8 U.S. 75 (1807).......................................................................................... 25

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) .......................................................................... 56

*Felker v. Turpin*, 518 U.S. 651 (1996) ...................................................................................... 26

*Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980) ............................................................... 61

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ................................................................................. 56

*Fuentes v. Shevin*, 407 U.S. 67 (1972)...................................................................................... 56

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987). .................................................................. 15

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ............................................................. 9, 12, 13, 29

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................................ passim

*Head-Money Cases*, 112 US. 580 (1884) .................................................................................. 62

*Heller v. Doe*, 509 U.S. 312 (1993) .......................................................................................... 59

*Ignatiev v. United States*, 238 F.3d 464 (D.C. Cir. 2001)........................................................ 15

*In re Estate of Ferdinand Marcos*, 25 F.3d 1467 (9th Cir. 1994)............................................... 61

*In re Guantanamo Detainees*, 355 F. Supp. 2d 453 (D.D.C. 2005) ......................... 11, 12, 15, 57

*In re Yamashita*, 327 U.S. 1 (1946) .......................................................................... 29, 38, 39

*INS v. St. Cyr*, 533 U.S. 289 (2001)...................................................................... 17, 25, 26, 30

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)........................................................... 17, 34, 38

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)......................................................................... 61

*Kelo v. City of New London*, 545 U.S. 469 (2005) .................................................................... 25

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) ............................................................... 12

*King v. Schiever*, (1759) 97 Eng. Rep. 551 (K.B.) ................................................................... 27

*Ludecke v. Watkins*, 335 U.S. 160 (1948)................................................................................. 28

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003)........................................................ 15

*Martinez v. Los Angeles*, 141 F.3d 1373 (9th Cir. 1998)........................................................... 36

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...................................................................................... 27

*Munaf v. Geren*, 128 S. Ct. 2207 (2008).................................................................................... 19

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855) ........... 57

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ................................... 20

*Nixon v. United States*, 506 U.S. 224 (1993)............................................................................. 55

*Owing v. Norwood's Lesse*, 9 U.S. (5 Cranch) 344 (1809) ....................................................... 59

*Panetti v. Quarterman*, 127 S. Ct. 2842 (2007)........................................................................ 56

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)......................... 15

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)............................................................. 20, 21
*Plyler v. Doe*, 457 U.S. 202 (1982)........................................................................................ 27
*Prakash v. American University*, 727 F.2d 1174 (D.C. Cir. 1984)........................................... 15
*Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002) ................................................................. 15
*Rasul v. Bush*, 542 U.S. 466 (2004)................................................................................... passim
*Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D.N.Mar.I. 1999)................................................ 23
*Reynolds v. United States*, 98 U.S. 145 (1879)....................................................................... 23
*Robertson v. Baldwin*, 165 U.S. 275 (1897) .......................................................................... 57
*Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006)............................................................... 27
*Sommersett v. Stewart*, (1772) 20 How. St. Tr. 1 (K.B.) ....................................................... 27
*Sosa v. Alvarez Machain*, 542 U.S. 692 (2004) ................................................................ 60, 61
*Springville v. Thomas*, 166 U.S. 707 (1897).......................................................................... 23
*St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936)............................................ 20
*The Pacquette Habana*, 175 U.S. 677 (1900) ........................................................................ 59
*Torres v. Puerto Rico*, 442 U.S. 465 (1979) .......................................................................... 23
*Torres v. Sablan*, 528 U.S. 1110 (2000) ............................................................................... 23
*U.S. ex rel. Bradley v. Watkins,* 163 F.2d 328 (2d Cir. 1947) ............................................... 28
*U.S. ex rel. Sommerkamp v. Zimmerman*, 178 F.2d 645 (3d Cir. 1949)................................... 29
*United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116 (2d Cir. 1949)................................ 28
*United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952)........................................... 27, 28
*United States ex rel. Ludwig v. Watkins*, 164 F.2d 456 (2d Cir. 1947) ................................... 28
*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004)............................... 15
*United States ex rel. von Heymann v. Watkins*, 159 F.2d 650 (2d Cir. 1947) ........................... 28
*United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871) ........................................................... 21
*United States v. Pink*, 315 US. 203 (1942) .......................................................................... 62
*United States v. Raddatz*, 447 U.S. 667 (1980) ..................................................................... 21
*United States v. Rauscher*, 119 US. 407 (1886) .................................................................... 62
*United States v. Robel,* 389 U.S. 258 (1967) ......................................................................... 56
*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................................ 23
*Von Moltke v. Gillies*, 332 U.S. 708 (1948)........................................................................... 29
*Vuolanne v. Finland*, No. 265/1987, U.N. Humans Rts. Comm. Communication No. 25/1987,
 ¶9.6, U.N. Doc. CCPR/C/35/D/265/1987 (1989) ............................................................. 61
*Warren v. Dist. of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ................................................. 15
*Wilson v. Izard*, 30 F. Cas. 131 (C.C.D.N.Y. 1815) (No. 17,810)............................................. 28
*Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887 (S.D.N.Y. 2002) ....................................... 61
*Wong Wing v. United States*, 163 U.S. 228 (1896).................................................................. 27
*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995).......................................................... 61
*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................................ 27

## STATUTES

Act of July 6, 1798, ch. 66, § 1, 1 Stat. 577 (1798) ................................................................ 27
Authorization for the Use of Military Force, 115 Stat. 224 (2001). ...................................... 33, 57
Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680, 2739-2744 (2005)......... 12, 14, 17
Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 .......................... passim

## RULES

Federal Rule of Civil Procedure 12 ................................................................................ 14, 15
Federal Rule of Civil Procedure 81(a). ................................................................................ 14

## TREATISES

Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt. h (1987) ..... 36

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. III ............................................................................................................ passim
U.S. Const. Art. VI, §2 .......................................................................................................... 59

## INTERNATIONAL LAWS AND TREATIES

Agreement and Exchanges of Notes Between the United States of America and Great Britain
    Respecting Leased Naval and Air Bases, art. IV, Mar. 27, 1941, 55 Stat. 1560 ..................... 47
Geneva Convention Relative to the Treatment of Prisoners of War, Art. 3, Aug. 12, 1949, 6
    U.S.T. 3316 ................................................................................................................ 13, 58
International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, 999
    U.N.T.S. 171 ........................................................................................................................ 61
Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-Cuba, art. I ............... 44
Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III T.S. No. 418
    .............................................................................................................................................. 43
Protocol Additional to the Geneva Conventions of 12 Aug., 1949, and Relating to the Protection
    of Victims of Int'l Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 603 .................................. 33
Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No.
    866 ....................................................................................................................................... 44
United Nations Body of Principles for the Protection of All Persons under Any Form of
    Detention or Imprisonment, adopted by the General Assembly by Resolution 43/173 G.A. Res.
    173, U.N. GAOR, 43rd Sess., Supp. No. 49, U.N. Doc. A/43/49 (1988) ............................... 60

## EXECUTIVE AUTHORITIES

Dep't of Def. Mem., Combatant Status Review Tribunal Process at Guantanamo (Jul. 2007) .. 40,
    41
Dep't of Def. Mem., Implementation of Combatant Status Review Tribunals for Enemy
    Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba (July 14, 2004) ............... 36
Dep't of Def. Memorandum, Implementation of Administrative Review Procedures for Enemy
    Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Sept. 14, 2004 ............... 37
Exec. Order No. 10,0144, 15 Fed. Reg. 4705 (July 21, 1950) ............................................... 51
Mem. to the Sec'y of the Navy from Paul Wolfowitz, Deputy Secretary of Defense (July 7,
    2004) ....................................................................................................................... 11, 30, 57

## OTHER AUTHORITIES

*$35 Million for Bagram AB Power Plant*, Defense Industry Daily (Aug. 4, 2008) ..................... 48
Henckaerts & Doswald-Beck, 1 *Customary International Humanitarian Law* 11 (2005) ........... 58
152 Cong. Rec. S10270 (daily ed. Sept. 27, 2006) ................................................................ 25
152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006) ................................................................ 24

152 Cong. Rec. S10404 (daily ed. Sept. 28, 2006) ...................................................... 25

3 *State Trials* 1098 (T.B. Howell ed. 1816) .................................................................... 2

Agreement on Control Machinery in Germany, adopted by the European Advisory Commission, art. 1, Nov. 14, 1944, 5 U.S.T. 2062 ...................................................... 50

Agreement on Military Exchanges and Visits between the Government of the United States of America and Mongolia, art. X, Jun. 26, 1996 .................................................... 47

Amnesty Int'l, No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo, AMR 51/163/2007 (2007) ............................................................. 32, 37

Army and Airforce Exchange Service, *Serving Troops Downrange* ....................................... 8, 48

Construction Services for Bulk Fuel Storage and Transfer System at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0054 (Apr. 25, 2008) ...................................................................... 48

Department of the Navy, *Commander's Handbook on the Law of Naval Operations* 11.3 (1995) ..................................................................................................................... 58

Diane P. Wood, *The Rule of Law in Times of Stress*, 70 U. Chi. L. Rev. 455 (2003) .................. 55

Environmental Conditions at Bagram Airfield Information for Health Care Providers (HCPs), June 2004 ................................................................................................... 47

Eric M. Freedman, *Hamdi and the Case of the Five Knights*, Legal Times, Feb. 3, 2003 ........... 16

Eric M. Freedman, *Lessons from Past Guide Future*, Newsday, June 17, 2008 ........................... 2

Fabric Aircraft Maintenance Hanger at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0052 (Apr. 29, 2008) ........................................... 48

Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien: A Case Missing from the Canon*, 9 Green Bag 2d 39 (2005) ............................................................. 27

Gerald L. Neuman, *The Habeas Corpus Suspension Clause After INS v. St. Cyr*, 33 Colum. Hum. Rts. L. Rev. 555 (2002) ...................................................................... 25

Human Rights First, *Arbitrary Justice: Trials of Bagram and Guantanamo Detainees in Afghanistan* (Apr. 2008) ................................................................................... 8

Installation Profile: U.S. Controlled Air Base in Bagram Equipped with Superior Essex Cable, 2008, Superior Essex Inc. ............................................................................ 48

International Committee of the Red Cross, *Afghanistan: Video Links Between Bagram Detainees and Families* (Jan. 14, 2008) ...................................................................... 48

Kent Harris, *Buildings Going up at Bagram Air Base as U.S. Forces Dig in for the Long Haul*, Stars and Stripes, Mar. 15, 2005 ............................................................. 48

M. Cherif Bassiouni, *Human Rights in the Context of Criminal Justice:  Identifying International Procedural Protections and Equivalent Protections in National Constitutions*, 3 Duke J. Comp. & Int'l L. 235 (1993) .......................................................... 60

Magna Carta ................................................................................................................ 3

Mark Denbeaux, *No-Hearing Hearings, CSRT: The Modern Habeas Corpus*? (Seton Hall Univ. Apr. 2, 2007) .......................................................................................... 32

Michael Schmitt, *Humanitarian Law and Direct Participation in Hostilities By Private Contractors or Civilian Employees*, 5 Chi. J. Int'l L. 511 (2005) ............................ 58

*New Bagram Hospital Offers State of the Art Care*, Air Force Print News Today (Feb. 9, 2007) ..................................................................................................... 48

Occupation Statute Defining the Powers To Be Retained by the Occupation Authorities, *reprinted in* Staff of S. Comm. On Foreign Relations, 92d Cong., *Documents on Germany, 1944-1971* (Comm. Print 1971) ....................................................... 51

Richard H. Fallon, *"The Rule of Law" as a Concept in Constitutional Discourse*, 97 Colum. L. Rev. 1 (1997) ............................................................................................................................. 55

Staff Sergeant Oshawn Jefferson, FET Keeps Bagram Improving, Growing, Air Force Print News Today, Dec. 4, 2007 ................................................................................................... 49

*Story, Commentaries on the Constitution of the United States,* § 1783 (1833) ........................... 57

Synopsis, Security Upgrades, Army Corps of Engineers Contracting ........................................ 48

*The Documentary History of the Ratification of the Constitution* (John P. Kaminski & Gaspare J. Saladino eds., 1990) .............................................................................................................. 25

The Federalist No. 47 (James Madison) .................................................................................... 56

The Federalist No. 83 (Alexander Hamilton) ............................................................................ 26

The Federalist No. 84 (Alexander Hamilton) ......................................................................... 3, 25

Thomas Paine, *Common Sense* (Philadelphia 1776) ..................................................................... 2

Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005 .......... 5

Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008 ... 7, 49

Tom Lasseter, *Day 2: U.S. Abuse of Detainees Was Routine at Afghanistan Bases*, McClatchy Newspapers, June 16, 2008 ....................................................................................................... 8

*U.S. Air Force Pamphlet* 110-31, § 5-3(a)(1)(c) (Nov. 19, 1976) ................................................ 58

William F. Duker, *A Constitutional History of Habeas Corpus* (1980) ....................................... 26

## Preliminary Statement

Petitioner Haji Wazir, acting through his Next Friend, his counsel, Mohammad Sharif, and by and through undersigned counsel, respectfully submits this Opposition to Respondents' Motion to Dismiss ("Resp't Mot.") the petition for a writ of habeas corpus for lack of subject matter jurisdiction. Petitioner Haji Wazir ("Mr. Wazir" or "Petitioner"), who has been imprisoned without charge or trial by Respondents in a U.S. military prison for more than six years, seeks the Great Writ.

Respondents maintain that Petitioner is not entitled to know the reason for his seizure, detention, repeated interrogations, and continued imprisonment because Respondents—in their sole discretion—have chosen to hold Mr. Wazir in the U.S. military prison located inside in Bagram Air Base, in Bagram, Afghanistan ("Bagram"), rather than in the military prison at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). Whatever argument Respondents *might have* relied upon more than six years ago to justify Petitioner's temporary detention in Bagram, they cannot now—after so much time has passed—insist that the *same unsupported* contention supports Mr. Wazir's continued detention without charge, access to counsel, trial, or due process of any sort. (Resp't Mot. at 3.) Respondents' view is that what they mislabel "separation of powers" permits them unilaterally to impose such a punishment without process, without appeal, and, as they have repeatedly stated, in the context of a war without end.[1] Respondents are dangerously mistaken. "Separation of powers" does not mean "concentration of powers." *See Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004). Contrary to Respondents' position, habeas corpus is not unconstitutional. The requirement that the Executive justify its imprisonments before a neutral judge is, like other aspects of our system of checks and balances,

---

[1] *See, e.g.*, Roger Cohen, *No Clear Victory, or End, to U.S. 'War on Terror'*, Int'l Herald Tribune, (Dec. 20, 2005), (Olshansky Decl., Ex.4); *Hamdi v. Rumsfeld*, 542 U.S. 507, 520 (2004) (plurality) ("war on terror" is "broad and malleable" and "'unlikely to end with a formal cease-fire agreement.'").

designed to implement the constitutional design of replacing a Government in which the King is Law[2] with one in which the Law is King.[3] *See Boumediene v. Bush*, 128 S. Ct. 2229, 2277 (2008).

This case involves the seizure and detention of an Afghan businessman in Karachi, Pakistan by U.S. forces, who then transported him to Afghanistan, placed him in Bagram Prison, and have held him in their custody there for more than six years. At issue is whether the Executive can create a modern-day Star Chamber, where it can label an individual an "enemy combatant" or "unlawful enemy combatant", deny him any meaningful ability to challenge that label, and on that basis, detain him indefinitely, virtually *incommunicado*, subject to interrogation and torture, without any right of redress. The English Parliament dissolved the original Star Chamber by the *Habeas Corpus Act of 1640, a*nd the U.S. Supreme Court has thrice-rejected Respondents' effort to build a modern-day Star Chamber in Guantánamo. Nevertheless, Respondents seek to revive their effort to create a prison beyond judicial scrutiny by arguing that habeas corpus does not extend to Bagram because they have deliberately located their Star Chamber in an airfield they contend is outside their "realm," for the express purpose of avoiding compliance with domestic civil, criminal, military, and international law.

Respondents' position is deeply at odds with the underlying legal and moral principles of American democracy as well as the historical grounding of habeas corpus in this country. The principle of ensuring people's freedom from arbitrary executive detention dates back to the

---

[2] In the "ship money" case, Charles I laid a defense tax, and John Hampden, a leader in the House of Commons, refused to pay it because Parliament had not authorized it. The Crown sued for the sum owed, and the twelve judges ruled in favor of the King. Concurring in the judgment, Sir Robert Berkeley stated: "I never read nor heard, that Lex was Rex, but it is common and most true, that Rex is Lex, for he is a lex loquens, a living, a speaking, an acting Law." *The Tryal of John Hambden Esq.* 131 (T. Salmon ed. 1719) *reprinted* in 3 *State Trials* 1098 (T.B. Howell ed. 1816). This judgment was one act in a drama that included Charles's assertion in *Darnel's Case* (1627) 3 How. St. Tr. 1 (K.B.), that he could simply invoke national security to preclude judicial review of detentions. *See Boumediene* Court's discussion of this case; Eric Freedman, *Lessons from Past Guide Future*, Newsday, June 17, 2008, at A 31.

[3] *See* T. Paine, *COMMON SENSE* 57 (Philadelphia 1776) ("[L]et a day be solemnly set apart for proclaiming the Charter; . . . that in America THE LAW IS KING.  For as in absolute Governments the King is Law, so in free Countries the law ought to be king; and there ought to be no other.")

writing of the Magna Carta.[4] It has not been limited territorially, and it remains one of the most fundamental tenets of the rule of law. Indeed, it was a primary concern of the Framers.[5] Yet Respondents' Orwellian argument is that this Court lacks the constitutional authority to lift the veil of secrecy surrounding Bagram and is precluded by the Constitution from fulfilling the judiciary's essential role as a check on Executive power.

Respondents' justification for denying Petitioner access to any forum in which he could challenge the legality of his detention is by now an all too familiar one:  Petitioner is not a U.S. citizen, and thus, Respondents allege, his imprisonment by the U.S. Government overseas cannot be challenged in this (or any) court of law.[6] However, Respondents' arguments that foreign nationals held outside of mainland U.S. territory lack any cognizable rights and are not entitled to invoke this Court's jurisdiction have already been expressly considered and rejected by the Supreme Court. In addition, Respondents' position finds no support in the statutory scheme enacted by Congress to regulate the Defense Department's treatment of alleged "enemy combatants."

Respondents contend alternatively that: (a) the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA"), precludes this Court from exercising jurisdiction under the federal habeas statute, 28 U.S.C. §§2241 *et seq.*; (b) the habeas statute does not extend to Bagram; (c) Petitioner Wazir has no statutory, constitutional, or a common law entitlement to the

---

[4] The Great Writ of habeas corpus descends from the Magna Carta signed by King John at Runnymede in 1215. *See* Art. 39 ("No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the laws of the land.").

[5] In *Federalist Paper No. 84*, Alexander Hamilton hails the writ of habeas corpus, saying "the practice of arbitrary imprisonments, [has] been, in all ages, [one of] the favorite and most formidable instruments of tyranny." *The Federalist No. 84*, at 435 (Alexander Hamilton) (Gary Wills ed., 1982). He goes on to quote "the judicious Blackstone," who wrote that punishment without accusation or trial "'. . . must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary Government.'"

[6] Respondents do not take the position that there is any other court that has jurisdiction to hear Petitioner's case. Indeed, it is hard to imagine how any other court could attempt to adjudicate the claims of Petitioner, who is being held *incommunicado*, without access to counsel, by U.S. forces in a U.S.-controlled military base.

writ; and (d) he is barred from enforcing any analogous international due process rights. For the following reasons, these arguments are legally untenable:

- This Court has jurisdiction to consider the Petition under the federal habeas statute, 28 U.S.C. §§2241 *et seq.* because the statute covers the Petitioner, *Rasul v. Bush*, 542 U.S. 466 (2004), and he *has not been determined* to be an "enemy combatant" by a "competent tribunal" as required by the MCA, the other arguably applicable statute;

- At minimum, this Court cannot decide whether Petitioner has been "determined by the United States to have been properly detained" as an "enemy combatant" without permitting him to take discovery regarding (1) the meaning of the term "enemy combatant" as it is used at Bagram, and (2) the operation, and personnel involved in the "Unlawful Enemy Combatant Review Board" process[7] allegedly used at Bagram as to which Respondents have made factual representations to this Court, *see Hamdi*, 542 U.S. at 535;

- To the extent MCA §7(a) is deemed to apply to this case, it violates the Suspension Clause of the Constitution because Congress neither properly suspended the writ nor provided for an adequate alternative remedy for Petitioner, *see Boumediene*, 128 S. Ct. at 2306; and

- Petitioner's imprisonment without even a modicum of due process violates the Constitution, international human rights law, the laws of war, and his common law rights.

It is important not to lose sight of the context in which this case is presented. Bagram is not a temporary holding camp, intended to house enemy soldiers apprehended on the battlefield, for the duration of a declared war, finite in time and space. On the contrary, the "war on terror," as conceived by Respondents, is unlimited in duration and global in scope. *Hamdi*, 542 U.S. at 520 (citing the Government's concession regarding the unconventional nature of the "war on terror"). Moreover, unlike the detention facilities at Guantánamo, Bagram is a *permanent* prison - one located, according to Respondents, in a lawless enclave. People seized from locations all over the world are brought to Bagram for whatever reasons Respondents may choose and are held there as long as Respondents may desire, while being subjected to whatever conditions of confinement and interrogation techniques Respondents may select. (Declaration of Jawed Ahmad, dated

---

[7] Declaration of Colonel Charles A. Tennison, dated October 3, 2008, ("Tennison Decl.") ¶¶11-20.

November 3, 2008 ("Ahmad Decl."), ¶¶5-20; Ex. 1 to the Declaration of Barbara Olshansky, dated November 3, 2008 ("Olshansky Decl.").) Indeed, Respondents have admitted that interrogators tortured and killed at least two prisoners at Bagram. Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005, (Olshansky Decl., Ex. 5.) But according to Respondents, their decisions are absolutely immune from judicial review. Petitioner respectfully urges the Court to reject that chilling proposition, deny Respondents' Motion to Dismiss, and issue the Great Writ.

## Statement of Facts

### A. Petitioner Haji Wazir

Petitioner Haji Wazir has been held in Respondents' unlawful custody at Bagram Prison for more than six years. Though he has committed no wrong, he has been held virtually *incommunicado* in U.S. military custody without lawful basis, without any legally cognizable charge, without access to counsel, and without access to any fair process by which he might challenge the legality of his detention. (Petition for a Writ of Habeas Corpus for Haji Wazir ("Pet."), ¶2; Declaration of Zaheerrullah, dated November 3, 2008 ("Zaheerrullah Decl."), ¶¶3-9, Olshansky Decl., Ex. 2.)

Petitioner Wazir is now approximately 50 years old; he has seven children, five sons and two daughters. (Zaheerrullah Decl. ¶2, Olshansky Decl., Ex. 2.) He is a citizen of Afghanistan. (Zaheerrullah Decl. ¶1, Olshansky Decl., Ex. 2.) Petitioner's son, Zaheerrullah, knew that his father was being detained by U.S. forces at Bagram Prison from 2002 through other family members. *Id.,* ¶7. Though Mr. Wazir's son has had the opportunity to speak with his father through the ICRC's videoconference system this year, Respondents do not permit detainees to explain the circumstances of their capture to their family members nor do they permit them access to counsel. (*See* Letter to Respondents' Counsel Jean Lin, dated October 13, 2008,

Olshansky Decl., Ex. 3.) However, while Petitioner Wazir has not been able to speak with his family or counsel about the circumstances of his seizure and detention, he *was* able to speak with Jawed Ahmad, a young Afghan journalist who was recently released from Bagram Prison. According to Mr. Ahmad—and Petitioner's family members who witnessed his seizure—Mr. Wazir was interdicted and taken into custody by U.S. forces in Dubai, United Arab Emirates. (Ahmad Decl. ¶31, Olshansky Decl., Ex. 1.) After his seizures by U.S. forces, Mr. Wazir promptly identified himself by correct name and nationality to the U.S. personnel questioning him, and then requested that the United States provide him with a means of access to his family and to legal counsel. (Pet. ¶20.) He was subsequently transported by the U.S. to Bagram Prison, *id.*, after first being taken to several other destinations. (Ahmad Decl. ¶31, Olshansky Decl., Ex. 1.) During the first six months of his detention, Mr. Wazir was "brutally tortured." (*Id.* ¶31.)

From the time of his transfer into Bagram Prison, Petitioner's only access to his family has been through the written correspondence delivered by the ICRC and brief monitored telephone calls with his family every two months or so. (*Id.* ¶36.) To this day, Respondents continue to deprive Petitioner with access to counsel, despite requests by counsel. (*See* Letter to Respondents' Counsel Jean Lin dated October 13, 2008, Olshansky Decl., Ex. 3.) Notwithstanding their refusal to allow counsel access to Petitioner, Respondents have authorized agents of the U.S. Departments of Defense and Justice to interrogate him on repeated occasions and continue to hold him *incommunicado*. (Pet. ¶25; Ahmad Decl. ¶35, Olshansky Decl., Ex. 1.) He has been denied his rights under all sources of domestic law as well as international law, including treaties such as the Geneva Conventions, and customary international law. (Pet. ¶25.)

Petitioner has never had the opportunity to relate any information to counsel that may be relevant to the Courts' consideration of the instant motion. Petitioner is not an "enemy combatant." (Pet. ¶¶29-33.) He has not received any fair process by which he has been

determined to be an "enemy combatant" and therefore he has not been properly detained as such. (Pet. ¶¶19-26.) Despite the having been denied due process of law, Petitioner has been imprisoned for more than six years at a detention facility where the conditions of confinement are significantly worse than those at Guantánamo. (*See, e.g.,* Ahmad Decl. ¶¶10-17, Olshansky Decl., Ex. 1.)

## B.  Bagram Air Base

Bagram Prison is not a transient possession being used temporarily out of war-time necessity. It is a *permanent* U.S. military base under the exclusive jurisdiction of the United States. The United States exercises exclusive jurisdiction and control over the Air Base at Bagram in exactly the same way it does over Guantánamo—the host nation (in this case, Afghanistan) has ceded ultimate control over the base to the U.S. under a lease agreement which can endure in perpetuity at the direction of the U.S. (*See* Accommodation Consignment Agreement in Afghanistan (Sept. 28, 2006), Tennison Decl., Ex. A, ¶¶2, 4, 8, 9.) Significantly, even if hostilities end, and all other U.S. forces have been withdrawn from the region, the terms of the lease do not require the U.S. to cede control of Bagram Air Base back to the Afghan Government. *Id.*

Bagram Prison has grown and continues to grow far beyond the size of the facility at Guantánamo. While the number of detainees at Guantánamo has decreased to close to two hundred fifty, the number of detainees at Bagram has increased to more than 670. *See* Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan. 7, 2008 (steady increase in detainees at Bagram Prison since 2004) (Olshansky Decl., Ex. 6.) The U.S. Government has announced plans to build a new prison on the Air Base, intended to house more than 1100 prisoners in addition to the nearly 700 held in the current prison. *Id.* The Army Corps of Engineers has also contracted for costly, permanent additions to the Air Base, including a bulk fuel service station, a central command center, and permanent barracks for army personnel.

Army First Lieutenant Lory Stevens, *Engineer Team Plans Bagram's Future,* American Forces Press Service News Articles, Aug. 13, 2008 (Olshansky Decl., Ex. 7.) With no end in sight to the U.S. presence in Afghanistan, projects are underway to renovate Bagram to make it more like home for U.S. troops and their families through the additions of a Dairy Queen, a beauty salon, a nail spa, an Orange Julius, a coffee shop, and a Burger King. Army and Air Force Exchange Service, *Serving Troops Downrange,* (Olshansky Decl., Ex. 8.)

Meanwhile, in the absence of judicial oversight, detainee abuse at Bagram has been pervasive, unceasing, and oftentimes brutal. By December 2001—weeks before the first detainees arrived at Guantánamo—the Bagram Theater Internment Facility had already become "a center of systematic brutality." Tom Lasseter, *Day 2: U.S. Abuse of Detainees Was Routine at Afghanistan Bases*, McClatchy Newspapers, June 16, 2008 (Olshansky Decl., Ex. 9.) The detainees at Bagram, many of whom have been held for more than six years, have been subjected to the worst degradations of human dignity, including sexual assault, physical and psychological torture, and murder. *See Human Rights First, Arbitrary Justice: Trials of Bagram and Guantánamo Detainees in Afghanistan,* Apr. 2008, (Olshansky Decl., Ex. 10.) Reports of abuse and brutality perpetrated by interrogators at Bagram are well-documented from sources inside the military, and recently released detainees have confirmed that detainee abuse remains a routine occurrence. (Ahmad Decl. ¶¶10-16, Olshansky Decl., Ex. 1.)[8]

There is no judicial process afforded Bagram detainees. Indeed, the Unlawful Enemy Combatant Review Board ("UECRB") scheme offers detainees even fewer due process protections than the Combatant Status Review Tribunals ("CSRTs") used at Guantánamo and excoriated by the *Boumediene* Court. Bagram detainees are not told the charges against them;

---

[8] Describing 110 interrogations over the course of 11 months, during which he was deprived of sleep, exposed to extreme temperatures, screamed at, beaten with chairs, and slammed into walls, breaking two of his ribs.  When he fell unconscious, the guards forced him to stand up again, and as he cried, his captors laughed, calling him a spy for the Taliban. (Ahmad Decl. ¶¶10-16, Olshansky Decl., Ex. 1.)

they are not permitted to attend any hearings held, to question the Government's witnesses, to call their own witnesses, or to receive the guidance of an advocate. (Ahmad Decl. ¶¶15-18, Olshansky Decl., Ex. 1.) And, unlike Guantánamo, for those held at Bagram, there is *no appeal* from a UECRB determination, no recourse to any neutral tribunal or court.  Because Bagram detainees lack any impartial venue for a review of their status, the UECRBs fail to meet even the barest standards of due process. There can be little doubt that the deficiencies in the processes helped to create an environment in which the torture and indefinite detention of countless detainees (many of whom are innocent) was sanctioned. For example, Jawed Ahmad, a journalist working for Canadian television who was erroneously detained by U.S. forces, was held in detention at Bagram for 11 months and suffered serious physical and psychological abuse. (Ahmad Decl. ¶¶10-19.) Despite over 60 written requests to present letters and certificates which would have established his innocence, the U.S. Government never responded or otherwise permitted Petitioner to present any such evidence to those responsible for his case. (*Id.* ¶¶18-20.)

## Legal Background

Over the past four years, the Supreme Court has issued three decisions concerning the role of the federal courts in reviewing and, where necessary, invalidating, the acts of the Executive branch taken in the course of its prosecution of the "war on terror." *See Rasul*, 542 U.S. at 487 ("there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated"); *Hamdi*, 542 U.S. at 535 ("[i]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims" related to Executive detention); *Hamdan v. Rumsfeld*, 548 U.S. 557, 588 (2006) ("*Ex parte Quirin* 'provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions.'") During the same time

period, Congress twice legislated to prohibit egregious conduct during interrogation and detention, such as torture and cruelty, while concomitantly imposing structure on the courts' oversight role. And just four months ago, the Supreme Court issued the definitive decision concerning the rights of "war on terror" detainees to the writ of habeas corpus. *See Boumediene,* 128 S. Ct. at 2229. The instant case is presented against the backdrop of this ongoing dialogue between the Courts and Congress, and, accordingly, Petitioner briefly summarizes the legislative and litigation history in this area.

In *Rasul*, four detainees imprisoned at Guantánamo filed a habeas petition seeking release from custody in February of 2002. 542 U.S. at 472. In resisting the *Rasul* Petition, the U.S. took the position that foreign nationals detained by the U.S. military were not entitled to the protection of the federal habeas statute, the Constitution, the common law, or any binding customary international law rule or treaty. *Id.* By June 2004, two cases had made their way to the Supreme Court and were decided *sub nom Rasul v. Bush,* 542 U.S. 466 (2004). In *Rasul*, the Supreme Court ruled that detainees at Guantánamo were protected under the federal habeas statute and were therefore entitled to bring petitions to challenge the legality of their detention. The Court based its reasoning on three findings relevant here: (i) the U.S. exercises "exclusive jurisdiction and control" over the territory occupied by the Guantánamo Bay Naval Base, *id.* at 467; (ii) the Guantánamo detainees had "never been afforded access to any tribunal, much less charged with and convicted of wrongdoing," *id.* at 476; and (iii) the federal habeas statute makes no distinction between aliens and citizens, and thus "[a]liens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under §2241." *Id.* at 481. As a result of its determination that the Guantánamo detainees fell within the ambit of the statutory writ of habeas corpus, the Supreme Court remanded the cases for adjudication on the merits. *Id.* at 485.

In *Hamdi*, the Supreme Court addressed the role of the courts in considering the Executive's procedures for determining whether its "war on terror" detainees are in fact "enemy combatants." 542 U.S. at 516. *Hamdi* confirms that, "whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id*. at 536. The plurality in *Hamdi* also held that a detainee "must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 533. The *Hamdi* plurality considered the possibility that "an appropriately authorized and properly constituted military tribunal" might meet this minimum threshold. *Id.* at 537. In the wake of the *Hamdi* decision, the Defense Department ("DoD") announced the creation of so-called Combatant Status Review Tribunals ("CSRTs") at Guantánamo to provide prisoners with some modicum of due process. *See* Memorandum to the Secretary of the Navy from Paul Wolfowitz, Deputy Secretary of Defense ("Wolfowitz Memo") (July 7, 2004), (Olshansky. Decl., Ex. 11.) The CSRTs are informal proceedings ostensibly offered to give detainees the opportunity to contest the prior secret Executive determinations that they are "enemy combatants." The CSRTs were purportedly "modeled after Army Regulation 190-8 which governs the determination of prisoner of war status." *In re Guantánamo Detainees*, 355 F. Supp. 2d 443, 467-68 (D.D.C. 2005).

On remand, Respondents filed motions to dismiss all of the habeas petitions, arguing that the *Rasul* decision had decided only a jurisdictional question and had left open the substantive question of whether the detainees had any constitutional, statutory, or international law rights that could be vindicated by means of the writ.[9] When two district courts reached conflicting

---

[9] In this way, Respondents try to dissect the Great Writ into two pieces, an argument seemingly unheard of in the decisional authority. In support of their argument, Respondents cited to *Bell v. Hood*, 327 U.S. 678, 681 (1946), where the Supreme Court held that in most civil actions, whether a court has jurisdiction and whether the complaint

decisions on the scope of *Rasul's* holding—including the definitively resolved question of whether petitioners were entitled to the statutory writ—*see Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005); *In re Guantánamo Detainees*, 355 F. Supp. 2d 443 (D.D.C. 2005), the decisions were appealed and consolidated before the D.C. Circuit Court of Appeals. *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).

In the fall of 2005, while the *Boumediene* appeal was pending, and after the majority of the CSRTs at Guantánamo had already been held, Congress passed the Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680, 2739-2744 (2005) ("DTA"). The DTA: (a) mandates the humane treatment of *all* detainees—not just persons detained at Guantánamo—in U.S. custody, except for "persons" detained "pursuant to a criminal or immigration law of the United States," DTA, §1002(a)-(b); (b) prohibits "the cruel, inhuman, or degrading treatment or punishment" of any "individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location," *id.* at §1003(a); (c) provides that all Guantánamo detainees are to be afforded an opportunity to appear at a CSRT to challenge their designation by DoD as "enemy combatants," and to appeal any final decision of the CSRT directly to the D.C. Circuit Court of Appeals, *id.* at §1005(e)(2); and (d) amended 28 U.S.C. §2241 by adding a subsection which stripped U.S. courts of jurisdiction to consider the habeas petitions filed on behalf of the alleged "enemy combatants" at Guantánamo.  DTA, §1005(e)(1).

The Supreme Court reviewed the DTA in *Hamdan*, a case challenging the military commission trial process created by the Executive branch to hear the cases it selected for military prosecution. The *Hamdan* Court held that: (a) the DTA could not be applied retroactively and

states a cause of action are distinct questions, and that the jurisdictional question must be resolved first and without regard to the cause of action question. This jurisdiction/cause of action dichotomy, however, has never been applied to habeas actions challenging Executive detention because the cause of action is inherent in the existence of jurisdiction to issue the writ. No other legal provision must be invoked to show entitlement to relief. In cases of Executive detention, the writ of habeas corpus is a procedural mechanism having a single purpose: it commands the respondent to bring the petitioner before the court, so the court may then determine the legality of respondent's detention of petitioner. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 113 (1866).

therefore did not strip jurisdiction from courts with pending habeas corpus cases; (b) Common Article 3 of the Geneva Conventions—the "mini-convention" that protects detainees' core due process rights by prohibiting "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all judicial guarantees which are recognized as indispensable by civilized peoples," Geneva Convention Relative to the Treatment of Prisoners of War, Art. 3, Aug. 12, 1949, 6 U.S.T. 3316 ("GCIII") —governs Mr. Hamdan's treatment in U.S. custody; and (c) the newly-fabricated military commission slated to try him for war crimes was unconstitutional because it had not been authorized by Congress. *Hamdan,* 548 U.S. at 587.

In the fall of 2006, Congress passed the MCA, which, among other things, provided the necessary authorization for the military commission trial process. The MCA also amended the habeas statute, 28 U.S.C. §§2241 *et seq.*, by adding the following provisions:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. §801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. §2241(e). The instant petition was filed before the MCA was enacted.

## A.  The *Boumediene v. Bush* Decision

In the consolidated cases testing MCA §7(a), stripping all courts of the power to hear §2241 petitions for a writ of habeas corpus, the Supreme Court ruled that the statutory provision could not be read to preclude foreign nationals held at Guantánamo from pursuing habeas challenges to the legality of their detention. *Boumediene*, 128 S. Ct. at 2229. The Court ruled that in enacting

the MCA, Congress had not validly taken away the detainees' habeas rights because it only has

the authority to do so within the framework of the Suspension Clause, which permits a temporary

suspension of the writ only when the country faces an internal rebellion or invasion. No part of

the MCA, nor any statement made in the debate prior to enactment, indicated that any member of

Congress believed the necessary conditions to be extant at the time.

The Court also declared that detainees do not have to go through the special review process

Congress created in the Detainee Treatment Act and later amended in the MCA, because that

process does not constitute an "adequate and effective substitute" for the constitutional right to

habeas corpus. *Id.* The Court refused to accept the Government's argument that the review

process provides sufficient legal protections to make it an adequate replacement for the writ.

Congress, the Court concluded, had unconstitutionally suspended the writ in enacting §7(a) of

the MCA. *Id.*

Finally, the Court noted that it was not ruling on the issue of whether the detainees are

entitled to be released—that is, entitled to have writs issued to end their confinement—nor was it

addressing "whether the President has authority to detain" individuals during the "war on

terrorism" and hold them in Guantánamo; both issues were left for the District Court judges to

determine in detainees' habeas corpus hearings.

## ARGUMENT

## I.  PETITIONER IS ENTITLED TO DISCOVERY AND A JUDICIAL DETERMINATION OF THE CONTESTED LEGALLY SIGNIFICANT JURISDICTIONAL FACTS

On a motion to dismiss a habeas petition brought under 28 U.S.C. §2241, the courts apply the

standard mandated by Federal Rule of Civil Procedure 12.[10] *In re Guantánamo Detainees*, 355 F.

---

[10] The Federal Rules of Civil Procedure apply to habeas petitions to the extent the rules do not conflict with the habeas statute or any applicable habeas rules.  Fed. Civ. P. 81(a).  Because this Petition was not brought under

Supp. 2d 453 (D.D.C. 2005) (applying F.R.C.P. 12); *see also Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002). Under Rule 12, the Court cannot dismiss the Petition for failure to state a claim unless Respondents can show beyond doubt that Petitioner can prove no set of facts in support of his claims that would entitle him to relief. *See Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004). The Court must treat the Petition's allegations as true and draw all reasonable inferences in Petitioner's favor. *See Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997).

Mr. Wazir is, at the very least, entitled to take discovery regarding all disputed jurisdictional facts. *E.g., Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) ("We have . . . required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion."). The nonmoving party must be afforded an "'ample opportunity to secure and present evidence relevant to [the] existence of jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40 (*quoting Prakash v. American University*, 727 F.2d 1174, 1180 (D.C. Cir. 1984)). Furthermore, courts cannot convert motions to dismiss for want of jurisdiction into summary judgment proceedings merely because extrinsic material has been proffered. *See BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp.2d 73, 80 (D.D.C. 2003). Instead, the motion to dismiss must be denied, and, following discovery, a separate summary judgment motion may be filed. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

As the *Hamdi* Court held, construing §2241 consistently with the Due Process Clause, the Executive branch is not entitled simply to announce by fiat that the Petitioner is an "enemy combatant" and thereby forestall judicial review. *See Hamdi,* 542 U.S. at, 538. Indeed, that rule

---

either 28 U.S.C. §2254 or §2255, no special habeas rules apply to this proceeding. The Petition is therefore governed by the Federal Rules. *See United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004).

was solidly established in habeas corpus proceedings a century and a half before the Constitution–which, at a bare minimum, forbids suspension of the writ as it existed at common law–came into force. *See* Eric M. Freedman, *Hamdi and the Case of the Five Knights*, Legal Times, Feb. 3, 2003.

If the Executive cannot suspend the writ even for reasons of military necessity absent congressional authorization, neither can a court do so in an effort to safeguard the Executive's military powers from alleged interference by the judiciary. A decision by this Court to accept the Executive branch's assertions of jurisdictional facts would constitute an unlawful suspension of the writ, not because the Court would refuse to grant Petitioner the relief he seeks, but because a ruling accepting the Executive's portrayal of the factual circumstances would limit the Court's review of Petitioner's detention to nothing more than the review that would have been available to him if the writ had actually been suspended. If the Court were to conclude that no habeas relief could be granted based on the Executive's determination that Mr. Wazir is an "enemy combatant" and that the facts alleged support this determination, it would be limiting Petitioner to the same crabbed form of judicial review as would obtain if Congress had suspended the writ. In short, the Court would be intruding on the exclusive congressional power to suspend the writ and on the judicial power to adjudicate the facts of petitions properly before the courts, and Petitioner would be denied the opportunity to challenge his detention.

## II.  THIS COURT HAS JURISDICTION TO HEAR PETITIONER'S CHALLENGE TO THE LEGALITY OF HIS DETENTION

### A.  The Court Has Jurisdiction under 28 U.S.C. §2241

Neither the law nor the facts support Respondents' contention (*see* Resp. Mot. at 1, 9-13) that MCA §7(a) bars this Court from hearing Petitioner's request for relief under the federal habeas statute, 28 U.S.C. §§2241 *et seq*. The Supreme Court definitively ruled that "war on terror" detainees held without adequate due process are entitled to the statutory writ. *Rasul*, 542 U.S at

483-84; *see also Boumediene*, 128 S. Ct. at 2229. The Court in *Rasul* concluded that the right of "persons detained at the [Guantánamo] base" to challenge their detention was "consistent with the historical reach of the writ of habeas corpus." 542 U.S. at 481. Expressly rejecting the Government's contention that "habeas corpus has been categorically unavailable to aliens held outside sovereign territory," *id.* at 482 n.14, the *Rasul* Court stated that at common law, "the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown.'" *Id.* at 482. The Court found that, where the Crown had exercised the requisite degree of control, the writ extended to *citizens and foreign nationals alike*. *See id.* at 482 n.14 (emphasis added). There is no basis for this Court to revisit the determinations—reconfirmed recently in *Boumediene*--that the writ was available in 1789 to foreign nationals in territory (sovereign or not) under the King's control, and that given the authority on this precise issue, *see, e.g., INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (noting that "[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789'"), the same must be true here. *See Rasul*, 542 U.S. at 482 n. 11 (collecting cases). Based upon this analysis, the *Rasul* Court ultimately concluded that the habeas statute "confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantánamo Bay Naval Base."[11] *Id.* at 483.

With its passage of the DTA in 2005,[12] and the MCA in 2006, Congress sought to strip habeas jurisdiction from the federal courts considering the Guantánamo detainees' habeas petitions. Addressing these two legislative efforts to deprive detainees of the writ, the Court in

---

[11] Noting that petitioners had also invoked the Court's jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1350, the Court found that nothing in *Johnson v. Eisentrager*, 339 U.S. 763 (1950) nor any other case excluding aliens in military custody outside the United States from exercising the "privilege of litigation' in U.S. courts. *Rasul*, 542 U.S. at 468.

[12] The DTA §1005(e) (2005) amended 28 U.S.C. §2241 to provide that "no court, justice, or judge shall have jurisdiction to hear or consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."

*Boumediene* stressed the importance of the writ as a fundamental part of the Framers' "constitutional plan that allocated powers among three independent branches." *Boumediene*, 128 S. Ct. at 2245 (noting that the "design serves not only to make Government accountable but also to secure individual liberty). The *Boumediene* Court, noting that the substantive guarantee of the separation-of-powers structure, like the guarantees of Fifth and Fourteenth Amendments, also *makes no distinction between citizens and foreign nationals*, and held that the detainees can seek enforcement of those principles in U.S. courts. *Id.* (emphasis added).

The Supreme Court's *Rasul* decision applies with equal force to Petitioner, an Afghan civilian imprisoned at Bagram. *Rasul* held that the federal habeas statute, 28 U.S.C. §§2241 *et seq.,* has extraterritorial reach when the U.S. exercises complete jurisdiction and control over the territory where the detainee is being held, *Rasul*, 542 U.S. at 480, and the U.S. military maintains an even greater degree of control over the Air Base at Bagram than it does over the Naval Base at Guantánamo.[13] Because Bagram, like Guantánamo, is under the exclusive jurisdiction and control of the U.S., Petitioner Wazir, imprisoned at Bagram like the detainees held at Guantánamo, is entitled to the protection of the statutory writ. In *Rasul*, the Court also determined that the habeas statute applies at Guantánamo because "[a]liens . . . no less than American citizens, are entitled to invoke the federal courts' authority under §2241 . . . ." 542 U.S. at 481. The Court thus found that the plain language of the statute draws *no distinction* between *U.S. citizens and foreign nationals* held in federal custody, and there is no reason to think that Congress intended the geographical coverage of the federal habeas statute would vary depending upon a detainee's citizenship. *Rasul* and *Boumediene* stand for the proposition that foreign nationals may invoke courts' authority under §2241 when they are held in territory under

---

[13] If the Court has any doubt as to the degree of control exercised by the U.S. at Bagram and how it compares with U.S. control at Guantánamo, Petitioners respectfully submit that there is an issue is a disputed question of fact that warrants determination. Petitioner has had no opportunity to take discovery concerning the facts asserted in the Miller and Gray Declarations, and should be permitted to do so before the Court decides the motion to dismiss.

the jurisdiction and control of the U.S. and the reviewing court has jurisdiction over the petitioners' custodians.

If, however, these legal principles were in the slightest doubt, the Court need only consider the Supreme Court's recent ruling in the case *Munaf v. Geren*, 128 S. Ct. 2207 (2008), which upheld the Court's jurisdiction under §2241 over petitions filed by detainees held in the detention facility in Camp Cropper, the U.S. military base in Baghdad. *Id*. at 2228. *Munaf* stands for exactly the proposition that Respondents (ignoring the extensive historical discussions in both *Rasul* and *Boumediene*) vehemently deny: that the test for habeas jurisdiction is whether the Government exercises practical control over the body of the prisoner. *Id*. If so, its agents must respond to a judicial order to account for the imprisonment.[14]

Respondents' contention that the *Rasul* and *Boumediene* decisions were somehow "uniquely about the Guantánamo Bay Naval Base" (Resp't Mot. at 11-12) is untenable. Indeed, Respondents themselves have argued that there is *no* legally significant distinction between aliens held at Guantánamo and aliens held at Bagram. *See* Merits Brief of Resp't at 56, *Rasul v. Bush*, 542 U.S. 466 (arguing against "drawing an arbitrary legal distinction between aliens held at a facility, such as the Bagram Air Force Base in Afghanistan, which is controlled by the U.S. military and located outside the sovereign territory of the United States, and aliens held at a facility such as Guantánamo Naval Base in Cuba, which is controlled by the U.S. Military and located outside the sovereign territory of the United States.") In order to demonstrate that Petitioner is not entitled to invoke §2241, Respondents would need to show: (i) that the statute's application has been displaced by MCA §7; and (ii) that such displacement is constitutional. Neither proposition is true.

---

[14] We need hardly add that Iraq is certainly as much a theatre of military operations as Afghanistan.  But, as *Munaf* shows, this is irrelevant.  Bagram, like Camp Cropper, is a fully secure American-run prison, not a front-line holding facility.

**B. Both Article III and the Suspension Clause Protect Petitioner's Right to Habeas Corpus Review of the Lawfulness of His Detention**

> **1. MCA §7 violates the separation-of-powers principle by forcing all courts to surrender their Article III power.**

The three branches of our federal Government are separate and co-equal and the people have as much right to enjoy the benefits of an independent judiciary as they do to enjoy the benefits of a wise legislature and an effective Executive. Respondents' position, far from protecting the Executive from unwarranted "second-guessing" and "superintendence" by the Judiciary (*see* Resp't Mot. at 3) violates the separation-of-powers principle by causing an unwarranted, expansive, and *permanent* surrender of the judicial power delineated in Article III of the Constitution.

Article III creates a federal judiciary that "stand[s] independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remain[s] impartial." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion). An essential element of the federal judiciary's responsibility and power under Article III is the "judicial duty to exercise an independent judgment." *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936). Neither Congress nor the Executive branch may constitutionally prevent the judiciary from fulfilling that duty; both branches lack the authority to require "the federal courts to exercise '[t]he judicial Power of the United States,' U.S. Const., art. III, §1, in a manner repugnant to the text, structure, and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) (holding that Congress violated the separation of powers by retroactively commanding the federal courts to reopen final judgments).

Throughout history, often in cases other than habeas corpus, the Supreme Court has carefully guarded the judiciary's power to make independent judgments by reserving to Article III courts

the power to determine whether the evidence is sufficient to support a claim properly before the court because "[h]ow the facts are found will often dictate the decision of federal claims." *England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411, 416 (1964).[15] The principle that a coordinate branch cannot tell an Article III court how to determine the outcome of a specific cause properly before it is central to the separation-of-powers structure embodied in the Constitution. The paradigmatic example of this fundamental principle is that of *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871), in which the Court held unconstitutional a congressional enactment that required federal courts to find a former Confederate citizen's acceptance of a general presidential pardon to be conclusive evidence of prior disloyalty to the Union. The Court rejected the statute as an attempt by Congress to forbid the court to consider the evidence before it and reach its own judgment, and held it to be an unconstitutional violation of the separation-of-powers. *Id.* at 147. Since *Klein*, the Supreme Court has consistently continued to hold that Congress cannot "require federal courts to exercise the judicial power in a manner that Article III forbids" by "'prescrib[ing] rules of decision to the Judicial Department of the Government in cases pending before it.'" *Plaut*, 514 U.S. at 218 (quoting *Klein*, 80 U.S. (13 Wall.) at 146).

In cases such as *Klein* and *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) (invalidating Attorney General's statutorily-authorized certification as compelling an Article III court to rubber-stamp factual determinations made by the Executive branch), the Court preserved inviolate the power of the federal courts to engage in independent fact-finding in the face of Executive branch usurpations of judicial power and assertions that Congress had shifted the power to adjudicate facts out of the courts' control. Yet, according to Respondents' interpretation of the MCA, the people must accept a declaration by a member of the Defense Department

---

[15] The Court has held that under the "demands of due process and the constraints of Art[icle] III," a federal district court cannot constitutionally abdicate its duty to find facts, and can only defer to a record developed by a non-Article III officer when "the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681, 683-84 (1980).

certifying the "enemy combatant" status of a detainee as a conclusive factual finding that determines the detainee's fate of indefinite, *incommunicado* detention. Indeed, Respondents' argument presents here precisely the claim rejected by the Supreme Court in *Klein* and *Gutierrez de Martinez* that Congress may not shift the Article III power to engage in independent fact-finding to the Executive branch. Here, not only must the federal habeas court stand back and accept as conclusive an Executive branch representation of facts that purport to justify Petitioner's confinement, the people must as well. The Executive's claim of a constitutional right to displace the fact-finding prerogatives of the habeas court misunderstands the separation-of-powers principle. The Executive claims the power to intrude upon the adjudicatory function of the habeas court in derogation of explicit constitutional and common law commands that repose that fact-finding function in the courts.

> **2.   The MCA violates the Suspension Clause by permanently suspending the writ.**

Four years ago, the Supreme Court held in *Rasul* that people imprisoned as "enemy combatants" during the U.S. "war on terror" had a right to habeas corpus review of the lawfulness of their detention. *Rasul*, 542 U.S. 466. Respondents now claim that Congress abolished this right by enacting the §7(a) of the MCA, and acted constitutionally in doing so when the detainees are held in any place *other* than Guantánamo. The fact that Respondents' argument abolishes Petitioner's right to habeas corpus without providing *any substitute remedy whatsoever*—no less an adequate and effective alternative to "test the legality of a person's detention," *Swain v. Pressley*, 430 U.S. 372 (1977)—does not seem to be a cause for consternation in the Executive branch. This is so despite the fact that there is little to no difference between the circumstances of the Guantánamo detainees and those of the Bagram detainees save proximity from the mainland United States, some degree of civil unrest in Afghanistan, and the vastly greater amount of due process protection (although deeply flawed as

well) put in place for the Guantánamo detainees as a substitute for the writ.

Respondents persist in their efforts to deprive people whom our military detains of the most rudimentary due process protections acknowledged around the world. Foreign nationals, like citizens, have a constitutional right to habeas corpus. *Boumediene*, 128 S. Ct. at 2229. History has shown that our courts have long consistently acknowledged the rights of even enemy aliens and prisoners of war to challenge the legality of their detention. Even during a "war on terror," absent a valid suspension, the writ "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*, 542 U.S. at 525. This constitutional requirement could not be evaded by detaining people at Guantánamo, *see Boumediene*, 128 S. Ct. at 2259, and it cannot be evaded by detaining people at Bagram.

As *Rasul* established, although the United States lacks ultimate sovereignty at Guantánamo, it has exclusive governing authority there, exercising complete jurisdiction and control. The same holds true with regard to Bagram. *See* Part III(B), *infra*. Under the rationale of the *Insular Cases*, fundamental constitutional rights apply to both citizens and foreign nationals in such a location.[16] The courts have consistently so held in comparable territories, where the United States has exercised sovereign powers without titular sovereignty. In this case too, Petitioner was deliberately transported to a highly secure base under U.S. control, to be detained, interrogated, and perhaps held indefinitely. It would certainly be anomalous for this Court to accept

---

[16] In the 19th Century, the Supreme Court fully applied the Bill of Rights to all federally-governed territories. *See, e.g., Springvill Citye v. Thomas*, 166 U.S. 707 (1897); *Reynolds v. United States*, 98 U.S. 145 (1879). In 1901, however, in the *Insular Cases*, a majority of the Court held that only "fundamental" constitutional rights extended by their own force to "unincorporated" territories. The Insular Cases concluded that constitutional provisions do not extend to particular territory by the will of Congress, but rather, as a result of the relationship that Congress creates between the United States and the territory. *Dorr v. United States*, 195 U.S. 138, 142 (1904); *Downes v. Bidwell*, 182 U.S. 244 (1901). The *Insular Cases* struck a compromise between the forces of constitutionalism and the forces of empire by guaranteeing that the Constitution's most fundamental rights would be honored wherever the United States possesses governing authority. In such cases, it is the exercise of complete U.S. jurisdiction and control, not nominal sovereignty that justifies the application of a correlative set of fundamental rights. The Supreme Court has never repudiated the Insular Cases. *See Torres v. Puerto Rico*, 442 U.S. 465 (1979); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990); *Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D.N. Mar .I. 1999), *aff'd mem. sub nom. Torres v. Sablan*, 528 U.S. 1110 (2000).

Respondents' invitation to authorize the United States to evade the Constitution by imprisoning men in a "rights-free zone," with no possibility for habeas review.

The "Privilege of the Writ of Habeas Corpus" was one of the few constitutional rights enshrined by the Framers in the original Constitution of 1787. The Suspension Clause of Article I, §9, prohibits Congress from suspending the writ "unless when in Cases of Rebellion or Invasion the public Safety may require it." The Framers defined the legislature's power to suspend the writ very narrowly in order to preserve it against both temporary and permanent evisceration. Yet Respondents urge an interpretation of MCA §7(a)[17] that would *permanently* eliminate a detainee's access to the writ, regardless of whether there has been provision of an adequate substitute. Interpreted in the fashion asserted by Respondents, §7(a) clearly violates the Suspension Clause.

Respondents do not claim that §7(a) was intended to be an exercise of Congress's authority to suspend the writ *temporarily* "in cases of Rebellion or Invasion." The statute itself makes no reference to suspension, and opponents of the legislation repeatedly stated, without contradiction, that there was no current "Rebellion or Invasion" that could justify suspending the writ. *See, e.g.*, 152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006) (Sen. Specter) ("Fact No. 3, uncontested. We do not have a rebellion or an invasion.") (Olshansky Decl., Ex. 12.) Given these undisputed facts, there can be no other conclusion than that the MCA's stripping of habeas corpus jurisdiction is *permanent*, not limited to a particular span of years, the duration of a particular emergency, the circumstances of a specific sub-population, or the boundaries of a particular geographic area. Instead, it permanently alters the federal statute. The legislative history

---

[17] Section 7(a) of the MCA provides that "No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

confirms this conclusion; the proponents of the MCA *did not intend to enact a temporary measure*. *See* 152 Cong. Rec. S10404 (daily ed. Sept. 28, 2006) (Sen. Sessions) ("We are legislating through this law for future generations [and] future wars") (Olshansky Decl., Ex. 13); 152 Cong. Rec. S10270 (daily ed. Sept. 27, 2006) (Sen. Kyl) ("all future conflicts") (Olshansky Decl., Ex. 14.)[18]

Permanently abolishing the writ of habeas corpus for certain persons violates the Suspension Clause on its face. By limiting Congress's power to suspend habeas to cases of "Rebellion or Invasion" when "the public Safety may require it," the Clause necessarily precludes other abridgments of the writ. Logically, personal liberty would be even more threatened by a power of *permanent abrogation* than by a broad power of *temporary suspension*. Reading the Suspension Clause as prohibiting permanent abridgements is also consistent with the interpretation of other constitutional provisions, such as the Takings Clause.[19] The Supreme Court has always understood the Suspension Clause as prohibiting a permanent deprivation, as well as limiting any temporary withdrawal, of the writ, *see, e.g.*, *Ex parte Bollman*, 8 U.S. 75, 95 (1807), and has viewed statutes permanently modifying habeas jurisdiction as raising potential Suspension Clause problems. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289 (2001).

Proponents of the federal Constitution fully understood that the Suspension Clause prohibited permanent abrogation.[20] Hamilton affirmed the Constitution's "establishment of the writ of habeas corpus" in *The Federalist No. 84*, and insisted that habeas corpus was "provided for in the

---

[18] Nor can MCA §7(a) be viewed as limited to the lower federal courts, leaving unimpaired the jurisdiction of the Supreme Court and the state courts. The Act's plain language bars jurisdiction by any "court, justice or judge" in relevant cases. The constitutional limits on the Supreme Court's original jurisdiction would forbid the Court to serve as a court of initial jurisdiction for habeas inquiry into executive detention in such cases. *See Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 100-101 (1807).

[19] Although the Takings Clause of the Fifth Amendment states only "nor shall private property be taken for public use without just compensation," it has traditionally been understood as prohibiting all takings without a public purpose. *See Kelo v. City of New London*, 545 U.S. 469, 484 (2005).

[20] Virginia Convention, Debates (June 10, 1788), *reprinted* in 9 *The Documentary History of the Ratification of the Constitution* at 1092, 1099 (John P. Kaminski & Gaspare J. Saladino eds., 1990). Early commentators, such as James Kent, William Rawle, and Joseph Story, agreed. *See* Gerald L. Neuman, *The Habeas Corpus Suspension Clause After INS v. St. Cyr*, 33 Colum. Hum. Rts. L. Rev. 555, 582-83, 585-87 (2002).

most ample manner in the plan of the convention." *The Federalist No. 83*. In *St. Cyr*, the Supreme Court rejected the sole suggestion to the contrary. Although a dissenting opinion argued that the Suspension Clause was intended to regulate only temporary suspensions, not total abrogations, of the writ, the majority squarely rejected that interpretation. 533 U.S. at 300-01, 336-38, 304 n.24. And history firmly rebuts that dissenting argument. While four state ratifying conventions included habeas corpus clauses in the bills of rights they proposed to add to the Constitution, these amendments reflected their desire to guarantee habeas in plain language.[21]

Nor is Congress constitutionally entitled to abolish Petitioner's right to the writ simply because he is a foreign national or even an alleged alien enemy. The writ has always been afforded to foreign nationals, in times of war and peace, including alleged and conceded enemy aliens and prisoners of war. Existing case law regarding the analogous categories of enemy aliens and prisoners of war demonstrates that foreign nationals accused of being "enemy combatants" must have some opportunity to challenge the legality of their detention. Indeed, precisely because the concept of "enemy combatant" and the scope of the "war on terror" are so ambiguous, there is an even greater need for such detentions to be reviewed by an independent court.

The Supreme Court has observed that "at the absolute minimum, the Suspension Clause protects the writ as it existed in 1789." *St. Cyr,* 533 U.S. at 301 (citation omitted). At the same time, until its decision in *Boumediene*, the Court left open the degree to which subsequent developments in habeas corpus doctrine might also be protected by the Suspension Clause. *St. Cyr*, 533 U.S. at 300-01. But even before the *Boumediene* decision, there could be no question that foreign nationals enjoyed the protection of the writ. Both at common law and throughout this Nation's history, habeas corpus has been available to aliens. *St. Cyr*, 533 U.S. at 301. This

---

[21] *See also* William F. Duker, *A Constitutional History of Habeas Corpus* 134-35 (1980) (explaining that this provision denied Congress the power to suspend the writ at all).

includes both foreign nationals who entered the country voluntarily, and those, like Petitioner, who were brought involuntarily within its domain. *See, e.g., id.* at 302 n.16 (citing *Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344 (K.B.); *Sommersett v. Stewart*, (1772) 20 How. St. Tr. 1 79-82 (K.B.); *King v. Schiever*, (1759) 97 Eng. Rep. 551 (K.B.)). The protection of foreign nationals by the Suspension Clause is consistent with other fundamental constitutional guarantees. As the Court held in *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886), the Equal Protection and Due Process Clauses of the Fourteenth Amendment are "universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *See also Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2681-82 (2006) (Roberts, C.J.) (quoting *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)); *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (even if presence "unlawful, involuntary, or transitory").

The concept of an "enemy alien" reflects an earlier international practice permitting expulsion or detention of nationals of an enemy state during a declared war. *See Brown v. United States*, 12 U.S. (8 Cranch) 110, 122-26 (1814) (Marshall, C.J.). The Alien Enemies Act of 1798 authorized the President to detain, relocate, or deport aliens who were "natives, citizens, denizens, or subjects of the hostile nation." Act of July 6, 1798, ch. 66, §1, 1 Stat. 577 (1798) (current version codified at 50 U.S.C. §§21-24). Yet as early as 1813, in an unpublished judgment on circuit, Chief Justice Marshall released a conceded enemy alien on habeas because he had been detained without an opportunity to relocate, as required by the controlling regulations.[22] The Supreme Court itself ordered the release of a detained enemy alien on habeas corpus in *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952), finding that Congress's termination of the war against Germany in 1951 ended the power of the Executive under the

---

[22] *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien: A Case Missing from the Canon*, 9 Green Bag 2d 39 (2005).

Alien Enemies Act.[23] Ever since that Act was first invoked in the War of 1812, courts have permitted detained enemy aliens to challenge on habeas corpus whether their detention complied with the statutory framework.[24]

In *Ludecke v. Watkins*, 335 U.S. 160 (1948), Justice Frankfurter summarized habeas practice under the Alien Enemies Act in the First and Second World Wars—the last occasions on which it was ever applied. The Court made clear that detained individuals were entitled "to challenge the construction and validity of the statute" and the factual predicates for applying it to them, including "the existence of the 'declared war,'" *id*. at 171, and "whether the person restrained is in fact an alien enemy fourteen years of age or older," *id*. at 171 & n.17. Thus, individuals detained as enemy aliens have been permitted to challenge on habeas the determination of their enemy alien status, either on the ground that they were in fact citizens, or because they were aliens but not natives or nationals of an enemy power. *See Ludecke*, 335 U.S. at 165 n.8, 171 n.17 and cases cited therein. Finally, enemy aliens have always had access to the writ, whatever the reason for their detention. During the War of 1812, a federal court entertained, though later denied on the merits, habeas writs filed by British subjects in the U.S. army[25] seeking release from military service.[26] When the federal Government sought to deport enemy alien internees under the immigration laws, the courts permitted them access to the writ.[27] Habeas corpus was also available to enemy aliens prosecuted for war-related crimes in Article III courts.[28]

---

[23] The Supreme Court rejected the Government's claimed authority to execute removal orders that had been issued against dangerous enemy aliens before termination of the war. *See* Brief for Respondents at 26-27, *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952).

[24] The Court has upheld the Act against constitutional challenge, citing its lengthy historical pedigree, but has never accepted the theory that enemy aliens lack constitutional rights. *See Ludecke v. Watkins*, 335 U.S. 160, 171-72 (1948).

[25] *See, e.g., United States ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116 (2d Cir. 1949) (finding adequate opportunity to depart); *United States ex rel. Ludwig v. Watkins*, 164 F.2d 456 (2d Cir. 1947) (granting the writ); *United States ex rel. von Heymann v. Watkins*, 159 F.2d 650 (2d Cir. 1947) (granting the writ). The two latter cases involved German nationals who had been brought to the United States involuntarily and detained as dangerous enemy aliens.

[26] *Wilson v. Izard*, 30 F. Cas. 131 (C.C.D.N.Y. 1815) (No. 17,810).

[27] *See, e.g., United States ex rel. Bradley v. Watkins*, 163 F.2d 328 (2d Cir. 1947) (granting the writ to former internee, who had been forcibly brought to the United States from Greenland); *United States ex rel. Sommerkamp v. Zimmerman*,

Finally, in three landmark cases, the Supreme Court exercised habeas corpus jurisdiction over conceded prisoners of war—whether privileged or unprivileged combatants—challenging their trial by military commission. In *Ex parte Quirin*, 317 U.S. 1, 24-25 (1942), the Court passed quickly to the merits and ruled against the petitioners. *In re Yamashita*, 327 U.S. 1 (1946), which involved an enemy soldier held in the U.S. overseas territory of the Philippines, rejected the Government's objection to habeas corpus jurisdiction, holding that absent a suspension of the writ, the courts had "the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus." In *Hamdan*, the Court ruled in favor of an alleged "enemy combatant" held at Guantánamo on jurisdiction and on the merits. 548 U.S. at 557. Absent a legitimate suspension, the traditional scope of the writ must also extend to alleged "enemy combatants." Indeed, the Government's expansive interpretations of the concepts of "enemy combatant" and the "war on terror," and the very real factual questions surrounding many of the detentions, heighten the specter of imprisonment by Executive fiat and the corresponding importance of habeas.

## C.  Section 7 of the MCA Does Not Apply to this Action

Section 7(a) of the MCA attempted to carve out an exception from the Court's historically broad jurisdiction to consider habeas corpus petitions. By definition, as an exception, the MCA precluded an exercise of jurisdiction in only a *limited* category of habeas cases—where statutory habeas relief is sought by a petitioner who: a) has already been "determined by the United States to have been properly detained as an enemy combatant"; or b) "is awaiting such determination." MCA §7(a). In all other habeas cases, the Court's jurisdiction remains unaffected. The MCA sets forth the only two procedures by which the U.S. can determine that an individual is an "enemy

---

178 F.2d 645 (3d Cir. 1949) (denying the writ on the merits to former internee who had been forcibly brought to the United States from Guatemala).
[28] *See Von Moltke v. Gillies*, 332 U.S. 708 (1948) (espionage).

combatant" who may be held indefinitely without charge or trial. Prisoners in Guantánamo receive a CSRT proceeding which reconfirms (or not) a prior Executive determination of whether or not a detainee is an "enemy combatant." (*See* Wolfowitz Memo, Olshansky Decl., Ex. 11.) By contrast, the only relevant term for the purposes of the MCA is not "enemy combatant" but "unlawful enemy combatant," which is defined in §3 as:

> (i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

> (ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal ["CSRT"] or another competent tribunal established under the authority of the President or the Secretary of Defense.

MCA, §3.

Given that the only term used and defined in the MCA is that of "unlawful enemy combatant," the statute must be interpreted to mandate that the determination of such status for detainees, who, like Mr. Wazir, are imprisoned at Bagram, is to be made by some form of "competent tribunal." MCA §3(a)(1). Yet, Respondents, airily ignoring the text of the statute—to say nothing of the principle that statutes must be construed to avoid constitutional doubt, *St. Cyr,* 533 U.S. 289—contend instead that not even a "competent tribunal" is required by the MCA. According to Respondents, "[t]he United States may determine that an alien meets the definition of subsection (i) *without having conducted a CSRT or a review by a 'competent tribunal.'*" Resp't Reply to Pet. Opp. at 4, n.2, *Ruzatullah v. Gates*, 06-CV-01707 (GK) (April 20, 2007) (emphasis added) (Olshansky Decl., Ex. 15.)

In this case, Petitioner has pled that he has not been determined to be an "enemy combatant" by a CSRT nor an "unlawful enemy combatant" by a "competent tribunal" or any other type of

combatant. Nor is he awaiting such a determination.[29] Respondents do not deny these allegations. Rather, they interpret the statute to mean that no process at all is required to seize and hold Petitioner without charge or access to a neutral tribunal of any sort.

While Respondents assure the Court that as a matter of grace they give each prisoner a review after 75 days by a UECRB which decides the prisoner's fate based on "reasonably available information, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee," (Resp't Mot. at 9) they concede that there is no CSRT process at Bagram (Resp't Mot. at 11 n.8) and have expressly acknowledged that the "Enemy Combatant Review Board ["ECRB"] . . . is not the functional equivalent of a CSRT."[30] In short, Respondents' own description of the "process" afforded detainees at Bagram makes it clear that it is not a "competent tribunal" and that its procedures do not satisfy the requirements of the MCA.[31] In short, the statute is simply inapplicable.

## III.  *BOUMEDIENE* MAKES CLEAR THAT JURISDICTION LIES WITH THIS COURT AND THAT PETITIONER MAY INVOKE THE WRIT

In *Boumediene,* the Supreme Court held that three factors are relevant in determining the reach of the Suspension Clause:

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place, and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

Critical to the Court's analysis was the concept that "[I]ndefinite imprisonment on reasonable suspicion is not an available option of treatment for those accused of aiding the enemy, absent a suspension of the writ." *Boumediene,* 128 S. Ct. at 2262. Applying the *Boumediene* analysis to

---

[29] Because no procedure before a competent tribunal is available to any detainee at Bagram, Petitioner cannot be said to be "awaiting" such a procedure.

[30] Resp't Mot. To Dismiss at 10, n. 5, *Ruzatullah v. Gates*, 06-CV-01707 (D.D.C. 2007), (Olshansky Decl., Ex. 16.)

[31] If Respondents in reply decide to contend that the UECRB process meets the "competent tribunal" requirement of the MCA or any due process standard at all, Petitioner is entitled to take discovery of the procedures purportedly used to make his "enemy combatant" or "unlawful enemy combatant" status determination.

Petitioner's situation makes clear that he is entitled to invoke this Court's power to hear his Petition. Indeed, the Great Writ is the only vehicle by which Mr. Wazir can challenge his indefinite imprisonment without charge or trial by the U.S. Government.

## A.  Consideration of the *Boumediene* "Status and Process" Factor Supports Petitioner's Contention

The first factor the *Boumediene* Court examined was the "citizenship and status of the detainee and the adequacy of the process through which th[e] status determination was made." *Id.* at 2259. Like Mr. Wazir, the Guantánamo Petitioners were not U.S. citizens, yet the Court proceeded to examine the extent to which the CSRTs provided sufficient due process protections to them, and concluded that the CSRT hearings "fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 2260. A comparison of the CSRT process with the UECRB process at Bagram reveals a significant disparity between the two. The UECRB process does not even meet the standard of the inadequate CSRT process,[32] and its shortcomings are woefully apparent when viewed in light of the *Boumediene* factors used to assess the adequacy of process due foreign nationals: (1) the status of the detainee; (2) effective notice of factual allegations; (3) whether an advocate was assigned to represent the detainee; (4) whether the detainee had an adequate opportunity to rebut the Government's evidence against him; (5) whether the detainee had the opportunity to confront the Government's witnesses; (6) whether the detainee had the opportunity to present evidence to demonstrate his

---

[32] Several studies suggest that in reality, the process afforded detainees at Guantanamo never came close to meeting the standards suggested by Respondents' characterization of the CSRTs. *See e.g., Amnesty Int'l, No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo*, AMR 51/163/2007 (2007) available at http://www.amnesty.org/en/library/asset/AMR51/163/2007/en/dom-AMR511632007en.pdf; Mark Denbeaux, *No-Hearing Hearings, CSRT: The Modern Habeas Corpus*? Seton Hall Univ. Apr. 2, 2007, (Olshansky Decl., Ex. 17.) For example, while military guidelines state that a detainee may examine any witnesses the Government presents to establish his "enemy combatancy" the Government did not produce a single witness in any CSRT proceeding. *Id.* at 5. Moreover, requests by the detainees to produce witnesses were denied in 74% of cases, and no witnesses from outside Guantanamo were ever permitted to appear. *Id.* at 3. Finally, though the guidelines state that a detainee may present documentary evidence of his innocence, in most cases requests to present such evidence were denied—even when the documents at issue (passports, hospital forms, and other records) were in the Government's possession. *Id.* at 6. The disparity between stated process afforded at Guantanamo and that detainees actually experienced suggests that the status determination procedures at Bagram may also offer detainees far less protection than the framework suggests.

innocence; (7) the neutrality of the tribunal; and (8) the effectiveness of the review by higher courts. 128 S. Ct. at 2238, 2260, 2269.   Assessed in terms of these standards, the UECRB process cannot withstand even the most minimal level of scrutiny. The UECRBs fall short in every single area. Given that the CSRT process failed to meet the requirements of the first factor of *Boumediene* test, the UECRB process must necessarily fail as well.

### 1.   Petitioner is a civilian who was seized in Dubai far from any battlefield, and is not an "enemy combatant."

Respondents argue that because Petitioner is a "non-U.S. citizen who was captured abroad and, at all relevant times, detained abroad" (Resp't Mot. at 23) he has no right to invoke the protection of the Suspension Clause. Yet it is precisely because he is an Afghan citizen, a country that is not at war with the U.S., and a civilian, who did not take up arms against the United States, that he cannot be denied the protections of the Suspension Clause to contest his indefinite detention.

The Authorization for the Use of Military Force ("AUMF"), authorized the use of force against "organizations" that "planned, authorized, committed, or aided" the September 11 attacks; it did not authorize the indefinite detention of civilian citizens of friendly nations who did not participate in any hostilities. AUMF, 115 Stat. 224 (2001). The *Hamdi* Court set forth the principles by which judicial investigation of "war on terror" detentions should be guided relying upon "longstanding law-of-war principles." 542 U.S. at 518. Under the laws of war, people like Mr. Wazir who never took up arms and were not affiliated with the armed forces of an enemy State are not "combatants," but "civilians." Protocol Additional to the Geneva Conventions of 12 Aug., 1949, and Relating to the Protection of Victims of Int'l Armed Conflicts, art. 50, June 8, 1977, 1125 U.N.T.S. 603. The *Hamdi* plurality stressed that military detention is justified *only* "to prevent a combatant's return to the battlefield," 542 U.S. at 519, and that because civilians were never participants in the battle on the "battlefield", the law does not permit a State to treat

them as "combatants" who might return to the battle.[33] Under a law of war analysis, because Mr. Wazir is the citizen of a nation that is friendly to the United States and has not taken up arms against the U.S., he cannot be considered an "enemy combatant" and the AUMF does not authorize his detention. *See Hamdi*, 542 U.S. at 518.  Because there is no longer an international armed conflict in Afghanistan and there is no basis under the law of internal armed conflict to detain any person, Respondents' detention of Petitioner is unlawful under international humanitarian law. In addition, Respondents are not permitted to detain Petitioner without due process without violating the constellation of human rights protections that apply both during war and peacetime.

Under the *Boumediene* analysis, Mr. Wazir's status is a far cry from that of the petitioners in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), who were German nationals accused of "engaging in, permitting or ordering continued military activity against the United States after surrender of Germany . . . .", 339 U.S. at 766, and placed in a jointly-controlled Allied prison in Germany, following their conviction by a military commission. The *Eisentrager* petitioners did not contest the allegation that they were "enemy alien[s]." *Id.* at 777.  And as the *Rasul* Court noted, there is a strong distinction to be made when the detained petitioners, like Mr. Wazir, are "not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States. . . ." *Rasul,* 542 U.S. at 476. Acknowledging the correctness of the *Rasul* analysis, the *Boumediene* Court likewise held that petitioners from Bosnia and Algeria (nations not at war with the United States) who denied their "enemy combatant" status, were also entitled to the protection of the writ. 128 S. Ct. at 2241. Because

---

[33] The only detention authority upon which the Government can rely is that pertaining to combatants/POWs in an international armed conflict. This war with Afghanistan ended when the U.S. recognized the new provisional Government of Afghanistan in 2002. To the extent that the violence in Afghanistan now can properly be characterized as an internal armed conflict, the Government is incorrect in its analysis; there is no basis in such a circumstance to detain anyone. That authority must derive from local law.

Mr. Wazir's status is no different from the *Rasul* petitioners or the *Boumediene* petitioners and he is entitled to the same protections.

### 2.   Petitioner has never been provided notice of the charges against him.

Examining the issue of notice, the *Boumediene* Court noted that the *Eisentrager* petitioners were "charged by a bill of particulars that made detailed factual allegations against them." *Id*. at 2260. In Guantánamo, detainees were supposed to have been provided notice of the "factual basis" for their detention in advance of their appearance before a CSRT. *See* Merits Brief of Resp't at 49, *Boumediene*, 128 S. Ct. at 2229. However, because the U.S. Government never filed the factual returns that are part of habeas proceedings prior to the *Boumediene* decision in June of this year, the Guantánamo detainees were only able to learn something of the contentions against them at their CSRT hearings. This was a far cry from the bill of particulars provided in *Eisentrager*. Respondents now concede that Bagram detainees are given no such information. According to Respondents, a detainee is given timely notice of the basis of his detention only if "operational requirements" permit. (Tennison Decl. ¶13.) If circumstances require then, a detainee presumably can be kept in the dark regarding any charges or evidence against him. *See id*. Moreover, the UECRB regulations do not ensure that notice—when given—will be provided *in advance* of the detainee's initial hearing or his six-month review. Indeed, there is no guarantee that any detainee will be permitted to attend his hearing. Merits Brief of Resp't at 49, *Boumediene*, 128 S. Ct. at 2229; (*see* Tennison Decl. ¶13.) The Government's failure to provide notice to detainees has been confirmed by Jawed Ahmad, the young Afghan journalist imprisoned at Bagram who was later declared innocent. According to Mr. Ahmad, during his 11 months at Bagram, he was never informed about any charges against him and was never permitted to attend any hearing held on his case. (Ahmad Decl. ¶17, Olshansky Decl., Ex. 1.) In the end, the issue of whether notice is provided to Bagram detainees is of little moment given

that they are not permitted to communicate with counsel about their legal options.  (*Id.* ¶19.)

Even assuming that Mr. Wazir had been furnished with a summary of the factual basis for his detention, he still would not have been provided sufficient notice for due process purposes, because the Government has not revealed even the general criteria it used to determine that he is an "unlawful enemy combatant." With no fixed definition of the term, it is impossible for a detainee to rebut the Government's claim that he falls within this status category—which also appears to be an offense, trial, and sentence combined in one Executive designation—and effectively challenge his detention. Indeed, the *Hamdi* Court appropriately queried why the Government has "never provided any court with the full criteria that it uses in classifying individuals" as enemy combatants. 542 U.S. at 516. Accepting the Government's articulated definition in that case, the *Hamdi* Court determined the classification to include individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Id.* (internal citations omitted). Since that time, however, the Government's definition of "enemy combatant" has undergone numerous iterations.[34] The perpetually mutating definition of "enemy combatancy" makes it impossible for a detainee to gain any meaningful notice of the charges against him. Under domestic and international law, detention is arbitrary in the absence of an adequate explanation of the legal basis for one's incarceration. *See, e.g., Martinez v. Los Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998) (stating that "[d]etention is arbitrary if it is 'not accompanied by notice of charges . . . .'" (*quoting* Restatement (Third) of the Foreign Relations Law of the United States §702 cmt. h (1987)). Where, as here, the legal standard is illusory and

---

[34] Apparently unsatisfied with the definition for "enemy combatancy" accepted by the *Hamdi* Court, the Government fabricated a new definition in July 2004, extending the classification beyond those fighting in Afghanistan to apply to anyone "who was part of or supporting the Taliban or Al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." (Wolfowitz Memo, Olshansky Decl., Ex. 11.) The definition was altered again in the MCA, expanding the category to include individuals who provide "material" support to U.S. enemies. MCA, §948.

notice of the factual basis for the charges is not provided, the accused cannot be informed of how he must act in order to conform his conduct to the law.[35]

### 3. Petitioner has been denied access to counsel.

The *Boumediene* Court also found the availability of legal representation at Guantánamo to be seriously deficient. 128 S. Ct. at 2260. Although a "Personal Representative" is made available to any detainee who wishes one, the individuals provided are not attorneys but military officers whose loyalty is to the officer making the CSRT determinations. There is no attorney-client confidentiality between a detainee and his Personal Representative and no guarantee that the Representative would be able to assist the detainee in gathering evidence to present at the CSRT hearing to rebut the factual basis for the Government's determination. *See* Merits Brief of Resp't at 51-52, *Boumediene*, 128 S. Ct. at 2229. And while the regulations state that when a detainee's case is reviewed by the panel for the annual review, he is to be assigned an "Assisting Military Officer" to help him review the summary of the Government's evidence against him and aid him in presenting information supporting his declassification, (Dep't of Def. Memorandum, Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantánamo Bay, Cuba, Sept. 14, 2004 ("ARB Memorandum") (Olshansky Decl., Ex. 18) in reality no such assistance is given detainees.[36]   But even this meager and ineffective assistance offered at Guantánamo has never been available to the detainees at Bagram. Counsel

---

[35] The inconsistent definition of "enemy combatancy" creates the same constitutional problems as vague or poorly defined criminal statutes. As the Supreme Court held in *Chicago v. Morales*, a vague statute may "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; [and] . . . it may authorize and even encourage arbitrary and discriminatory enforcement." 527 U.S. 41, 56 (1999). The broad and ever-evolving standard for "enemy combatancy" raises exactly these concerns. For example, while the MCA promulgates a definition of unlawful "enemy combatancy" that requires material and purposeful support for U.S. enemies, the definition offered in the Defense Department's directive includes no such provision. As such, a detainee who offered only minor and even accidental support to Al Qaeda could be deemed an "enemy combatant" under the DoD standard, while his lack of intent and minor role would exculpate him under the MCA. The problems inherent in the inconsistent definitions of enemy combatancy ensure that, even with knowledge of the factual basis of the Government's case against him, a detainee cannot mount an effective defense.

[36] *See, e.g.*, Amnesty Int'l, *No Substitute for Habeas Corpus: Six Years Without Judicial Review in Guantanamo*, AMR 51/163/2007 (2007), available at http://www.amnesty.org/en/library/asset/AMR51/163/2007/en/dom-AMR511632007en.pdf.

has been repeatedly denied access to Petitioner. (Olshansky Decl. ¶2; *see also* Ahmad Decl. ¶19, Olshansky. Decl., Ex. 1) ("[d]uring the entire time I was at Bagram, I never had a lawyer or anyone advocating on my behalf").

Ultimately, the Court in *Boumediene* was so unimpressed by the representation offered detainees as part of the CSRT process at Guantánamo, *see* 128 S. Ct. at 2260, that this procedure added little weight to Respondents' side of the due process scale. By the same measure, for Petitioner and other Bagram detainees, the lack of any assistance must weigh heavily against Respondents' due process contentions. At Bagram, there is no guarantee that a detainee will even be given an interpreter through which to plead his case or assist him during interrogations. According to former detainee Jawed Ahmad, he was *never,* during the 110 interrogations he endured at Bagram, provided with an interpreter so that he could respond to the interrogators in his native tongue. (Ahmad Decl. ¶¶14, 19, Olshansky Decl., Ex. 1.)

### 4.  Petitioner has had no opportunity to rebut the evidence against him.

The Court in *Boumediene* compared the CSRTs to the military tribunals held for the German prisoners in *Eisentrager* to assess whether the detainees were ever in a position to present evidence to rebut the Government's allegations. In *Eisentrager*, "[the defendants] were allowed to introduce evidence on their own behalf and permitted to cross-examine the prosecution's witnesses." *Boumediene*, 128 S. Ct. 2260. In fact, the 27 German defendants received a full trial—albeit a military trial—lasting months and six of the accused were acquitted.[37] Moreover, in *Eisentrager*, as in *Ex Parte Quirin,* 317 U.S. 1 (1942), and *In re Yamashita*, 327 U.S. 1 (1946), the Supreme Court engaged in a searching and detailed analysis of whether the jurisdiction of the military commissions was proper, whether the admission of certain types of evidence violated constitutional, military, or treaty law, and whether procedural irregularities

---

[37] *See Eisentrager*, Index to Pleadings filed in the Supreme Court, Ex. F – "Regulations Governing the Trial of War Criminals in the China Theater" at 34.

occurred in violation of the Geneva Conventions. *See Eisentrager*, 339 U.S. at 780-81, 785-91; *Quirin*, 317 U.S. at 24; *Yamashita*, 327 U.S. at 5-6, 9.

In stark comparison, the Supreme Court found that the *Rasul* petitioners "never have been afforded access to any tribunal, much less charged with and convicted of wrongdoing," 542 U.S. at 476, and concluded that the CSRT proceedings did not provide adequate due process protections because, in the final analysis, a detainee's ability to rebut evidence against him "[was] limited by the circumstances of his confinement and his lack of counsel . . . ." *Id.* Given that the Bagram process is significantly inferior to the flawed procedures used at Guantánamo, the barriers facing Bagram detainees who seek an opportunity to be heard unequivocally tip the due process scale fully in their favor. While Respondents now claim that detainees are permitted to appear before a review panel at a screening that apparently takes place after six months of imprisonment, (*see* Resp't Mot. at 9) this new rule has been in place only since April 2008 and therefore was not available to Mr. Wazir for the duration of his six-year imprisonment at Bagram. He was given no opportunity to appear before any officer or Board. And while Respondents claim that detainees are permitted to make written statements to the UECRB (*see* Resp't Mot. at 9) suggesting that this constitutes a meaningful opportunity to be heard, little could be further from the truth. Former Bagram detainee Jawed Ahmad made numerous attempts to submit statements from his employer, CTV News, the biggest private news organization in Canada, from the Governor of the province in which his family lives, and from international journalists with whom he had worked, and was rebuffed each time. He was never given the chance to speak to any U.S. personnel no less submit any of the additional exculpatory information that his family had collected on his behalf. (*See* Ahmad Decl. ¶20, Olshansky. Decl., Ex. 1.) A process that prohibits a detainee from hearing the charges and evidence against him and submitting exculpatory evidence simply cannot meet any recognizable standard for due

process. In fact, given the lack of any response to Mr. Ahmad's 60 written requests to prison authorities for permission to present evidence, (Ahmad Decl. ¶18, Olshansky Decl., Ex. 1) detention at Bagram seems to meet the definition of the term "arbitrary".

### 5.  Mr. Wazir has not had the opportunity to confront the Government's witnesses.

The *Boumediene* Court opined that the procedures in *Eisentrager* were adequate in part because the accused were permitted to confront the Government's witnesses. *Boumediene,* 128 S. Ct. at 2260. Although the CSRT guidelines state that detainees will be able to confront the witnesses against them, the Court found that the Guantánamo detainees lacked meaningful adversarial mechanisms because of the circumstances of their confinement. 128 S. Ct. at 2229. The Bagram detainees suffer from the same procedural deficiency albeit to an even greater degree. There is no mechanism allowing for the confrontation of the Government's witnesses. Though Respondents concede that "unlawful enemy combatant" determinations are based on "testimony from individuals involved in the capture and interrogation of the detainee," (Tennison Decl. ¶13) detainees are not permitted to know the names of those who have spoken against them, no less question them. These due process deficiencies have been confirmed by Jawed Ahmad, who never had any opportunity to hear the statements of witnesses whom the Government claimed had testified against him. (Ahmad Decl. ¶20, Olshansky Decl., Ex. 1.)

### 6.  Mr. Wazir has not had the opportunity to gather and present evidence to demonstrate his innocence.

Further compounding the obstacles facing Bagram detainees is the lack of any opportunity to gather and present evidence. At Guantánamo, while the rules seem to permit detainees to present documentary information and witnesses at the CSRT, in actuality no detainee has been able to present witnesses that the Government deemed to be "reasonably available" within the meaning of the rule. *See* Dep't of Def. Mem., Combatant Status Review Tribunal Process at Guantánamo, at 3 (Jul. 2007) ("CSRT Process") (Olshansky. Decl., Ex. 19). In addition, the CSRT Reporter is

*obligated* to provide the Tribunal "evidence to suggest that the detainee should *not* be designated as an enemy combatant." Merits Brief of Resp't at 52, *Boumediene*, 128 S. Ct. at 2229. At Bagram, Respondents provide none of these safeguards against erroneous imprisonment; consideration of any evidence submitted in support of the detainee is entirely discretionary. According to Respondents, the detaining combatant commander, or his designee, *may* interview reasonably available witnesses if he so chooses, and only if doing so would "not affect combat, intelligence gathering, law enforcement, or support operations." (Tennison Decl. ¶13.) In other words, the same commander who is responsible for "combat, intelligence gathering, law enforcement, or support operations" at Bagram is also tasked with gathering evidence to demonstrate that the people in his custody were not properly detained in the first place.

Moreover, unlike the CSRT guidelines which specify that the detainee must be determined to be an "enemy combatant" by a preponderance of the evidence, *see* CSRT Process at 6 (Olshansky Decl., Ex. 19), no burden of proof is specified in the Government's explanation of the UECRB process. Consequently, the determination that Mr. Wazir is an "unlawful enemy combatant"—a label that could result in life sentence in a notoriously brutal prison camp—could have been based on nothing more than a scintilla of the most unreliable evidence. In the case of Jawed Ahmad, the U.S. Government never presented a single piece of evidence against him, and yet he was imprisoned at Bagram for nearly a year. (Ahmad Decl. at ¶¶9, 17, 20, Olshansky Decl., Ex. 1.)

### 7. The UECRB determinations lack a neutral decision-maker to which Petitioner can plead his case.

The UECRB process fails to provide Bagram detainees with access to a neutral decision-maker. In *Boumediene*, Respondents argued that the officers determining the status of detainees in Guantánamo were sufficiently neutral because "none . . . [were] involved in the apprehension, detention, interrogation, or previous determination of the status of the detainee." Merits Brief of

Resp't at 49-50, *Boumediene*, 128 S. Ct. 2229 (internal citations omitted). The guidelines for "unlawful enemy combatant" status determinations at Bagram include no such protection. While Respondents note that annual determinations are made by a UECRB panel comprised of "three commissioned officers," they make no mention of the neutrality of those individuals, offering no guarantee that they were not in fact involved in the capture of the detainee. (Resp't Mot. at 8.)

### 8. Petitioner has no right of appeal.

The final factor that the *Boumediene* Court analyzed was whether the CSRT determinations would be adequately reviewed by a higher court. 128 S. Ct. at 2260. The Court held that "although a detainee can seek review of his status determination in the Court of Appeals, that review process cannot cure all defects in the earlier proceedings." *Id*. At Bagram, there is no provision whatsoever for review of a detainee's status determination outside of the Defense Department.[38] Thus, not only do the detainees lack access to a neutral tribunal for a review of the original status determination, they lack any recourse to a neutral court or tribunal and have no access at all to civilian courts. The review process afforded Bagram detainees pales in comparison to even the deficient process offered at Guantánamo. In as much as the CSRT regime was deemed an inadequate substitute for the writ, Petitioner's entitlement to the Great Writ in this case is beyond doubt.

### B. The U.S. Government has Exclusive Jurisdiction and Control over Bagram

In *Boumediene,* the Supreme Court expressly rejected the proposition that "de jure sovereignty is the touchstone of habeas jurisdiction." 128 S. Ct. at 2235. According to the Court, the extraterritorial application of the Suspension Clause hinges upon "practical concerns" and "objective factors," not formal rules. *Id*. at 2236. Writing for the majority, Justice Kennedy identified "the nature of the sites where apprehension and then detention took place" as the

---

[38]At Bagram, the decision of the UECRB is reviewed by the Commanding General. (Tennison Decl. ¶13.)

second factor relevant to its determination of whether the Constitution extends to invalidate a suspension of the writ of habeas corpus. *Id.* at 2237.

Respondents have admitted that "the detention operation at Bagram is under the command and control of the U.S. military, and petitioner is in the physical and legal custody of the United States." (Resp't Mot. at 22 (internal quotations and citations omitted).) They have also stated that "the United States would not detain enemy combatants on any long-term basis at a facility that it did not control." *Id.* The evidence overwhelmingly demonstrates that Bagram is in the "absolute and indefinite control" of the United States, 128 S. Ct. at 2237, that the United States is not "answerable to its Allies for all activities occurring there," 128 S. Ct. at 2260, and that in every practical sense it is in the "constant jurisdiction of the United States." 128 S. Ct. at 2261. For these reasons, the Suspension Clause protects Mr. Wazir at Bagram no less than it would if Respondents had decided to transfer him to Guantánamo instead.

**1. The Afghan Government has ceded indefinite and exclusive control over Bagram to the United States under the terms of the agreements between the two nations.**

The Government concedes that Bagram is under the United States' command and control. (Resp't Mot. at 5.)[39]   The lease agreement between the two nations reveals that the United States' control over Bagram is just as absolute and exclusive as its control over Guantánamo. A comparison of the two lease agreements appears below.

| Indicia of Control (from lease) | Guantánamo Leases | Bagram Lease |
|---|---|---|
| 1. Right to exclusive use of the land. | "[T]he Republic of Cuba consents that during this period of the occupation by the United States…the United States shall | Afghanistan "hereby consigns to the UNITED STATES to have and to hold for the exclusive use of the UNITED STATES Forces |

---

[39] (*See also* Tennison Decl. ¶3 ("Task Force Guardian, a subordinate unit of CJTF-101, is under United States national command and control. Task Force Guardian is responsible for operating Bagram Theater Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility in support of Operation Enduring Freedom (OEF), located at the Bagram Airfield.  I have served as the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-101, since November 16, 2007.  In this position, I am responsible for all aspects of detention operations for CJTF-101.").)

| Indicia of Control (from lease) | Guantánamo Leases | Bagram Lease |
|---|---|---|
| | exercise complete jurisdiction and control over and within said areas." Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III T.S. No. 418 (Olshansky. Decl. ¶23, Ex. 20). | land, facilities, and appurtances (sic) currently owned by or otherwise under the control of Afghanistan…." Bagram Lease, Tennison Decl., Ex. A, ¶1. Afghanistan "warrants that the United States shall have exclusive, peaceable, undisturbed and uninterrupted possession without any interruption whatsoever by [Afghanistan] or its agents." *Id.* at ¶9. |
| 2. Right to perpetual possession at the United States' discretion. | "So long as the United States of America shall not abandon the said naval station of Guantánamo Bay…" Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866 (Olshansky. Decl. 24, Ex. 21). | The lease continues in effect "until the UNITED STATES or its successors determine that the Premises are no longer required for its use." *Id.* at ¶4. |
| 3. Occupation with de minimis or no rental obligation. | "[A]nnual sum of two thousand dollars, in gold coin." Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-Cuba, art. I (Olshansky. Decl. ¶25, Ex. 22). | "The HOST NATION makes the Premises available to the UNITED STATES, without rental or any other consideration for use of the premises." *Id.* at ¶5. |
| 4. Right of Host Nation to exert control over use of premises. | None. | None. The United States is permitted to "hold and enjoy the Premises during the period of th[e] agreement without any interruption whatsoever by the HOST NATION or its agents." *Id.* at ¶9. |
| 5. Right to assign property to another party without the consent of the host nation. | None. | "The UNITED STATES shall have the right to assign this agreement to a successor nation or organization." *Id.* at ¶2. |
| 6. Right of reversion. | None | "The UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use…." *Id.* at ¶12. |

Based on the terms of the lease agreements, a strong argument can be made that the degree of

U.S. control over Bagram is *greater* than it is over Guantánamo. Not only can the United States

occupy the land, (Tennison Decl., Ex. A (lease agreement) ¶¶1, 9), rent free, (*id.* ¶5), for as long

as it wishes, (*id.* ¶4), but it is also guaranteed no interference from the Government of

Afghanistan. (*Id.* ¶9.) The Bagram lease agreement also grants the U.S. the right to assign the

property on the same terms (*id.* ¶2) as well as a right of reversion to take back possession if the

successor later abandons the property. (*Id.* ¶12.)  The lease agreement expressly states the U.S.

Government has the right to the "exclusive use", "exclusive control", and the "exclusive,

peaceable, undisturbed and uninterrupted possession" of all facilities and land at Bagram during

the existence of the agreement. (Tennison Decl. ¶7; Ex. A (lease agreement) ¶¶1, 5, 8, 9.) The

lease agreement also continues in effect until the U.S. determines that it no longer requires use of

the Air Base. (Tennison Decl. ¶6; Ex. A (lease agreement) ¶4.)

Furthermore, under the terms of the Diplomatic Notes that Respondents contend create the

Status of Forces Agreement ("SOFA"), Afghanistan has acceded to the United States' demand

for a critical facet of Afghanistan's sovereignty:  the power to exercise criminal jurisdiction over

all U.S. personnel in the country. (*See* Diplomatic Note, Sept. 26, 2002, Tennison Decl., Ex. 2.)

The SOFA cedes control to the U.S. Government in the following ways:

| Area of control (sovereign authority) relinquished by Afghanistan to the United States | Corresponding provisions in the Status of Force Agreement |
|---|---|
| 1. The right to exercise criminal jurisdiction over persons within Afghanistan. | (a) "Afghanistan authorizes the United States Government to exercise criminal jurisdiction over the United States personnel." (Ex. 1 at p.20.)<br>(b) "[P]ersonnel may not be surrendered to . . . the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States." (*Id.* at p.20.) |
| 2. The right to lay a civil claim against the hosted nation for damages within Afghanistan. | "The parties waive any and all claims against each other for damages to, or loss or destruction of, property owned by each party, arising out of activities in Afghanistan under this agreement." (*Id.* at p.20.) |
| 3. The right to regulate the entry and exit of U.S. personnel. | "United States personnel [are] permitted to enter and exit Afghanistan with United States |

| Area of control (sovereign authority) relinquished by Afghanistan to the United States | Corresponding provisions in the Status of Force Agreement |
|---|---|
|  | identification." (*Id*. at p.18.) |
| 4. The right to charge fees and tolls for the use of Afghan roads and airspace. | "[V]ehicles and aircraft owned or operated by or for the United States armed forces shall not be subject to the payment of landing, navigation, over flight or parking charges or overland transit fees or tolls while in Afghanistan." (*Id.* at p.18.) |
| 5. The right to inspect U.S. vehicles within Afghan territory. | "Aircraft and vehicles of the United States shall be free of inspections" (*Id.* at p.18.) |
| 6. The right to impose taxes. | (a) "The Government of the United States of America . . . shall not be liable to pay tax or similar charges assessed within Afghanistan." *Id.* "[A]cquisition of articles and services . . . shall not be subject to any taxes, customs, duties or similar charges in Afghanistan." (*Id.* at p.18.) |
| 7. The right to regulate imports and exports into Afghanistan. | (a) "The Government of the United States of America . . . may import into, export out of, and use in the Republic of Afghanistan any personal property, equipment, supplies, materials, technology, training, or services required to implement this agreement." (*Id.* at p.18.) (b) "[I]mportation, exportation and use shall be exempt from any inspection, licenses, other restrictions, customs, duties, taxes or any other charges assessed within Afghanistan." (*Id.*) |
| 8. The right to regulate U.S. commercial activities in Afghanistan. | "[C]ontracts for the acquisition of articles and services, including construction . . . . shall be awarded in accordance with the laws and regulations of the Government of the United States of America." (*Id.)* |
| 9. The right to the exclusive development, operation, and control of critical communication technologies in Afghanistan | (a) "The United States Government shall be allowed to operate its own telecommunications systems." (*Id.* at p.20.) (b) "Use of radio spectrum shall be free of cost." (*Id.* at p.3.) |

The language establishing the United States' jurisdiction over the land, facilities, its own forces, the terms of military and commercial operations in Afghanistan and at Bagram is much stronger than that used in other SOFAs—which are designed to create exclusive jurisdiction— leaves no doubt that Bagram is under the exclusive jurisdiction and control of the U.S. within the

meaning of the Supreme Court's decisional authority.[40]

In short, the agreements make clear that any use of Bagram is permitted at the sole discretion of the United States.[41] (Tennison Decl., Ex. A ¶¶1, 9.) Contrary to the suggestion in the Tennison Declaration, (¶6), the power to grant another country the right to use part of Bagram does not undermine the United States' control over the property, it confirms it.

### 2.   The United States' control of Bagram has grown substantially and is expanding.

Respondents' self-serving statement that the United States "does not intend to occupy Bagram for an extended period or to treat it as part of U.S. territory, and [that] its use of the Airfield is no more than a transient possession necessitated by war," (Resp't Mot. at 20) is belied by the volume of information stated in DoD press releases, news articles, and insider reports detailing the U.S. Government's multi-billion dollar investment in the expansion of the Base. The Defense Department has stated that "[a]t Bagram Airfield, improvements to the living and working conditions have been and are constantly being made." Environmental Conditions at Bagram Airfield Information for Health Care Providers, June 2004 (Olshansky Decl., Ex. 23.) The United States' commitment of money and other resources to the continued development of Bagram plainly demonstrates its intention to maintain long-term occupation and control of the Base.

Since early 2005, Bagram has grown from a "glorified city of tents," Kent Harris, *Buildings Going up at Bagram Air Base as U.S. Forces Dig in for the Long Haul*, Stars and Stripes, Mar.

---

[40] For example, the 1996 U.S. Executive Agreement with Mongolia provides, unlike the Afghan agreement, that Mongolia may request that the United States waive its exclusive jurisdiction. Agreement on Military Exchanges and Visits between the Government of the United States of America and Mongolia, art. X, Jun. 26, 1996 (Olshansky Decl., Ex. 24). Similarly, unlike the Afghan agreements, Executive Agreements entered into by the U.S. prior to World War II with Newfoundland, Bermuda, Trinidad and other locations, all provided for shared jurisdiction over personnel, reserving exclusive jurisdiction only for offenses of a military nature. *See* Agreement and Exchanges of Notes Between the United States of America and Great Britain Respecting Leased Naval and Air Bases, art. IV (1)(a-c), Mar. 27, 1941, 55 Stat. 1560 (Olshansky Decl., Ex. 25.)

[41] If the Court is in any doubt as to the degree of control exercised by the United States at Bagram, and its comparison with the United States' control of Guantanamo, Petitioner respectfully submits that, at the least, the issue is a disputed question of fact. Petitioner has had no opportunity to take discovery concerning facts asserted in the Tennison Declaration. He should be permitted to do so before the Court dismisses the instant petition.

15, 2005 (Olshansky Decl., Ex. 26), to a state-of-the-art Air Base with: 1) permanent housing for

U.S. and coalition soldiers;[42] 2) a new runway, service taxiways, and aprons to meet military

standards;[43] 3) guard towers and concertina wire fencing to encircle the perimeter;[44] 4) an entry

control point facility;[45] 5) bulk fuel storage areas;[46] 6) the recently constructed Craig Hospital

and dental clinic;[47] 7) video-teleconference facilities;[48] 8) a $35 million power plant;[49] and 9) an

Army and Air Force Exchange Facility whose concessions include a Barber/Beauty Salon,

Nail/Spa, Gift Shop, Jewelry, Alterations, Artisan, Gifts, Jewelry, Sports Apparel, Korean

Snacks, Engraving, Sports, Coffee, Dairy Queen, Orange Julius, Thai Food, Pizza, Burger King,

Phone Center, Tailor, [and] Bazaar, housed in a "3,000 sq. ft. *permanent* building."[50] One

contractor, hired in 2008 to install 150,000 feet of information cable described the development

at Bagram as follows:

> With *no plans to reduce flight operations or personnel in the immediate future*, an
> *extensive overhaul and expansion project* that has already *spanned more than four years is*
> *underway*; and Superior Essex cable products are being instated to help the base meet
> *growing mission demands*.

Installation Profile: U.S. Controlled Air Base in Bagram Equipped with Superior Essex Cable,

2008, Superior Essex Inc. (Emphasis added.) (Olshansky Decl., Ex. 27).

Twenty-one American military and civilian engineers coordinate the development on the

Base. The team oversees the "steady flow of projects designed to improve and expand Bagram

---

[42] Synopsis, Security Upgrades, Army Corps of Engineers Contracting ("Army Corps of Engineers Security Upgrades"),  (Olshansky Decl., Ex. 28.).
[43] Fabric Aircraft Maintenance Hanger at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0052 (Apr. 29, 2008), (Olshansky Decl., Ex. 29.).
[44] Army Corps of Engineers Security Upgrades, (Olshansky Decl., Ex. 28.).
[45] *Id*.
[46] Construction Services for Bulk Fuel Storage and Transfer System at Bagram Airfield, Afghanistan, Army Corps of Engineers Contracting, Solicitation No. W912ER08R0054 (Apr. 25, 2008), (Olshansky Decl., Ex. 30.).
[47] *New Bagram Hospital Offers State of the Art Care*, Air Force Print News Today (Feb. 9, 2007), (Olshansky Decl., Ex. 31.).
[48] ICRC, *Afghanistan: Video Links Between Bagram Detainees and Families* (January 14, 2008), (Olshansky Decl., Ex. 32.).
[49] *$35 Million for Bagram AB Power Plant*, Defense Industry Daily (Aug. 4, 2008), (Olshansky Decl., Ex. 33.).
[50] Army and Air Force Exchange Service, Serving Troops Downrange, (Olshansky Decl., Ex. 8.).

Airfield." Army First Lieutenant Lory Stevens, *Engineer Team Plans Bagram's Future,*
American Press Forces Press Service News Articles, Aug. 13, 2008 (Olshansky Decl., Ex. 7.). At
any given time, the team "juggles about 20 projects," including demolition work, barrier
building, and structural work. *Id.* Among the ongoing initiatives is the construction of a $2.7
million Base administration building. *Id.* According to a Defense Department press release, 50
additional development projects are already in the pipeline for Bagram's expansion. *Id.* To
coordinate these projects, the U.S. military has deployed a Facilities Engineering Team ("FET")
to work at Bagram. Staff Sergeant Oshawn Jefferson, *FET Keeps Bagram Improving, Growing,*
Air Force Print News Today, Dec. 4, 2007, (Olshansky Decl., Ex. 34.). The responsibilities of
Bagram's FET include providing "support of more the 300 contractors on a daily basis," *id.*, who
are working the construction of "a new gym, dining facilities, a multipurpose facility, a
contractor village for large military construction projects, surge housing war reserve material
storage, a landfill wit an incinerator, and a wastewater treatment plant." In sum, far from being a
"transient possession," as Respondents claim, the U.S. military has retrofitted and continues to
modernize and build up the once Soviet-controlled airbase—operated without running water or
permanent accommodations—into a small city serving thousands of troops with advanced
medical care, housing, sanitation, entertainment, and many of the comforts of home for their
families.

The expansion of Bagram Air Base has also included a number of "quiet" additions to the
U.S. Government's internment facility, which has grown from a temporary holding pen designed
to hold roughly 100 detainees to a prison that now accommodates more than 670 alleged "enemy
combatants." Tim Golden, *Foiling U.S. Plan, Prison Expands in Afghanistan*, N.Y. Times, Jan.
7, 2008, at A1 (Olshansky Decl., Ex. 6.). Recent U.S. Government announcements have detailed
the plans for the construction of another very large prison on the Base, designed to hold up to

1100 detainees. Tim Golden and Eric Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo*, N.Y. Times, Feb. 26, 2006, at A1 (Olshansky Decl., Ex. 35). According to the New York Times, "[p]rivately, some administration officials acknowledge that the situation at Bagram has increasingly come to resemble the legal void that led to a landmark Supreme Court ruling in June 2004 affirming the right of prisoners at Guantánamo to challenge their detention in United States Courts." *Id.* Bagram has become a permanent fixture in Afghanistan under the complete jurisdiction and exclusive control of the U.S. to a degree more than sufficient to pass muster under the test set forth in *Boumediene*.

### 3.   U.S. control over Bagram Prison is much more extensive than its control over Landsberg Prison as analyzed in *Eisentrager*.

Respondents claim that Bagram is more like *Eisentrager*'s Landsberg Prison than Guantánamo, but the historical evidence shows that this is most certainly not the case. (Resp't Mot. at 20.) First, the nature and extent of U.S. authority over the sector of occupied Germany within which Landsberg Prison was located changed continuously in the years after World War II. The highly charged environment of the early Cold War led the U.S. to coordinate its operations more tightly with the United Kingdom and France, to shift responsibility for the occupation from military to civilian shoulders, and to set definite endpoints for its involvement in running a prison in Germany.[51] Second, the treatment of individual inmates at Landsberg Prison was split between a civilian official, the High Commissioner, and a military official, the Commander-in-Chief of the European Command, depending upon which of the Allied

---

[51] Well before Germany surrendered, the Allies agreed that "[s]upreme authority in Germany will be exercised, on instructions from their respective Governments, by the Commanders-in-Chief of [the Allies], each in his own zone of occupation, and also jointly, in matters affecting Germany as a whole, in their capacity as members of the [Control Council]." Agreement on Control Machinery in Germany, adopted by the European Advisory Commission, art. 1, Nov. 14, 1944, 5 U.S.T. 2062, (Olshansky Decl., Ex. 36.). Thus, any power the U.S. exercised within its zone in Occupied Germany constituted a power devolved from the Allied occupation authority, and its use, therefore, was subject to negotiation and deliberation by the other Allies if the Allied Control Council deemed the matter to "affect Germany as a whole," *id.*, or to be an area in which the four Allies needed to "to ensure appropriate uniformity of action by the Commanders-in-Chief in their respective zones of occupation." *Id.*, art. 3(b).

authorities had tried that particular inmate. In contrast, Respondents here admit, (Resp't. Mot. at 7), that the detention operations at Bagram are *solely* under the United States' command and control. *See* Exec. Order No. 10144, 15 Fed. Reg. 4705 (July 21, 1950), (Olshansky. Decl., Ex. 37.). Finally, by 1950, when *Eisentrager* was decided, the U.S. had already established its intention to transfer Landsberg prison back to the Germans. Occupation Statute Defining the Powers To Be Retained by the Occupation Authorities, *reprinted in* Staff of S. Comm. On Foreign Relations, 92d Cong., *Documents on Germany, 1944-1971*, 148 (Comm. Print 1971), (Olshansky Decl., Ex. 38). The U.S. Government's control over Bagram continues to expand. The circumstances of U.S. participation in the operation of Landsberg starkly contrasts with its role in running Bagram Air Base, where the Government of Afghanistan has expressly transferred control over all operations to the U.S. alone. (*See* Tennison Decl., Ex. A.)

## C. There Are No Practical Obstacles Inherent in Providing Mr. Wazir with Access to a Neutral Tribunal to Hear His Petition

Rejecting the Government's sweeping assertion that habeas jurisdiction must turn on the existence of formal sovereignty, the Supreme Court in *Boumediene* instead held that "[w]hether a constitutional provision has extraterritorial effect depends upon the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it" and, in particular, whether judicial enforcement of the provision would be "impracticable and anomalous." *Boumediene*, 128 S. Ct. at 2255-56. The *Boumediene* Court reasoned that while there are always likely to be costs associated with holding the Suspension Clause applicable in a case of military detention abroad, such costs are not dispositive. *Id*. at 2261. In this case, the practical barriers noted by the Government are far outweighed by the importance of upholding the rule of law and the structure and protections of the Constitution, which "are designed to survive, and remain in force, even in extraordinary times." *Id*. at 2277.

Respondents argue that extending habeas rights to Mr. Wazir will impose insurmountable

practical burdens on U.S. forces abroad and potentially disrupt our relations with Afghanistan by compelling his release into that country. (Resp't Mot. at 25-28.) But providing Petitioner with the right to challenge his detention by means of a petition for a writ of habeas corpus does not mean that he must be released immediately. It means that he is entitled to a hearing in which he can hear the charges and evidence against him and offer a rebuttal. Of course, in Mr. Wazir's case, the nature of his incarceration indicates that the U.S. Government is likely to have a difficult time supporting its actions. Whatever investigation led to his abduction in Dubai obviously did not take place in a "theater of war" any more than Mr. Wazir's arrest took place amidst enemy gunfire. His captors neither stormed nor held any combat position and he neither took up arms nor resisted his arrest. Acting on information whose veracity has yet to be tested or even openly alleged, U.S. Government officers snatched him from his business in Dubai, a peaceable U.S. ally, and then rendered him, via undisclosed locations, to Bagram. (*See* Ahmad Decl. ¶31, Olshansky Decl., Ex. 1.). Withholding all due process protections from Mr. Wazir is an exercise of arbitrary discretion, and his torture, interrogation, and seemingly unending detention a violation of his fundamental human rights to personal freedom and human dignity. To permit his continued detention without review would mean that the United States could pick up anyone, from any country around the world and escape scrutiny merely by sequestering that person in a foreign military base.

To the extent that anything is known about Mr. Wazir's seizure, it seems to have more closely resembled a law-enforcement arrest. (*See* Zaheerrullah Decl., Olshansky Decl., Ex. 2.). Indeed, there is no statement by Respondents that Mr. Wazir ever took up arms or participated in any hostilities against the U.S. or any of its coalition allies or that he is a member of the Taliban or somehow affiliated with Al Qaeda. (*See* Tennison Decl.) In fact, to the contrary, according to Jawed Ahmad, "one of the investigators in Bagram told Haji Wazir that there was no

incriminating evidence against him." (Ahmad Decl. ¶33, Olshansky Decl., Ex. 1.) Moreover, a letter signed by the Attorney General of Afghanistan, President Hamid Karzai, and all 14 members of the Afghan Government Prisoners' Commission for Reintegration stating that Mr. Wazir is innocent and should be released immediately. (*See* Zaheerrullah Decl. ¶6, Olshansky Decl., Ex. 2.)

Contrary to Respondents' allegations that the extension of process to Mr. Wazir, or others in a similar position, would compromise our military missions, (Resp't Mot. at 27) the ordinary trappings of law enforcement routinely accompany U.S. forces in the field. For example, the U.S. Army Criminal Investigation Command ("CID") has been organized as a specialized component of the U.S. Army for over forty years to conduct investigations wherever U.S. military units (including Special Forces) operate. As one of its officers has boasted: "[w]hen the need dictates, our paratrooper agents are prepared for airborne deployment directly into the theater of conflict." Statement of Command Sergeant Major Michael Misianowycz, *Criminal Investigation Command 'On the Lookout' for Soldiers*, Jan. 24, 2006, http://www.cid.army.mil/documents/CID_in_the_News/ on%20the%20lookout.pdf. The CID has authority to investigate felony crimes affecting the Army at any time in any country in the world. Thus, the military's investigative capabilities accompany the flag. And they are not only considered practical; they are a deemed necessary to enforcing the laws of war. *See* U.S. Army Criminal Investigation Command, *History*, http://www.cid.army.mil/history.html. If professionals like CID agents can accompany U.S. Special Forces into the heat of battle, it seems anomalous for Respondents to complain that insurmountable burdens will result from the requirement to produce evidence and provide process for individuals, such as Mr. Wazir, whom it seizes as part of something resembling a global law enforcement operation.

Respondents' position of entitlement to absolute immunity from judicial review, coupled

with the opacity with which they shroud the arbitrary detention of civilians like Mr. Wazir, threatens the American mission abroad far more than the extension of rights secured by U.S. and international law. In the absence of judicial oversight, Bagram Prison has been the site of numerous gross violations of detainees' rights, including the brutal murder of prisoners. James R. Schlesinger, et al., *Final Report of the Independent Panel to Review DoD Detention Operations*, August 24, 2004, http://www.pbs.org/wgbh/pages/frontline/torture/paper/reports.html (noting migration of unlawful interrogation tactics from Guantánamo to Afghanistan and Iraq). Confronted with a U.S. system of lawlessness and brutality, our allies now express reluctance to render detainees to facilities over which the United States exercises exclusive jurisdiction.[52] Air force Judge Advocate General Charles Dunlap identified U.S. involvement in human rights violations as "literally indistinguishable from conventional military defeats . . . . The reality is Americans have died and will continue to die as an indirect result of this. It energized the enemy, it eroded the Coalition." *The Law of Armed Conflict*, Air & Space Conference and Technology Exposition 2005, 13 Sept. 2005, http://www.afa.org/media/scripts/Dunlap_conf2005.html. It is not the extension of process to detainees such as Mr. Wazir but rather the *lack of process* that threatens our coalition, diverts "attention of military personnel from other pressing tasks," and damages "the prestige of our military commanders at a sensitive time." (Resp't Mot. at 26-7.)

   The Government's argument that "Petitioner's allegation that he was not captured on a battlefield in Afghanistan is immaterial" bodes ill for us all. To allow the Government to continue to seize individuals from any country and detain them in Bagram in order to hide their treatment under the cloak of "war" will inevitably result in thousands of persons being held

---

[52] Glenn Kessler, Europeans Search for Conciliation with U.S., Dec. 9, 2005, Wash. Post. at A1 (Dutch forces in Afghanistan pressed to set up own detention facilities due to reluctance to render to U.S. custody). The Controversy Over Detainees, Apr. 27, 2007, CBS News, *http://www.cbc.ca/news/background/afghanistan/detainees.html* (Canadians opted to turn over detainees to Afghans rather than U.S. detention facilities).

indefinitely in a conflict that the Government concedes is "unlikely to end with a formal cease-fire agreement." *Hamdi,* 542 U.S. at 520. The Government cannot hold Mr. Wazir in detention indefinitely and claim that a due process review of his status will disrupt combat operations when the only reason he is even near any area of hostilities is because the United States decided to place him there.

The application of all three factors to Petitioner's detention at Bagram demonstrates that the Suspension Clause reaches this case. Failure to allow Mr. Wazir to pursue habeas relief would violate the Constitution because Congress neither properly suspended the Great Writ nor provided for an adequate alternative remedy.

## IV. THE U.S. GOVERNMENT HAS VIOLATED PETITIONER'S CONSTITUTIONAL, STATUTORY, AND INTERNATIONAL RIGHTS

### A. Petitioner's Seizure and Detention Violates the Rule of Law

The fundamental precept that the Government may not take the life, liberty or property of a person without authority from the law is one of the cornerstones of our democracy. The rule of law encompasses both "procedural and substantive" limitations on Government power,[53] and requires the supremacy of legal authority over officials as well as ordinary citizens and the availability of the courts to enforce the law and employ fair procedures.[54] Petitioner has been subjected to indefinite detention by the Executive and in the absence of this Court's proper intervention he will most likely be deprived of any impartial judgment regarding his continued detention. Such a consolidation of power undermines our system of checks and balances. *See Nixon v. United States*, 506 U.S. 224, 234-35 (1993). The Founders warned against exactly these circumstances in advocating for the adoption of our Constitution: "[t]he accumulation of all powers legislative executive and judiciary in the same hands, whether of one, a few or many, and

---

[53] Diane P. Wood, *The Rule of Law in Times of Stress*, 70 U. Chi. L. Rev. 455, 457 (2003).
[54] Richard H. Fallon, *"The Rule of Law" as a Concept in Constitutional Discourse*, 97 Colum. L. Rev. 1, 8 (1997).

whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." *The Federalist No. 47*, at 244. Respondents assert that the amorphous exigencies of international terrorist activities warrant the creation of a black hole in which the rule of law disappears. But this assertion ignores the time-honored principle, forged in the heat of many armed conflicts, that even armed combat does not eviscerate the Constitution. "No penance would ever expiate the sin against free Government of holding that a President can escape control of executive powers by law through assuming his military role." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645-46 (1952) (Jackson, J., concurring). The Constitution is applied "equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866); *accord United States v. Robel,* 389 U.S. 258, 263-64 (1967).

## B. Petitioner's Seizure and Imprisonment Violates the Due Process Clause

Petitioner's detention violates the fundamental Fifth Amendment right against imprisonment without due process of law—a right Petitioner may invoke due to his imprisonment on a military base subject to the exclusive jurisdiction and control of the United States. Due process requires that any serious deprivation of liberty be tested under fair procedures that afford meaningful notice of the basis for the detention and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533 (plurality opinion); *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2856 (2007) (due process requires opportunity "to submit 'evidence and argument from the prisoner's counsel'"). Moreover, "the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533 (quoting *Fuentes v. Shevin*, 407 U.S. 67 (1972) (internal quotation marks omitted)). The Due Process Clause is particularly exacting where, as here, potentially lifelong confinement is contemplated without any of the protections that precede a

criminal conviction. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) ("We have often subjected to heightened due process scrutiny, with regard to both purpose and duration, deprivations of physical liberty imposed before a [criminal] judgment is rendered[.]").[55]

In *Hamdi*, the Government claimed the power to imprison "enemy combatants," a defined category limited to persons who were "'part of or supporting forces hostile to the United States or coalition partners in Afghanistan' and who 'engaged in an armed conflict against the United States there.'" 542 U.S. at 516. The Supreme Court found that the AUMF authorized the military detention of persons falling within this narrowly cabined and "limited category." *Id*. at 518. Nine days after the *Hamdi* decision was announced, the Deputy Secretary of Defense promulgated a far broader definition of the term "enemy combatant."[56] The Government has since claimed authority to subject to indefinite military imprisonment any individual falling within successive new definitions of the phrase, all of which apparently include citizens of friendly nations whose conduct does not approach any definition of "combatancy" (*see* Ahmad Decl. ¶¶1-6, Olshansky Decl., Ex. 1) or whose supposed "support[]" for al Qaeda is unintentional. *See Guantánamo Detainee Cases*, 355 F. Supp. 2d at 475 (noting the Government's position that the military could indefinitely detain "[a] little old lady in Switzerland who writes checks to what she thinks is a charity that helps orphans in Afghanistan but [what] really is a front to finance al-Qaeda activities" (internal quotation marks omitted)).

The laws of war justify extended military detention "to prevent a combatant's return to the

---

[55] The requirements of due process mirror the procedures familiar to the common law as the Due Process Clause has long been understood to "affirm[] the right of trial according to the process and proceedings of the common law." 3 Story, Commentaries on the Constitution of the United States §1783 (1833); *see also Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) (aim of the Due Process Clause is "to embody certain guaranties and immunities which we had inherited from our English ancestors"); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 277 (1855) (due process inquiry "look[s] to those settled usages and modes of proceeding existing in the common and statute law of England").

[56] *See* Wolfowitz Memo (Olshansky Decl. ¶14, Ex. 11).

battlefield." *Hamdi*, 542 U.S. at 519. "Indefinite detention for the purpose of interrogation is not authorized." *Id.* at 521. *Hamdi* rested on the foundation that the laws of war authorize military detention of persons who join "'the military arm of the enemy Government,'" *id.* at 519 (quoting *Quirin*, 312 U.S. at 37-38), and who "'engage[] in an armed conflict against the United States'" *Id.*(citation omitted). Under the laws of war,[57] individuals who are not affiliated with the armed forces of an enemy State are not "combatants," but "civilians."[58] The laws of war permit the use of military force against civilians, but only and for such time as they "take a direct part in hostilities,"[59] which must be intentional.[60] *See* 1 Henckaerts & Doswald-Beck, Customary International Humanitarian Law 11, 20-21 (2005). The Government's newest definition of "unlawful enemy combatant" as set forth in the MCA is not based on any recognized law-of-war principle. The laws of war do not treat as "combatants" and do not authorize the use of military force against persons who might provide "support" for a group such as al Qaeda but do not directly engage in hostilities. Yet the MCA appears to label as "combatants" persons who are not lawful targets of force under the laws of war, such as civilians who may provide "food or medicine" or "monetary aid".

Although the *Hamdi* plurality suggested a procedural framework that might have satisfied the dictates of due process had it been implemented in 2004, the UECRB process falls far short of

---

[57] *See also* 1949 Geneva Convention art. 4(A)(1) (defining "prisoners of war" as "[m]embers of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces"); Additional Protocol I, art. 43(2) (defining "combatants" as "[m]embers of the armed forces of a Party to a conflict" other than medical and religious personnel); Henckaerts & Doswald-Beck, 1 Customary International Humanitarian Law 11 (2005).

[58] Additional Protocol I, art. 50 (defining "civilian" as any person who does not fall under identified sections of article 4 of the Third Geneva Convention or article 43 of Additional Protocol I).

[59] Department of the Navy, *Commander's Handbook on the Law of Naval Operations* 11.3 (1995) ("Civilians who take a direct part in hostilities by taking up arms or otherwise trying to kill, injure, or capture enemy personnel or destroy enemy property lose their immunity and may be attacked.") (Olshansky Decl. ¶42, Ex. 39); *U.S. Air Force Pamphlet* 110-31, §5-3(a)(1)(c) (Nov. 19, 1976) ("Civilians enjoy the protection afforded by law unless and for such time as they take a direct part in the hostilities.") (Olshansky Decl. ¶43, Ex. 40.)

[60] *See, e.g.,* Michael Schmitt, *Humanitarian Law and Direct Participation in Hostilities By Private Contractors or Civilian Employees*, 5 Chi. J. Int'l L. 511, 538 (2005) ("[T]he mens rea of the civilian involved is the seminal factor in assessing whether an attack or other act against military personnel or military objects is direct participation.").

such an approach. After holding Petitioner for six years in horrendous conditions, the Government's failure to comply with even the most rudimentary aspects of due process deserves no further indulgence. The Government's promulgation of rules that allow it to avoid providing notice of charges, prevent detainees from seeing the evidence against them, forbid detainees from consulting with counsel, and deny detainees the opportunity to proffer evidence, cannot be sanctioned as meeting even the bare bones structure contemplated by the plurality in *Hamdi*. In arguing for the total absence of law at Bagram, Respondents ignore the practical flexibility which the Due Process Clause permits in its application and instead continue to press their argument that this Court should condone Petitioner's six-year limbo for an indefinite period into the future. *See Heller v. Doe*, 509 U.S. 312, 332 (1993) ("[F]lexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.") Due process cannot bear the burden of further delay.

## C. Respondents' Detention of Petitioner Violates International Law

The U.S. was founded on a deep respect for international law as reflected in the text of the Constitution, which includes treaties as part of the supreme law of the land along with the Constitution itself.[61] The Supreme Court has held that customary international law is also part of federal law. *The Pacquette Habana*, 175 U.S. 677, 700 (1900). And the competence of federal courts to adjudicate the effect of treaties and customary international law has been definitively established by the Constitution,[62] case law[63] and statute.[64] Indeed, the Supreme Court has even applied international law to determine the legal status and rights of persons detained in the

---

[61] U.S. Const. Art. VI, §2 (the Constitution, federal statutes and treaties are all "the Supreme law of the land").

[62] U.S. Const. Art. III, §2 (providing that cases arising under "the Laws of the United States…. and Treaties made…under their Authority" are within the federal judicial power).

[63] *See, e.g., Owing v. Norwood's Lessee*, 9 U.S. (5 Cranch) 344, 348 (1809).

[64] 28 U.S.C. §1331.

course of armed conflict. *See, e.g., Quirin*, 317 U.S. at 27-28.

By treaty and customary law, international human rights law recognizes the right of persons to be free from arbitrary detention, and the concomitant right to meaningful judicial review to ensure that any detention is lawful. *See Sosa v. Alvarez Machain*, 542 U.S. 692, 732 (2004). The universally recognized norm prohibiting arbitrary arrest and detention is codified in every major comprehensive human rights instrument and is reflected in at least 119 national constitutions.[65] The Universal Declaration of Human Rights, which is recognized as an authoritative statement of customary international law, contains the obligation to provide detainees with an opportunity to challenge their detention in court. Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc. A/810 (Dec. 12, 1948). This obligation is included in every other major international human rights convention that contains a general enumeration of rights.[66] There is also wide international practice in support of a principle akin to habeas corpus under international law.[67] The consistency and weight of international practice is such that the distinguished authors of the Third Restatement have stated that, as a matter of customary international law, a State violates international law if, as a matter of policy, it practices, encourages, or condones "prolonged arbitrary detention." Restatement (Third) of Foreign Relations Law of the United States §702, n.6 (1987).

Customary international law claims are cognizable in U.S. courts provided they enforce

---

[65] *See* M. Cherif Bassiouni, *Human Rights in the Context of Criminal Justice:  Identifying International Procedural Protections and Equivalent Protections in National Constitutions*, 3 Duke J. Comp. & Int'l L. 235, 260-61 (1993).

[66] *See, e.g.*, Am. Decl. of the Rights and Duties of Man, O.A.S. Res. XXX, arts. XXV-XXVI, reprinted in 43 Am. J. Int'l L. Supp. 133 (1949) (expressing the obligations of members of the Organization of American States, including the U.S.); European Convention for the Protection of Human Rights and Fundamental Freedoms art. 5, Nov. 4, 1950, 213 U.N.T.S. 221; International Covenant on Civil and Political Rights, art. 9, Nov. 22, 1966, 999 U.N.T.S. 171; O.A.S., American Convention on Human Rights, art. 7(5), Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123; African Charter on Human and People's Rights, arts. 6-7, June 27, 1981, 21 I.L.M. 58.

[67] For example, the United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. Res. 43/173, U.N. GAOR, 43rd Sess., Supp. No. 49, U.N. Doc. A/43/49 (1988) (Olshansky Decl. ¶44, Ex. 41), contains a requirement for judicial control (Principle 4), a right to legal assistance (Principle 17), a right to consult counsel (Principle 18) and a right to challenge the lawfulness of detention (Principle 32). The Body of Principles contains no provision for suspension of the guarantees in times of crisis.

"international norms with definite content and acceptance among civilized nations," and/or norms that rise to the level of "specific, universal and obligatory" standards. *Sosa*, 542 U.S. at 732. Petitioner's claims here include only those that have been endorsed by the courts as meeting that standard: torture;[68] cruel, inhuman or degrading treatment;[69] and prolonged arbitrary detention.[70] *See Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995). These claims are distinct from those arising under treaties ratified by the United States. *See* Restatement (Third) of the Foreign Relations Law of the United States §702(e) (1986).

Petitioner is protected from arbitrary detention under the International Covenant on Civil and Political Rights ("ICCPR"),[71] which has been ratified and is binding on the United States. The ICCPR provides, in pertinent part:

> Article 9(1): Everyone has the right to liberty and security of the person. No one shall be subjected to arbitrary arrest or detention. . . .
> Article 9(4): Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

As the plain language indicates, the essence of the prohibition against arbitrary detention is a right to judicial review.[72] The habeas corpus statute expressly provides that it is available where detention is contrary to treaties of the U.S., *see* 28 U.S.C §2241(c)(3), and therefore no new legislation is necessary to enforce Petitioner's rights under the ICCPR. *See Rasul*, 542 U.S. at 484 n. 15. Petitioner is availing himself of the habeas statute and §2241 executes Article 9 of the ICCPR for purposes of his Petition.[73] Similarly, any reservation by the U.S. cannot nullify the

---

[68] *See, e.g., Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980); *In re Estate of Ferdinand Marcos*, Human Rights Litigation, 25 F.3d 1467 (9th Cir. 1994).

[69] *See, e.g., Xuncax v. Gramajo*, 886 F. Supp. 162, 189 (D. Mass. 1995); *Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887, at *7-*9 (S.D.N.Y. 2002).

[70] *See, e.g., Wiwa*, 2002 WL 319887; *Gramajo*, 886 F.Supp. at 184-85.

[71] ICCPR, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171. The U.S. ratified the ICCPR on June 8, 1992.

[72] *See, e.g., Vuolanne v. Finland*, No. 265/1987, U.N. Humans Rts. Comm. Communication No. 25/1987, ¶9.6, U.N. Doc. CCPR/C/35/D/265/1987 (1989) (finding that review of petitioner's claim before a superior military officer lacked the "judicial character" of a court hearing, thus depriving petitioner of his right of recourse to a "court").

[73] For this reason, the U.S. declaration that articles 1 through 27 of the ICCPR are non-self-executing is of no effect.

binding nature of the ICCPR under the fundamental principle, embodied in the Supremacy Clause, that it constitutes supreme federal law. *See United States v. Pink*, 315 US. 203, 230 (1942). As the "law of the land," the provisions of the ICCPR are directly enforceable through the habeas statute. *See United States v. Rauscher*, 119 US. 407, 418-19 (1886) (quoting *Head-Money Cases*, 112 US. 580, 599 (1884)).

Protection against arbitrary detention is guaranteed by virtually every State's domestic laws, but it does not end at any one State's border. International law guarantees this fundamental right for any person detained under the authority and control of a State, regardless of whether the detention occurs within the State's sovereign territory, and the guarantee applies equally in times of war and times of peace. Petitioner's allegations unequivocally state valid claims under nonderogable norms of customary international law, under binding international treaties, and under federal common law.

## Conclusion

For the foregoing reasons, this Court should deny Respondents' Motion to Dismiss Mr. Wazir's Petition for Writ of Habeas Corpus.

Dated: November 3, 2008                    Respectfully submitted,

_____/s/_____

BARBARA OLSHANSKY (DC Bar No. NY0057)

KATHLEEN KELLY (CA Bar No. 228571)
International Human Rights Clinic
Stanford Law School
559 Nathan Abbott Way
Stanford, CA, 94305
Tel. 650.721-5885
Fax 650.723.4426

_____/s/_____
Tina Monshipour Foster
International Justice Network
PO Box 610119
New York, New York, 11361-0119
Tel.:   917.442.9580
Email: tina.foster@ijnetwork.org