WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 2
of Declaration of Barbara J. Olshansky,
dated November 3, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------------------x
HAJI WAZIR,                                     )
         Detainee,                              )
         United States Air Base at              )
         Bagram, Afghanistan; and               )
                                                )
MOHAMMAD SHARIF,                                )
         as the Next Friend of HAJI WAZIR,      )
                                                )         1:06-CV-01697     (RBW)
         Petitioners/Plaintiffs,                )
                                                )
v.                                              )         DECLARATION OF
                                                )         ZAHEERRULLAH
                                                )
ROBERT GATES,                                   )
         Secretary of Defense                   )
         U.S. Department of Defense             )
         1000 Defense Pentagon                  )
         Washington, D.C.  20301-1000;          )
                                                )
JOHN DOE 1,                                     )
         Custodian of Petitioner; and           )
                                                )
JOHN DOE 2,                                     )
         Custodian of Petitioner,               )
                                                )
         Respondents/Defendants.                )
                                                )
Respondents are all sued in their official      )
capacities.                                     )
-----------------------------------------------------------------x
```

## DECLARATION OF ZAHEERRULLAH

I, Zaheerrullah, son of Haji Wazir, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

      1.    I am the son of Petitioner Haji Wazir, son of Muhammad Gul.  Like my father, I am a citizen of Afghanistan.  The statements made in this declaration are based on my personal knowledge.

      2.    Petitioner Haji Wazir is my father.  He is 50 years old and has seven children, five sons and two daughters.  My father was seized by officers of the United States Government in 2002 and has remained imprisoned at the Bagram Detention Facility since that time.

3.      Until my father was seized and detained by the United States Government in Dubai, he owned and ran a currency exchange business with an office in Afghanistan and an office in Dubai, United Arab Emirates.  My father is a very well-respected businessman who has a reputation for integrity, honesty, and fairness.  He has never engaged in any criminal activity and has never violated any civil law.  He has never been charged with any offense by either the Afghan Government or that of Dubai or the U.A.E.

4.      My father has never participated in any unlawful activities of any kind.  He has never taken up arms in any situation and most certainly never against the United States.  He always has been and remains to this day, a civilian.  He has never been a member of the Taliban, Al Qaeda, or any terrorist organization of any kind, nor has he ever advocated that participation in or support of such organizations is a worthwhile endeavor of any sort.  He had no involvement, direct or indirect, on the terrorist attacks on the United States on September 11, 2001.

5.      My father has never worked in any way worked to harm the interests of the United States or any other coalition or NATO forces in Afghanistan, Iraq, or any other country.

6.      My father is not an enemy combatant.  In fact, the highest authorities in Afghanistan have determined that he is innocent of any wrongdoing.  The Attorney General of Afghanistan has written a letter stating that it is his opinion that Haji Wazir is innocent and should be released as soon as possible.  The letter has been signed by President Hamid Karzai and all 14 members of the Afghan Government Prisoners' Commission for Reintegration.  I understand from this fact that my father is eligible for participation in the national reconciliation program and release back into Afghan society.

7.      I learned informally that my father had been seized and was being held in Bagram in 2002.  We received the family's first letter from him through the International Committee of the Red Cross in 2004.

8.     This year, I had an opportunity to talk with my father through the Bagram ICRC videoconference system.  He appeared to be physically weak, and said that he is extremely sad and upset about what has happened to his life.

9.     I understand that my father is being held by the United States military without charge, without access to counsel, and without being afforded any fair process by which he might challenge the legality of his designation and his detention.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of November 2008 in London, England.

_____/s/_____
Zaheerrullah son of Haji Wazir

WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 3
of Declaration of Barbara J. Olshansky,
dated November 3, 2008

International Human
Rights Clinic

Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel  650 724-1900
Fax  650 723-4426

October 13, 2008


Ms. Jean Lin
Trial Attorney
United States Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530

>           **Re:**   ***Fadi Al Maqaleh, et al. v. Robert Gates, et al.***
>                     **Civil Action No. 1:06-cv-01669 (JDB)**
>
>                     ***Haji Wazir, et al. v. Donald Rumsfeld, et al.***
>                     **Civil Action No. 1:06-cv-01697 (RBW)**

Dear Jean,

        Thank you for taking the time to speak with me about the issue of client access.  As you
know, I still believe that we should have access to speak with our clients, Mr. Fadi Al Maqaleh
and Mr. Haji Wazir, either by telephone or video conference, in order to talk with them about
any evidence that they might have to rebut Respondents' claims and adequately provide them
with representation in their cases.  This letter confirms our conversation on October 9, 2008 in
which I requested that your client grant us access and you confirmed that this would not be
possible at this time.  If your client's position on this issue changes, please let me know.


Sincerely,

*Barbara J. Olshansky*

Barbara Olshansky
Leah Kaplan Distinguished Visiting Professor of Human Rights
Director, International Human Rights Clinic

Community Law ✧ Criminal Defense ✧ Cyberlaw ✧ Environmental Law
Immigrants' Rights ✧ International Human Rights ✧ Organizations and Transactions
Supreme Court Litigation ✧ Youth and Education Law Project

WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 4
of Declaration of Barbara J. Olshansky,
dated November 3, 2008

## INTERNATIONAL
# Herald Tribune

## Globalist: No clear victory, or end, to U.S. 'war on terror'

**By Roger Cohen International Herald Tribune**
WEDNESDAY, DECEMBER 21, 2005

**NEW YORK** Perhaps no new entrant into the world's political lexicon is more troubling than "the war on terror."

It's disturbing because, as used by President George W. Bush, it is often equated with past wars. In his radio address on Dec. 17, the president said: "Yet in this first war of the 21st century, one of the most critical battlefronts is the home front."

The subliminal message here is that after the wars of the 20th century, not a scarce commodity, along came a new one - another struggle Americans must fight and win to spread the beacon of liberty, this time in the Middle East.

But at the same time, the president has conceded there can be no clear moment of victory in this war; no act of surrender will be signed by Osama bin Laden (if he's alive) and it's inconceivable that the stateless terrorist movement called Al Qaeda will be vanquished in the same way as the German and Japanese armies in 1945.

To be engaged in a war without end is problematic. It requires patience. It also requires great caution in making claims of exceptional presidential war-making powers, because exceptional personal powers that last forever smack of the kinds of authoritarian regimes the United States has spent a lot of blood and treasure fighting.

On the international front, the president is showing patience. But on the domestic front, he's scarcely showing caution in arrogating wide domestic powers as a commander in chief in a period of potentially endless war.

Let's start with the patience. The remarkable election this month in Iraq - striking not least for the degree of Sunni participation - suggests that Bush's persistence in the name of a reformist Middle Eastern vision is bringing some rewards. Iraq is very fragile, but its thirst for some form of democratic government is unmistakable.

In a series of recent speeches, Bush has set out a coherent political, military and economic program for the country. His words have gained in credibility as a result of a new frankness.

He is conceding that "much of the intelligence turned out to be wrong," accepting for the first time that good-faith criticism of the Iraq war is desirable, taking personal responsibility for the conflict, and answering questions about Iraqi casualties without circumlocutions.

"I would say 30,000, more or less, have died as a result of the initial incursion and the ongoing violence against Iraqis," he said earlier this month. You can't get much more straightforward than that.

The president has also been clear and unwavering, despite increased political pressure, on the need to avoid setting timetables for a withdrawal of the more than 150,000 U.S. soldiers in Iraq. He knows Iraq's fragile democratic experiment would probably collapse if unprotected by U.S. arms and the solemnity of a U.S. commitment.

"Victory will be achieved by meeting certain clear objectives," Bush said this month, "when the terrorists and Saddamists can no longer threaten Iraq's democracy, when the Iraqi security forces can protect their own people, and when Iraq is not a safe haven for terrorists to plot attacks against our country. These objectives, not timetables set by politicians in Washington, will drive our force levels in Iraq."

The president might have put these reasonable aims a different way. He might have said that when the rule of law begins to have real meaning in Iraq, and a hold on the imaginations of its people, the time to consider a U.S. military withdrawal will be closer.

The rule of law is, of course, central to any functioning democracy, be it in the Middle East or the

Middle West. Which brings us to the domestic ramifications of the war on terror, recently revealed by The New York Times to include warrantless eavesdropping on U.S. citizens approved by Bush in the name of fighting terrorism.

The president has been adamant in defending this practice, insisting that it is "consistent with U.S. law and the Constitution" and essential to save American lives in a time of war and in a world where terrorist plots may have devastating scope.

The administration seems to be arguing that a combination of Congress's authorization of the use of military force, passed after the Sept. 11 attacks, and the president's "plenary" war-making powers give him the right, in certain circumstances, to override the protection from "unreasonable searches and seizures" guaranteed by the Fourth Amendment. As a general matter, the Constitution bars the government from spying on Americans without prior court approval.

A brief signed in 2002 by former Attorney General John Ashcroft sums up the administration's thinking: "The Constitution vests in the president inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

In effect, if that suspected "agent" is a U.S. citizen, and this citizen calls overseas, Bush believes spies have the right to listen in on the call, or read e-mail, without first making the case there's probable cause to believe this American is up to no good.

That's tantamount to placing domestic security surveillance within the sole discretion of the executive branch - an upsetting of the balance of powers central to the success of American democracy and the preservation of American freedoms.

The policy is doubly disturbing because a special court, established under the 1978 Foreign Intelligence Surveillance Act, exists precisely so the president can in secret obtain a warrant for spying if convincing evidence is presented.

The president says he has reauthorized this program 30 times since the Sept. 11 attacks and will "do so for as long as our nation faces a continuing threat from Al Qaeda and related groups."

That could be a very long time given the nature of the war on terror, so long that talk of the "exceptional" nature of such measures becomes meaningless. Infringements of Americans' essential freedoms then become permanent. That's not a good example for the nascent democracy being nurtured by the president's patience.

E-mail: rocohen@nytimes.com

Tomorrow: Alan Riding on the delights of bad taste.

IHT   Copyright © 2008 The International Herald Tribune | www.iht.com

WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 5
of Declaration of Barbara J. Olshansky,
dated November 3, 2008

The New York Times

PRINTER-FRIENDLY FORMAT   BASED ON
SPONSORED BY   THE NOVEL

May 22, 2005
Army Faltered in Investigating Detainee Abuse
By TIM GOLDEN

Despite autopsy findings of homicide and statements by soldiers that two prisoners died after being struck by guards at an American military detention center in Bagram, Afghanistan, Army investigators initially recommended closing the case without bringing any criminal charges, documents and interviews show.

Within days after the two deaths in December 2002, military coroners determined that both had been caused by "blunt force trauma" to the legs. Soon after, soldiers and others at Bagram told the investigators that military guards had repeatedly struck both men in the thighs while they were shackled and that one had also been mistreated by military interrogators.

Nonetheless, agents of the Army's Criminal Investigation Command reported to their superiors that they could not clearly determine who was responsible for the detainees' injuries, military officials said. Military lawyers at Bagram took the same position, according to confidential documents from the investigation obtained by The New York Times.

"I could never see any criminal intent on the part of the M.P.'s to cause the detainee to die," one of the lawyers, Maj. Jeff A. Bovarnick, later told investigators, referring to one of the deaths. "We believed the M.P.'s story, that this was the most combative detainee ever."

The investigators' move to close the case was among a series of apparent missteps in an Army inquiry that ultimately took almost two years to complete and has so far resulted in criminal charges against seven soldiers. Early on, the documents show, crucial witnesses were not interviewed, documents disappeared, and at least a few pieces of evidence were mishandled.

While senior military intelligence officers at Bagram quickly heard reports of abuse by several interrogators, documents show they also failed to file reports that are mandatory when any intelligence personnel are suspected of misconduct, including mistreatment of detainees. Those reports would have alerted military intelligence officials in the United States to a problem in the unit, military officials said.

Those interrogators and others from Bagram were later sent to Iraq and were assigned to Abu Ghraib prison. A high-level military inquiry last year found that the captain who led interrogation operations at Bagram, Capt. Carolyn A. Wood, applied many of the same harsh methods in Iraq that she had overseen in Afghanistan.

Citing "investigative shortfalls," senior Army investigators took the Bagram inquiry away from agents in Afghanistan in August 2003, assigning it to a task force based at the agency's headquarters in Virginia. In October 2004, the task force found probable cause to charge 27 of the military police guards and military intelligence interrogators with crimes ranging from involuntary manslaughter to lying to investigators. Those 27 included the 7 who have actually been charged.

"I would acknowledge that a lot of these investigations appear to have taken excessively long," the Defense Department's chief spokesman, Larry Di Rita, said in an interview on Friday. "There's no other way to describe an investigation that takes two years. People are being held accountable, but it's taking too long."

Mr. Di Rita said the Pentagon was examining ways to speed up such investigations, "because justice delayed is justice denied."

A spokesman for the Criminal Investigation Command, Christopher Grey, would not discuss details of the case, but played down the significance of the agents' early proposal to close it. He said that the investigation had been guided by a desire for thoroughness rather than speed, and that it eventually included more than 250 interviews around the world.

"Case agents make recommendations all the time," Mr. Grey said. "But the review process looks at investigations constantly and points to other things that need to be completed or other investigative approaches."

While the proposal to close the case was ultimately rejected by senior officials, documents show that the inquiry was at a virtual standstill when an article in The New York Times on March 4, 2003, reported that at least one of the prisoner's deaths had been ruled a homicide, contradicting the military's earlier assertions that both had died of natural causes. Activity in the case quickly resumed.

The details of the investigation emerged from a file of almost 2,000 pages of confidential Army documents about the death on Dec. 10, 2002, of Dilawar, a 22-year-old taxi driver. The file was obtained from a person involved in the inquiry who was critical of the abuses at Bagram and the military's response to the deaths.

The file presents the fates of Mr. Dilawar and another detainee who died six days earlier, Mullah Habibullah, against a backdrop of frequent harsh treatment by guards and interrogators who were in many cases poorly trained, loosely supervised and only vaguely aware of or attentive to regulations limiting their use of force against prisoners they viewed as terrorists.

According to interviews with military intelligence officials who served at Bagram, only a small fraction of the detainees there were considered important or suspicious enough to be transferred to the American military prison at Guantánamo Bay, Cuba, for further interrogation. Two intelligence officers estimated that about 85 percent of the prisoners were ultimately released.

Still, most new detainees at Bagram were hooded, shackled and isolated for at least 24 hours and sometimes as long as 72 hours, the commander of the military police guards at Bagram, Capt. Christopher M. Beiring, told investigators. Prisoners caught in infractions like talking to one another were handcuffed to cell doors or ceilings, often for half an hour or an hour, but sometimes for far longer. Interrogators trying to break the detainees' resistance sometimes ordered that they be forced to sweep the same floor space over and over or scrub it with a toothbrush.

The responsibility of senior officers at Bagram for carrying out such methods is not clear in the Army's criminal report.

In several instances, the documents show Captain Wood and her deputy, Staff Sgt. Steven W. Loring, sought clarification about what techniques they could use. "Numerous requests for strict guidance on P.U.C. treatment have been voiced to the Staff Judge Advocate," Sergeant Loring said, referring to the detainees by the initials for Persons Under Control, "but no training has been offered."

Major Bovarnick, the former legal adviser to the detention center, told investigators that the shackling of detainees with their arms overhead was standard operating procedure when he arrived at Bagram in mid-November 2002. On Nov. 26, after complaints from the International Committee of the Red Cross, he convened a group of military and C.I.A. officials at Bagram to discuss methods of interrogation and punishment, including shackling to fixed objects.

"My personal question then was, 'Is it inhumane to handcuff somebody to something?' " he said. Referring to his consultations with the two senior lawyers at Bagram, he added, "It was our opinion that it was not inhumane."

After the deaths, officers who served at Bagram said, there was a similar debate over whether criminal charges were warranted.

Military lawyers noted that the autopsies of the two dead detainees had found severe trauma to both prisoners' legs - injuries that a coroner later compared to the effect of being run over by a bus. They also acknowledged statements by more than half a dozen guards that they or others had struck the detainees. But the lawyers and other officers did not press for a fuller accounting, two officers said in interviews.

Instead, statements showed, they pointed to indications that both detainees had some existing medical problems when they arrived at Bagram, and emphasized that it would be difficult to determine the responsibility of individual guards for the injuries they sustained in custody.

"No one blow could be determined to have caused the death," the former senior staff lawyer at Bagram, Col. David L. Hayden, said he had been told by the Army's lead investigator. "It was reasonable to conclude at the time that repetitive administration of legitimate force resulted in all the injuries we saw." Both Major Bovarnick and Colonel Hayden declined requests for comment.

As late as Feb. 7 - nearly two months after the first autopsy reports had classified both deaths as homicides - the American commander of coalition forces in Afghanistan, Lt. Gen. Daniel K. McNeill, said in an interview that he had "no indication" that either man had been injured in custody.

General McNeill, who has since been promoted, declined repeated requests to clarify his remarks.

In retrospect, the investigators' initial interviews with guards, interrogators and interpreters at the detention center appear cursory and sometimes contradictory. As transcribed, many of the statements are little more than a page or two long

Most of the guards who admitted punching the detainees or kneeing them in the thighs said they did so in order to subdue prisoners who were extraordinarily combative. But both detainees were shackled at the hands and feet throughout their time at Bagram. One of them, Mr. Dilawar, weighed only 122 pounds and was described by interpreters as neither violent nor aggressive. Both detainees also complained of being beaten and seemed to have trouble walking, some witnesses said.

The early interviews also included statements by two of the interpreters that they had been so troubled by the abusive behavior of some interrogators that they had gone to the noncommissioned officer in charge of the military intelligence group, Staff Sergeant Loring, to complain. One of the interrogators, Specialist Damien M. Corsetti, refused to speak to the agents at all, and another told of the guards' beating one of the detainees who died.

Even so, investigators failed to interview some crucial witnesses, including the officer in charge of the interrogators, Captain Wood, and the commander of the military police company, Captain Beiring. They also neglected an interrogator who had been present for most of Mr. Dilawar's questioning. When he finally went to investigators at his own initiative, he described one of the worst episodes of abuse.

Many of the guards who later provided important testimony were also initially overlooked. Computer records and written logs that were supposed to record treatment of the detainees were not secured and later disappeared. Blood taken from Mr. Habibullah was stored in a butter dish in the agents' office refrigerator, from which it was only recovered - or "seized" as a report explains it - when the office was later moved.

The record of the investigation indicated that Army investigators almost entirely stopped interviewing witnesses within three weeks after Mr. Dilawar's death. And although Major Bovarnick, the detention center's legal adviser, said he told Captain Beiring after the first death "that there would be no shackling to the ceiling ever again," the issue was largely ignored in the initial investigation.

While the Army's criminal inquiry continued, General McNeill ordered a senior officer, Col. Joseph G. Nesbitt, to conduct a separate, classified examination of procedures at the detention center. That led to changes including prohibitions against the shackling of prisoners for sleep deprivation and interrogators' making physical contact with detainees.

Documents from the criminal investigation suggested that Colonel Nesbitt was also dismissive of the notion that the two deaths pointed to wider wrongdoing. He concluded that military police guards at the detention center "knew, were following and strictly applying" proper rules on the use of force, documents showed, and he cited a "conflict between obtaining accurate, timely information and treating detainees humanely."

Senior officials at the Criminal Investigation Command's headquarters took a different view. On April 15, 2003, they rejected the field agents' proposal to close the case, sending it back "for numerous investigative, operational, administrative and security classification-related issues, which required additional work, pursuit, clarification or scrutiny." Four months later, the headquarters officials reassigned the case to the task force that eventually implicated the 27 soldiers.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map | Back to Top

WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 6
of Declaration of Barbara J. Olshansky,
dated November 3, 2008

The New York Times

THE SE[...]
LIFE OF

**January 7, 2008**

# Foiling U.S. Plan, Prison Expands in Afghanistan

## By TIM GOLDEN

Correction Appended

WASHINGTON — As the Bush administration struggles for a way to close the military prison at Guantánamo Bay, Cuba, a similar effort to scale down a larger and more secretive American detention center in Afghanistan has been beset by political, legal and security problems, officials say.

The American detention center, established at the Bagram military base as a temporary screening site after the invasion of Afghanistan in 2001, is now teeming with some 630 prisoners — more than twice the 275 being held at Guantánamo.

The administration has spent nearly three years and more than $30 million on a plan to transfer Afghan prisoners held by the United States to a refurbished high-security detention center run by the Afghan military outside Kabul.

But almost a year after the Afghan detention center opened, American officials say it can accommodate only about half the prisoners they once planned to put there. As a result, the makeshift American site at Bagram will probably continue to operate with hundreds of detainees for the foreseeable future, the officials said.

Meanwhile, the treatment of some prisoners on the Bagram base has prompted a strong complaint to the Pentagon from the International Committee of the Red Cross, the only outside group allowed in the detention center.

In a confidential memorandum last summer, the Red Cross said dozens of prisoners had been held incommunicado for weeks or even months in a previously undisclosed warren of isolation cells at Bagram, two American officials said. The Red Cross said the prisoners were kept from its inspectors and sometimes subjected to cruel treatment in violation of the Geneva Conventions, one of the officials said.

The senior Pentagon official for detention policy, Sandra L. Hodgkinson, would not discuss the complaint, citing the confidentiality of communications with the Red Cross. She said that the organization had access to "all Department of Defense detainees" in Afghanistan, after they were formally registered, and that the military "makes every effort to register detainees as soon as practicable after capture, normally within two weeks.

"In some cases, due to a variety of logistical and operational circumstances, it may take longer," Ms. Hodgkinson added.

The obstacles American officials have faced in their plan to "transition out" of the Bagram detention center underscore the complexity of their challenges in dealing with prisoners overseas. Yet even as Bagram has expanded over the last three years, it has received a fraction of the attention that policy makers, Congress

and human rights groups have devoted to Guantánamo.

"The problem at Bagram hasn't gone away," said Tina M. Foster, a New York human rights lawyer who has filed federal lawsuits on behalf of the detainees at Bagram. "The government has just done a better job of keeping it secret."

The rising number of detainees at Bagram -- up from barely 100 in early 2004 and about 500 early last year -- has been driven primarily by the deepening war in Afghanistan. American officials said that all but about 30 of those prisoners are Afghans, most of them Taliban fighters captured in raids or on the battlefield.

But the surging detainee population also reflects a series of unforeseen problems in the United States' effort to turn over prisoners to the Afghan government.

In a confidential diplomatic agreement in August 2005, a draft of which was obtained by The New York Times, the Bush administration said it would transfer the detainees if the Kabul government gave written assurances that it would treat the detainees humanely and abide by elaborate security conditions. As part of the accord, the United States said it would finance the rebuilding of an Afghan prison block and help equip and train an Afghan guard force.

Yet even before the construction began in early 2006, the creation of the new Afghan National Detention Center was complicated by turf battles among Afghan government ministries, some of which resisted the American strategy, officials of both countries said.

A push by some Defense Department officials to have Kabul authorize the indefinite military detention of "enemy combatants" — adopting a legal framework like that of Guantánamo -- foundered in 2006 when aides to President Hamid Karzai persuaded him not to sign a decree that had been written with American help.

Then, last May, the transfer plan was disrupted again when the two American servicemen overseeing the project were shot to death by a man suspected of being a Taliban militant who had infiltrated the guard force.

The Pentagon initially reported only that the two Americans, Col. James W. Harrison Jr. and Master Sgt. Wilberto Sabalu Jr., were killed May 6 by "small-arms fire." But American officials said the Afghan guard had opened fire with a semiautomatic rifle as two vehicles carrying senior officers waited to pass through the prison gate. The killings forced more than a month of further vetting of the Afghan guards and the dismissal of almost two dozen trained recruits, Pentagon officials said.

A Spartan Site of Metal Pens

The Bagram Theater Internment Facility, as it is called, has held prisoners captured as far away as Central Africa and Southeast Asia, many of whom were sent on to Guantánamo. Since the flow of detainees to Cuba was largely shut off in September 2004, the Bagram detention center has become primarily a repository for more dangerous prisoners captured in Afghanistan.

Despite some expansion and renovation, the detention center remains a crude place where most prisoners are fenced into large metal pens, military officers and former detainees have said.

Military personnel who know both Bagram and Guantánamo describe the Afghan site, on an American-controlled military base 40 miles north of Kabul, as far more spartan. Bagram prisoners have fewer privileges, less ability to contest their detention and no access to lawyers. Some detainees have been held without charge for more than five years, officials said.

The treatment of prisoners at Bagram has generally improved in recent years, human rights groups and former detainees say, particularly since two Afghan detainees died there in December 2002 after being beaten by their American captors. Two American officials familiar with the Red Cross complaint that was forwarded to the Pentagon over the summer described it as a notable exception.

A Red Cross spokesman in Washington, Simon Schorno, said the organization would not comment on its discussions with the Defense Department. But in remarks about the organization's work in Afghanistan, its director of operations, Pierre Kraehenbuehl, emphasized on Dec. 13 that "not all places of detention and detainees" are made available to the group's inspectors.

"The fact that the I.C.R.C. does not publicize its findings does not indicate satisfaction with the conditions of any given detention place," he said on the group's Web site.

The two United States officials, who insisted on anonymity because of the confidentiality of Red Cross communications, suggested that the organization had been more forceful in private. They said the group had complained that detainees in the isolation area were sometimes subjected to harsh interrogations and were not reported to Red Cross inspectors until after they were moved into the main Bagram detention center and formally registered — after being held incommunicado for as long as several months.

One former Bush administration official said the Pentagon told Congressional leaders in September 2006 that a small number of prisoners held by Special Operations forces might not be registered within the 14-day period cited in a Defense Department directive issued that month. The exceptions were to be "approved at the highest levels," the former official said.

Discounting Complaints

Bush administration officials have at times discounted complaints about the crowding and harsh conditions at Bagram by saying the detention center was never meant to be permanent and that its prisoners would soon be turned over to Afghanistan.

Hundreds of Bagram detainees have been released outright as part of an Afghan national reconciliation program. But by early 2006, internal Defense Department statistics showed that the average internment at Bagram was 14.5 months, and one Pentagon official said that figure had since risen.

After a White House agreement by President Bush and Mr. Karzai in May 2005, the plan to transfer the prisoners was drawn up by administration officials and outlined in an exchange of confidential diplomatic notes that August.

The two-page Washington note — the first document to become public showing the terms that Washington has sought from other governments for the transfer of detainees from Guantánamo and Bagram — asks the Kabul administration to share any intelligence information from the prisoners, "utilize all methods appropriate and permissible under Afghan law to surveil or monitor their activities following any release," and "confiscate or deny passports and take measures to prevent each national from traveling outside

Afghanistan."

At the time, some Bush administration officials predicted that transfers from Bagram could begin within six months. Col. Manuel Supervielle, who worked on legal aspects of the transfers as the senior United States military lawyer in Afghanistan, recalled that officials in Washington expected the primary difficulty to be the rebuilding of a cellblock at Afghanistan's decrepit Pul-i-Charkhi prison to meet international standards of humane treatment.

"We've got a bunch of guys we want to hand over to the Afghans," Colonel Supervielle said, recalling the prevailing view. "Build a jail and hand them over."

But complications emerged at almost every turn.

Afghan officials rejected pressure from Washington to adopt a detention system modeled on the Bush administration's "enemy combatant" legal framework, American officials said. Some Defense Department officials even urged the Afghan military to set up military commissions like those at Guantánamo, the officials said.

Officials of both countries said the defense minister, Abdul Rahim Wardak, was reluctant to take responsibility for the new detention center as the Pentagon wanted, fearing he would be besieged by tribal leaders trying to secure the release of captives. The minister of justice, Sarwar Danish, opposed sharing his control over prisons, the officials said.

American officials finally brokered an agreement between the ministries, internal documents show. But that did not resolve more basic questions about the legal basis under which Afghanistan would hold the detainees.

For nearly a year, American military officials and diplomats worked with the Afghan government to draft a plan for how it would detain and prosecute all prisoners captured in Afghanistan. Colonel Supervielle, who had helped set up legal operations at Guantánamo, said the effort in Afghanistan was in some ways more complex. "You weren't dealing just with a U.S. interagency process," he said. "It involved the interagency process, bilateral relations with Afghanistan, the military coalition and other international interests."

The draft law was finally delivered to Mr. Karzai in August 2006. Despite American entreaties, he decided not to sign it after opposition from senior aides, officials said.

The construction of a new detention center at Pul-i-Charkhi also proved more complicated than United States officials had anticipated.

A New Project Is Flawed

When Afghan contractors broke ground on the $20 million project in 2006, United States officials estimated that the center would hold as many as 670 prisoners. But as the military police colonel overseeing the project toured the site with Afghan and Red Cross officials, they pointed to a significant flaw. In other parts of Pul-i-Charkhi, men were crammed as many as eight to a cell, and used toilets down the hall. To improve security and hygiene, the Americans equipped each two-man cell in the new block with its own toilet.

But because the cultural modesty of Afghan men would make them uncomfortable sharing an open toilet, it

was subsequently decided that the prisoners should be held individually, two former officials involved in the project said. That immediately reduced the optimal capacity of the main prison to about 330 detainees, they said, although a Pentagon spokeswoman said its "maximum capacity" was 628 prisoners.

The training of Afghan military personnel to guard and administer the new prison has posed other challenges. After initially budgeting $6 million for guard training, the Defense Department decided it would need about $18 million for training and "mentoring" of guards over three years, officials said.

A first group of 12 Bagram detainees was moved into the Pul-i-Charkhi prison on April 3. Over the next nine months, that number rose to 157 prisoners, including 32 from Guantánamo, official statistics show. Afghan officials decided to release 12 of those detainees soon after their transfer.

American officials said the modest flow had been dictated mainly by the Afghan military, which has wanted to make sure its guards could handle the new arrivals. But some United States officials say they have also had to reassess the Afghans' ability to hold more dangerous detainees. They said the detention center at Bagram would probably continue to hold hundreds of prisoners indefinitely. "The idea is that over time, some of our detainees at Bagram — especially those at the lower end of the threat scale — will be passed on to Afghanistan," one senior military official said last year. "But not all. Bagram will remain an intelligence asset and a screening area."

Ms. Hodgkinson, the deputy assistant secretary of defense for detainee affairs, acknowledged that the military was holding more detainees at Bagram than it had anticipated two years ago and that the Pentagon had no plan to assist the Afghans with further prison-building. But, she added, "A final decision on the higher-threat detainees has not yet been made."

And even now, the legal basis under which prisoners are being held at the Afghan detention center remains unclear. Another Defense Department official, who insisted on anonymity because she was not authorized to publicly discuss the issue, said the detentions had been authorized "in a note from the attorney general stating that he recognizes that they have the legal authority under the law of war to hold enemy combatants as security threats if they choose to do so."

Afghan officials said they were still expecting virtually all of the Afghan prisoners held by the United States — with the possible exception of a few especially dangerous detainees at Guantánamo — to be handed over to them.

A spokesman for the Afghan Defense Ministry, Gen. Zaher Azimi, said, "What is agreed is that all the detainees should be transferred."

*Kirk Semple, Carlotta Gall and Abdul Waheed Wafa contributed reporting from Kabul.*

Correction: January 12, 2008

Because of an editing error, a front-page article on Monday about the American detention center at the Bagram military base in Afghanistan omitted a reporting credit. Kirk Semple, Carlotta Gall and Abdul Waheed Wafa contributed from Kabul.

Copyright 2008 The New York Times Company

WAZIR v. GATES, Civil Action No. 06-CV-1697 (RBW)

# EXHIBIT 7
of Declaration of Barbara J. Olshansky,
dated November 3, 2008



**AMERICAN FORCES PRESS SERVICE**

# NEWS ARTICLES

SHARE

**Engineer Team Plans Bagram's Future**

By Army 1st Lt. Lory Stevens
Special to American Forces Press Service

BAGRAM AIRFIELD, Afghanistan, Aug. 13, 2008 – The talents of 21 military members and civilians here combined with the work of about 1,000 Afghan nationals at any given time blend together to facilitate the steady flow of projects designed to improve and expand Bagram Airfield.

Five officers, four enlisted servicemembers and 12 civilians make up the base's facility engineer team, which prepares plans and designs, conducts inspections, and offers expertise for Bagram construction projects.

The team typically juggles about 20 projects involving demolition, rubble removal, barrier building and other structural work, and normally has up to 50 additional projects in the works. Synchronization is key to the team, because new projects result in a domino effect, Air Force Maj. Kyle Torster explained, noting that every project affects at least four other units on the base. "Individual units tend to only see their own circle of operations," he said. "It's our job to see the big picture."

To keep track of ongoing efforts and the development of secondary projects, such as well building or area de-mining, the team had to devise a plan.

"Major Torster developed a tracker to trace secondary effects," Air Force Lt. Col. Christopher J. West said. "[Before that], it was impossible to follow all the development projects and changes going on inside the wire."

Projects in the works include a new $2.7 million Combined Joint Task Force 101 administrative building that's nearing completion. The building will provide administrative space, conference rooms, secure rooms, and a new command center.



*A civilian contractor shows Air Force Maj. Kyle Torster, a facility engineer team member at Bagram Airfield, Afghanistan, the progress of a construction project. Ongoing projects at Bagram include a new $2.7 million Combined Joint Task Force 101 administrative building that is nearing completion. Courtesy photo (Click photo for screen-resolution image);high-resolution image available.*

Other projects under way include upgrading guard towers, reorganizing the locations of motor pools and replacing temporary "B-huts" with pre-engineered buildings -- all projects aimed at improving Bagram living and working conditions for the troops, officials said.

In addition to improving lives for deployed servicemembers, the facility engineer team brings jobs to Afghan nationals by empowering local contractors to lead in most areas of construction.

"[Many] Afghans are very good at brick and mortar, and they are very smart," said Torster, who explained that, while Afghans now are hired mainly to perform hands-on labor, they will play an increasingly valuable role here as their technology evolves. For example, he said, sizing electrical or mechanical loads is challenging at this point to a culture accustomed to living with limited electricity.

"I believe Afghans are watching and will find a way to bring more technology to Afghanistan," Torster said. "In terms of electrical and mechanical engineering, Afghanistan is a generation or two away from the United States in terms of technology."

Afghan contractors and local nationals who work with the facility engineer team not only build projects to improve Bagram Airfield, but also build relationships with U.S. military and civilian contractors. By working closely together, good relationships are formed, and Afghans are able to improve their construction techniques and processes, team members said.

(Army 1st Lt. Lory Stevens serves in the Task Force Warrior Public Affairs Office.)

**Related Sites:**
Combined Joint Task Force 101
NATO International Security Assistance Force



*Two Afghan workers prepare to cut drywall for rooms inside a new $2.7 million Combined Joint Task Force 101 administrative building on Bagram Airfield, Afghanistan. Bagram's facility engineer team employs about 1,000 Afghan nationals at any given time. Courtesy photo*
Download screen-resolution
Download high-resolution