**REDACTED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____

| | |
|---|---|
| FADI AL MAQALEH, <u>et al.</u>,<br><br>Petitioners,<br><br>v.<br><br>ROBERT GATES, <u>et al.</u>,<br><br>Respondents. | Civil Action No.  06-1669 |
| HAJI WAZIR, <u>et al.</u>,<br><br>Petitioners,<br><br>v.<br><br>ROBERT GATES, <u>et al.</u>,<br><br>Respondents. | Civil Action No.  06-1697 |
| AMIN AL BAKRI, <u>et al.</u>,<br><br>Petitioners,<br><br>v.<br><br>BARACK H. OBAMA, et al.,<br><br>Respondents. | Civil Action No.  08-1307 |
| REDHA AL-NAJAR, <u>et al.</u>,<br><br>Petitioners,<br><br>v.<br><br>ROBERT GATES, <u>et al.</u>,<br><br>Respondents. | Civil Action No.  08-2143 |

## <u>MEMORANDUM OPINION</u>

Before the Court are respondents' motions to dismiss these four petitions for habeas

corpus.  The petitioners are all foreign nationals captured outside Afghanistan yet held at the

Bagram Theater Internment Facility at Bagram Airfield in Afghanistan for six years or more. The issue at the heart of these cases is whether these petitioners may, in the wake of Boumediene v. Bush, 128 S. Ct. 2229 (2008), invoke the Suspension Clause of the Constitution, Art I. § 9 cl. 2. If so, then section 7(a) of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, is unconstitutional as applied to these petitioners and they are entitled to seek the protection of the writ of habeas corpus. But if not, then these petitions must be dismissed as respondents have urged.

The issues here closely parallel those in Boumediene, in large part because the detainees themselves as well as the rationale for detention are essentially the same. The case calls for the first application of the multi-factor functional test crafted by the Supreme Court in Boumediene, and the same vital jurisprudential concerns at play there also frame the analysis here.

It must be remembered, then, that the writ of habeas corpus plays a central role in our constitutional system as conceived by the Framers, which "must inform proper interpretation of the Suspension Clause." Boumediene, 128 S. Ct. at 2244. Indeed, "the Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme," id. at 2246, that, as Alexander Hamilton observed, was vital to the protection of individuals against the very same arbitrary exercise of the government's power to detain that is alleged by petitioners here:

> "[C]onfinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government." And as a remedy for this fatal evil [Blackstone] is everywhere peculiarly emphatical in his encomiums on the habeas corpus act, which in one place he calls "the bulwark of the British Constitution."

Boumediene, 128 S. Ct. at 2247 (quoting The Federalist No. 84, at 512 (Alexander Hamilton) (C. Rossiter ed., 1961) (quoting 1 W. Blackstone, Commentaries *136)) (emphasis in original).

So, too, the Suspension Clause was forged to guard against such Executive abuses, by protecting those detained through the assurance, except in the strictly-confined periods of suspension, that "the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." Boumediene, 128 S. Ct. at 2247 (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) (plurality opinion)). Hence, "[t]he separation-of-powers doctrine . . . must inform the reach and purpose of the Suspension Clause." Id. But that principle requires, as well, that the Judiciary accord proper deference to the political branches, particularly during conflicts abroad where the Executive must retain "substantial authority to apprehend and detain those who pose a real danger to our security." Id. at 2277. In the end, though, while "the Executive's powers as Commander in Chief" must be preserved, the courts still must fulfill their responsibility to review, with appropriate caution, the exercise of those powers:

> Within the Constitution's separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person. Some of these petitioners have been in custody for six years with no definitive judicial determination as to the legality of their detention. Their access to the writ is a necessity to determine the lawfulness of their status, even if, in the end, they do not obtain the relief they seek.

Id.

This Court's role, and this decision, is nonetheless quite narrow, and is limited today to assessing whether the Suspension Clause extends to these four petitioners and hence whether

they are entitled to seek habeas corpus in this Court. Applying the Boumediene factors carefully, the Court concludes that these petitioners are virtually identical to the detainees in Boumediene -- they are non-citizens who were (as alleged here) apprehended in foreign lands far from the United States and brought to yet another country for detention. And as in Boumediene, these petitioners have been determined to be "enemy combatants," a status they contest. Moreover, the process used to make that determination is inadequate and, indeed, significantly less than the Guantanamo detainees in Boumediene received. Although the site of detention at Bagram is not identical to that at Guantanamo Bay, the "objective degree of control" asserted by the United States there is not appreciably different than at Guantanamo. Finally, it cannot be denied that the "practical obstacles" inherent in resolving a Bagram detainee's entitlement to habeas corpus are in some ways greater than those present for a Guantanamo detainee, because Bagram is located in an active theater of war. But those obstacles are not as great as respondents claim, and certainly are not insurmountable. And importantly, for these petitioners, such practical barriers are largely of the Executive's choosing -- they were all apprehended elsewhere and then brought (i.e., rendered) to Bagram for detention now exceeding six years.

Based on those conclusions driven by application of the Boumediene test, the Court concludes that the Suspension Clause extends to, and hence habeas corpus review is available to, three of the four petitioners. As to the fourth, his Afghan citizenship -- given the unique "practical obstacles" in the form of friction with the "host" country -- is enough to tip the balance of the Boumediene factors against his claim to habeas corpus review. When a Bagram detainee has either been apprehended in Afghanistan or is a citizen of that country, the balance of factors may change. Although it may seem odd that different conclusions can be reached for different

detainees at Bagram, in this Court's view that is the predictable outcome of the functional, multi-factor, detainee-by-detainee test the Supreme Court has mandated in <u>Boumediene</u>.

## BACKGROUND

All four petitioners in these cases have been detained as "enemy combatants" by the United States at the Bagram Theater Internment Facility at Bagram Airfield in Afghanistan ("Bagram"). All four claim to have been captured outside Afghanistan and contest their designation as enemy combatants.[1] Fadi al Maqaleh, a Yemeni citizen who was taken into U.S. custody sometime in 2003, filed a petition for a writ of habeas corpus on September 28, 2006. Maqaleh Am. Habeas Pet. ¶¶ 11, 14. He claims that he was captured beyond Afghan borders but does not specify where. <u>Id.</u> ¶¶ 24-25. Haji Wazir, an Afghan citizen, filed a habeas petition on September 29, 2006.[2] Wazir Habeas Pet. ¶ 2. Wazir was captured in Dubai, United Arab Emirates in 2002 and has been in U.S. custody since. <u>See</u> Declaration of Jawed Ahmad ¶ 31 (attached as Exhibit 1 to Wazir Opp'n to Resps.' Mot. to Dismiss ("Wazir Opp'n")). Amin al Bakri is a Yemeni citizen, captured by U.S. forces in Thailand in 2002, who filed a petition seeking habeas review on July 28, 2008. Bakri Habeas Pet. ¶¶ 2-3. Redha al-Najar filed a habeas petition on December 10, 2008. Al-Najar is a citizen of Tunisia who was captured in Pakistan in 2002. Al-Najar Habeas Pet. ¶¶ 12, 25.

---

[1] Recently, the Executive Branch has decided to abandon the term "enemy combatant" as to detainees held at Guantanamo Bay, but not necessarily for those at Bagram. <u>See</u> note 11, <u>infra</u>. Each of these petitioners was determined to be an enemy combatant through the process at Bagram for determining a detainee's status, and that term has been employed by the parties in the briefing. Hence, the Court will use it as well.

[2] Wazir originally filed his petition along with three other Bagram detainees, Mohammad Omar, Gul Mohammad, and Haji Naqib. Omar, Mohammad, and Naqib have since been released from U.S. custody. Hence, only Wazir's petition remains pending before the Court.

Respondents dispute some of the facts alleged in the habeas petitions. Although respondents do not contest any petitioner's claim as to his country of citizenship, they do take issue with some petitioners' statements as to the place of their capture. For example, respondents contest al Maqaleh's claim that he was captured outside Afghanistan. See Declaration of Charles A. Tennison ¶ 20 (attached as Exhibit 1 to Resps.' Mot. to Dismiss al Maqaleh's Habeas Pet. ("Resps.' Maqaleh Mot.")).

After al Maqaleh and Wazir filed their habeas petitions, but before al Bakri and al-Najar filed their petitions, the Supreme Court decided Boumediene v. Bush, 128 S. Ct. 2229 (2008).[3] In that case, the Supreme Court considered habeas petitions filed by "aliens designated as enemy combatants and detained at the United States Naval Station at Guantanamo Bay, Cuba." Id. at 2240. The Court first determined that section 7 of the MCA "deprives the federal courts of jurisdiction to entertain the habeas corpus actions now before us." Id. at 2242-44. The Court then examined "whether [petitioners] have the constitutional privilege of habeas corpus, a privilege not to be withdrawn except in conformance with the Suspension Clause." Id. at 2240. In a lengthy five-to-four opinion, the Supreme Court first determined that the Suspension Clause of the Constitution has "full effect" at Guantanamo Bay and detainees at Guantanamo "are entitled to the privilege of habeas corpus to challenge the legality of their detention." Id. at 2262. The Court then held that the process Guantanamo detainees receive pursuant to the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2739, is not an adequate substitute for habeas review. Id. at 2262-74. Hence, the Court "h[e]ld these petitioners do have

_____

[3] This Court stayed al Maqaleh's and Wazir's petitions while underlying jurisdictional issues were pending before the Supreme Court and the D.C. Circuit, including the Boumediene case.

the habeas corpus privilege . . . [and t]herefore § 7 of the [MCA] operates as an unconstitutional suspension of the writ." Id. at 2240.

After Boumediene, respondents filed the pending motions to dismiss these petitioners' habeas petitions for lack of jurisdiction, and the parties filed opposition and reply memoranda. The Court consolidated the four cases for argument on the jurisdictional issue and held a motions hearing on January 7, 2009, in which petitioners were represented by able counsel. Because of the change in the Presidential Administration, the Court on January 22, 2009 invited respondents to notify the Court whether they intended to refine the position that they had taken to date. On February 20, 2009, respondents informed the Court that "the Government adheres to its previously articulated position." See Al Maqaleh v. Gates, Civ.A.No. 06-1669 (dkt ent. #30). Hence, the issues are fully briefed and ripe for resolution. As the analysis below makes clear, the application of the Supreme Court's Boumediene decision to these four petitioners is at the center of these cases and respondents' motion.

## STANDARD

"[R]esponding to a habeas petition with a motion to dismiss is common practice." White v. Lewis, 874 F.2d 599, 603 (9th Cir.1989) (citing Murray v. Carrier, 477 U.S. 478, 483 (1986)). A motion to dismiss for lack of subject matter jurisdiction in habeas cases, like jurisdictional motions in other civil cases, is subject to review under the standards of the Federal Rules of Civil Procedure. See Rasul v. Bush, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), aff'd, Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003), rev'd on other grounds, Rasul v. Bush, 542 U.S. 466 (2004) (applying Fed. R. Civ. P. 12(b)(1) to the government's motion to dismiss a pending habeas petition on jurisdictional grounds); see also In re Guantanamo Detainee Cases, 355 F. Supp. 2d

443, 453 (D.D.C. 2005), vacated, Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), rev'd,

Boumediene v. Bush, 128 S. Ct. 2229 (2008) ("The respondents . . . seek dismissal of all counts

as a matter of law under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can

be granted.  In the alternative, the respondents seek a judgment based on the pleadings pursuant

to Fed. R. Civ. P. 12(c).").

     Under Rule 12(b)(1), those seeking to invoke the jurisdiction of a federal court --

petitioners here -- bear the burden of establishing that the court has jurisdiction.  See US

Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 103-04 (1998)); see also Grand Lodge of Fraternal Order

of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes

on the court an affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority."); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C.

1998).  Although a court must accept as true all of petitioners' factual allegations when reviewing

a motion to dismiss pursuant to Rule 12(b)(1), see Leatherman v. Tarrant Cty. Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), "'factual allegations . . . will bear

closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to

state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & 

Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1990)).  At the stage of litigation

when dismissal is sought, a petitioner's habeas petition must be construed liberally, and the

petitioner should receive the benefit of all favorable inferences that can be drawn from the

alleged facts.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).  Additionally, a court may consider material other than the allegations in the habeas

petition in determining whether it has jurisdiction to hear the case, so long as it still accepts the factual allegations in the habeas petition as true.  See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3; Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

## ANALYSIS

Respondents seek to dismiss these four habeas petitions for lack of jurisdiction. Petitioners oppose respondents' motions on several grounds, arguing that:  (1) this Court has statutory jurisdiction to entertain these habeas petitions under 28 U.S.C. § 2241, see al Maqaleh Opp'n to Resps.' Mot. to Dismiss ("Maqaleh Opp'n") at 17-21; (2) the MCA unconstitutionally suspends habeas rights without providing an adequate substitute, see id. at 23-31, 33-58; (3) MCA § 7 works an unconstitutional usurpation of the judiciary's Article III powers, see id. at 21-23; (4) MCA § 7 is an unconstitutional "permanent" suspension of the writ of habeas corpus, see id. at 23-31; (5) petitioners have not had their status determined by a "competent tribunal" pursuant to MCA § 3, see id. at 31-33; and (6) petitioners' detention violates the rule of law, the Constitution, and international law, see id. at 58-68.  The Court will begin by addressing petitioner's first argument:  whether federal courts have statutory jurisdiction under § 2241. Petitioner's second argument presents the key issue in these cases, and the Court accordingly devotes the majority of the analysis to it.  The Court will then briefly address petitioners' remaining four arguments.

## I. Statutory Habeas Jurisdiction Under 28 U.S.C. § 2241

Petitioners argue that this Court has statutory jurisdiction under 28 U.S.C. § 2241. Resolution of this argument requires some familiarity with the cases and statutes leading to the

Supreme Court's opinion in Boumediene. See generally Bismullah v. Gates, 551 F.3d 1068, 1073-74 (D.C. Cir. 2009) (reviewing cases and statutes leading to Boumediene). The first Supreme Court case to address the rights of detainees held at Guantanamo Bay was Rasul v. Bush, 542 U.S. 466 (2004). In Rasul, the Supreme Court held that alien detainees designated as enemy combatants could invoke the federal habeas statute, 28 U.S.C. § 2241, to challenge their detention at Guantanamo. The same day, the Supreme Court issued a decision in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), which focused on the due process rights of U.S. citizens detained as enemy combatants. The following year, in response to the Supreme Court's rulings, Congress passed the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2739, which mandates humane treatment of detainees and sets forth a process for testing the legality of detention. See DTA §§ 1002-03, 1005(e)(2). The DTA also amended the federal habeas statute by stripping federal courts of jurisdiction to entertain habeas petitions filed by Guantanamo detainees. Id. § 1005(e)(1). But the next year, the Supreme Court decided Hamdan v. Rumsfeld, 548 U.S. 557, 575-76 (2006), which held, among other things, that the DTA could not be applied retroactively to bar habeas petitions pending at the time of the DTA's enactment. Within a few months, however, Congress passed the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600. In section 7(a), Congress again amended the federal habeas statute to read as follows:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1). And, in direct response to Hamdan, the MCA provides in section 7(b) that the jurisdiction-stripping provision "shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act . . . ." When Boumediene came before the Supreme Court in 2008, the central issue was the constitutionality of § 2241, as amended by MCA § 7(a). As discussed at length in the section that follows, the Boumediene Court struck down MCA § 7(a) as an unconstitutional suspension of the writ of habeas corpus.

According to petitioners, Boumediene was a facial invalidation of MCA § 7, thereby "fully restor[ing] this Court's jurisdiction" under § 2241. See al Bakri Opp'n to Resps.' Mot. to Dismiss ("Bakri Opp'n") at 11. The § 2241 inquiry, petitioners maintain, is governed by Rasul's holding that federal district courts have statutory jurisdiction to hear habeas petitions filed by aliens and citizens held by the United States at Guantanamo. Because the United States controls Bagram to the same degree that it controls Guantanamo, the argument goes, Rasul applies with equal force to the pending petitions here. Respondents counter that Boumediene was an "as applied" rejection of MCA § 7, not a facial one, so § 2241(e) remains in force as to detainees held as "enemy combatants" at Bagram. See Resps.' Reply in Support of Mot. to Dismiss al Bakri's Habeas Pet. ("Resps.' Bakri Rep.") 1-4. Under the plain language of § 2241(e)(1), as modified by MCA § 7(a), federal district courts lack habeas jurisdiction over "an alien detained by the United States who has . . . been properly detained as an enemy combatant." Because § 2241(e)(1) on its face strips federal courts of jurisdiction to consider Bagram detainees' habeas petitions, the outcome depends on whether Boumediene was as applied or a facial rejection of MCA § 7. Only if it was a facial rejection may the Court ignore the clear language of the statute.

Fairly read, Boumediene was an as applied rejection of MCA § 7.  To be sure, the Supreme Court framed the issue in general terms -- i.e., whether aliens held in "distant countries" could invoke the Suspension Clause.  128 S.Ct at 2248.  And the Supreme Court did not specifically mention Guantanamo each time it announced an aspect of its holding.  But to interpret Boumediene as a facial repudiation of MCA § 7 would not only require a selective reading of the Supreme Court's opinion, it would also require this Court to ignore the history preceding the Supreme Court's holding.

Boumediene was focused on the habeas rights of detainees held at Guantanamo.  The Supreme Court examined the history of the U.S. presence at Guantanamo, see 128 S. Ct. at 2251-52, the degree of U.S. control at Guantanamo, see id. at 2260-61, and the practical obstacles of extending habeas rights to Guantanamo, see id. at 2261.  The Supreme Court did not examine those very fact-specific factors with regard to any other place the United States presently operates or confines detainees.  When the Supreme Court did examine other historical sites of detention, like Landsberg Prison in post-World War II Germany, it only did so to compare those historical sites to Guantanamo.  See id.  Indeed, the Supreme Court specifically observed that it might reach a different outcome if the site of detention was someplace other than Guantanamo.  Id. at 2261-62.  Hence, to infer that Boumediene rejected MCA § 7 worldwide would be to ignore the Supreme Court's unmistakably Guantanamo-specific analysis.

The conclusion that Boumediene only assessed the constitutionality of MCA § 7 as applied to Guantanamo is inescapable when the case is viewed in context.  Beginning with Rasul and Hamdi, and then continuing with Hamdan, the decision in Boumediene is the latest in a series of landmark Supreme Court opinions addressing the habeas rights of detainees held at

Guantanamo. Neither Rasul, Hamdi, nor Hamdan considered other sites of detention. Under petitioners' reading, Boumediene not only held -- for the first time -- that the Suspension Clause extends to a foreign country where the United States does not exercise de jure sovereignty, but took that ground-breaking step well beyond the cases that framed that important constitutional question. The Supreme Court has time and again stated its preference for "partial, rather than facial, invalidation." Ayotte v. Planned Parenthood, 546 U.S. 320, 328-29 (2006) (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985)). Hence, this Court will not adopt the far-reaching interpretation of Boumediene that petitioners advance. Because the Court interprets Boumediene as a rejection of MCA § 7 as it applies to Guantanamo specifically, rather than a broader facial rejection, MCA § 7 (and, therefore, § 2241(e)(1)) continues to deprive this Court of statutory jurisdiction over habeas petitions filed by Bagram detainees. Absent statutory habeas corpus jurisdiction, petitioners must look to the constitutional right to habeas corpus as protected by the Suspension Clause, and whether that provision extends to them. The question, then, is whether the statute withdrawing habeas corpus jurisdiction is constitutional as applied to these detainees held at Bagram.

## II. The Reach of the Suspension Clause to Bagram

The specific constitutional question posed by these four cases is whether petitioners -- foreign nationals designated as enemy combatants, captured and held abroad at Bagram -- are entitled to invoke the protections of the writ of habeas corpus in U.S. courts. This is essentially the same "specific question" the Supreme Court faced in Boumediene: "whether foreign nationals, apprehended and detained in distant countries during a time of serious threats to our Nation's security, may assert the privilege of the writ and seek its protections." 128 S. Ct. at

2248. And that question involves at its core the issue of the reach of the Suspension Clause, just as it did in Boumediene. The facts may vary from petitioner to petitioner, but the only material difference between the petitioners in Boumediene and the petitioners here is where they are held -- at the military base at Guantanamo Bay in Cuba or at the Bagram Theater Internment Facility at Bagram Airfield in Afghanistan.

The Boumediene Court conducted a far-reaching historical exegesis of the writ of habeas corpus and the Suspension Clause. The Court began with the Framers' original intent, surveying English habeas jurisprudence pre-dating the Constitution. Id. at 2244-47. The Court then turned to "founding-era authorities" addressing the scope of the Suspension Clause, finding them too muddled and too incomplete "to infer too much, one way or the other, from the lack of historical evidence on point." Id. at 2248-51. Finally, the Court weighed its own precedent assessing extraterritorial application of the Constitution -- cases like the Insular Cases,[4] Johnson v. Eisentrager, 339 U.S. 763 (1950), and Reid v. Covert, 354 U.S. 1 (1957). See Boumediene, 128 S. Ct. at 2253-58. The Court concluded that some cases from this venerable array -- especially Eisentrager -- helped inform its analysis. Id. But no case was so on point as to allow the Court simply to apply established precedent. Instead, the Court constructed a new framework to address the specific question it faced. Id. at 2259. Because that "specific question" is no different than the constitutional question in the cases now before this Court, and because Boumediene fashioned a specific framework to address it, the analysis here must focus first and foremost on Boumediene.

---

[4] See De Lima v. Bidwell, 182 U.S. 1 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Hawaii v. Mankichi, 190 U.S. 197 (1903); Dorr v. United States, 195 U.S. 138 (1904).

Boumediene concluded that "at least three factors are relevant in determining the reach of the Suspension Clause":

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

128 S. Ct. at 2259. For the sake of analysis, these three factors can be subdivided further into six: (1) the citizenship of the detainee; (2) the status of the detainee; (3) the adequacy of the process through which the status determination was made; (4) the nature of the site of apprehension; (5) the nature of the site of detention; and (6) the practical obstacles inherent in resolving the petitioner's entitlement to the writ.

The parties dispute how these six factors should be applied. A threshold issue is whether application of the Boumediene factors to determine whether the Suspension Clause applies should be on a detainee-by-detainee basis or categorically as to all Bagram detainees. Petitioners argue that the factors require an individualized, detainee-specific application. According to petitioners, although some factors -- like the nature of the site of detention or the adequacy of process -- can be applied categorically to all Bagram detainees, other factors -- like the detainee's citizenship and site of apprehension -- necessarily vary from one detainee to the next. See Transcript of Jan. 7, 2009 Hearing ("Tr.") at 66. Respondents counter that all six factors can be applied categorically. See id. at 7-8; see also Resps.' Reply in Support of Mot. to Dismiss al Maqaleh's Habeas Pet. ("Resps.' Maqaleh Rep.") at 16-17. For citizenship, they contend, the only question is whether a detainee is a U.S. citizen. And the only question for the site of apprehension factor is whether a detainee was captured within U.S. territory. Because no

Bagram detainee is a U.S. citizen and none was captured within U.S. territory, respondents maintain that the Court need not examine those two factors any further.

Boumediene contemplated a more nuanced analysis than respondents propose. The Supreme Court repeatedly eschewed bright-line rules, favoring instead an assessment of "objective factors and practical concerns." See 128 S. Ct. at 2258. Take, for instance, Boumediene's careful comparison of Reid v. Covert and In re Ross, 140 U.S. 453 (1891). Id. at 2255-57. The Court observed that although both cases considered whether the Fifth and Sixth Amendments applied extraterritorially to U.S. citizens detained by the U.S. government, the cases came out differently.[5] The Constitution reached the petitioners in Reid but not those in Ross because extraterritorial application in Ross would have been impractical. Id. at 2256-57. As the Court explained in Boumediene, "[i]f citizenship had been the only relevant factor in [Ross], it would have been necessary for the [Reid] Court to overturn Ross." Id. at 2257. Boumediene's repeated rejection of bright-line rules, then, coupled with its choice of certain detainee-specific factors, strongly supports petitioners' individualized approach.

Respondents warn that a detainee-by-detainee analysis might "lead to the anomalous result that some alien detainees at Bagram Airfield would have habeas rights, while others do not." Resps.' Maqaleh Mot. at 25. Perhaps respondents are right that such a result would be "anomalous." But it is certainly no more anomalous than the result that might follow -- and indeed that respondents urge -- under their categorical approach. Aside from where they are held, Bagram detainees are no different than Guantanamo detainees. Yet not only do

---

[5] The petitioner in Ross was a British subject serving on an American merchant vessel. But as Boumediene noted, "[t]he petitioner's citizenship played no role in the disposition of the case . . . [because] the Court assumed (consistent with the maritime custom of the time) that Ross had all the rights of a similarly situated American citizen." 128 S. Ct. at 2256.

Guantanamo detainees receive greater process than do Bagram detainees, but Guantanamo detainees have the privilege of habeas corpus under Boumediene while Bagram detainees, under respondents' approach, would not. It would be an even more "striking anomaly" to permit the Executive "to switch the Constitution on or off at will" merely by deciding who will be held where.[6] See Boumediene, 128 S. Ct. at 2259. This Court is not persuaded, then, that respondents' categorical approach, in which they now advocate different results solely on the basis of whether they ship otherwise identically-situated detainees to Guantanamo or instead to Bagram, is consistent with Boumediene.[7] Hence, the Court will apply the six factors in an individualized, detainee-specific manner.

A seventh factor tacitly informed Boumediene's analysis as well: the length of a petitioner's detention without adequate review. See id. at 2275-76; see also id. at 2278 (Souter, J., concurring). In holding that the Suspension Clause applies to detainees held at Guantanamo, the Court was clearly motivated, at least in part, by the prospect of indefinite Executive detention without judicial oversight. Allowing that "it likely would be both an impractical and

---

[6] One could argue that by considering adequacy of process in determining whether the Suspension Clause applies -- rather than only examining the process to determine whether it is an adequate substitute for habeas -- the Boumediene factors do, in fact, allow the Executive to "switch the Constitution on or off." If the Executive provides detainees greater process, the argument goes, then detainees may be beyond the reach of the Suspension Clause. Although this tension could be viewed as an inconsistency in Boumediene's logic, it also signifies deference to the Executive's conduct of the war in Afghanistan. It allows the Executive to forestall judicial superintendence of the military's detention policies as long as he provides detainees with sufficient process within a reasonable amount of time.

[7] This Court's concern with the unrestrained power of respondents (i.e., the Executive Branch) to determine the availability of habeas corpus simply by choosing to send a detainee to Bagram rather than Guantanamo is precisely the concern that animated the Supreme Court's separation-of-powers observations in Boumediene. See 128 S. Ct. at 2259 ("The test for determining the scope of [the Suspension Clause] must not be subject to manipulation by those whose power it is designed to restrain.").

unprecedented extension of judicial power to assume that habeas corpus would be available at the moment the prisoner is taken into custody," the Court held that "the Executive is entitled to a reasonable period of time to determine a detainee's status before a court entertains that detainee's habeas corpus petition." Id. at 2275-76. But the Court stressed that "[t]he cases before us . . . do not involve detainees who have been held for a short period of time." Id. at 2275. The Boumediene petitioners -- like petitioners here -- had been held for six years or more. See id. Hence, whatever "reasonable period of time" the Executive was entitled to had long since passed. Because the Supreme Court did not include the length of detention in its explicit list of factors that courts should consider in determining the reach of the Suspension Clause, this Court will not separately consider that circumstance here. Instead, the length of detention must exceed that "reasonable period" to which the Executive is entitled and also may shade other factors, like the practical obstacles inherent in resolving a petitioner's entitlement to the writ. But the Supreme Court's observation in Boumediene is equally powerful here: "the costs of delay can no longer be borne by those who are held in custody. The detainees in these cases are entitled to a prompt habeas corpus hearing." Id.

Finally, respondents suggest that to hold that the Suspension Clause reaches these petitioners would be a usurpation of the Executive Branch's powers -- it would allow the judiciary to "superintend[] the Executive's conduct in waging a war." Resps.' Maqaleh Mot. at 3. This Court is, of course, fully aware of the separation-of-powers concerns that underlie these cases. And the Court is well-advised of the Supreme Court's oft-repeated admonition that the political branches are entitled to a "healthy deference . . . in the area of military affairs." Rostker

v. Goldberg, 453 U.S. 57, 66 (1981).[8] But the writ of habeas corpus plays a unique role in our constitutional system of checks and balances. "[T]he privilege of habeas corpus was one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights. In the system conceived by the Framers the writ had a centrality that must inform proper interpretation of the Suspension Clause." Boumediene, 128 S. Ct. at 2244. The writ is a judicial check on Executive detention. See INS v. St. Cyr, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.").[9] Hence, respondents' recurring theme -- that this Court would be overstepping its constitutional role by entertaining habeas petitions filed by these detainees -- rings hollow. As Boumediene has already made clear, reaching back to the admonition in Marbury v. Madison, 1 Cranch. 137, 177 (1803), that it is the Court that says "what the law is," the Judiciary -- not the Executive – must decide when and where the Suspension Clause applies:

> [T]he writ of habeas corpus itself is an indispensable mechanism
> for monitoring the separation of powers . . . . The test for
> determining the scope of [the Suspension Clause] must not be
> subject to manipulation by those whose power it is designed to
> restrain.

_____  _____

[8] See also Munaf v. Geren, 128 S.Ct 2207, 2224-25 (2008) ("Our constitutional framework 'requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.'") (quoting Orloff v. Willoughby, 345 U.S. 83, 94 (1953)).

[9] See also Boumediene, 128 S. Ct. at 2246-47 ("The practice of arbitrary imprisonments . . . 'is a less public, less striking, and therefore more dangerous engine of arbitrary government.' And as a remedy for this fatal evil [Blackstone] is everywhere peculiarly emphatical in his encomiums on the habeas corpus act . . . .") (quoting The Federalist No. 84, at 512 (Alexander Hamilton) (C. Rossiter ed., 1961) (quoting 1 W. Blackstone, Commentaries *136)) (emphasis in original).

Id. at 2259. With these principles in mind, the six Boumediene factors can be applied to the petitioners here.

*A. Citizenship, Status, and Site of Apprehension*

Petitioners are situated no differently than the detainees in Boumediene with regard to three of the six factors: citizenship of the detainee; status of the detainee; and site of apprehension. Like the petitioners in Boumediene, none of the petitioners here are U.S. citizens. See 128 S. Ct. at 2259. Moreover, these petitioners, too, have been determined to be "enemy combatants" -- a determination that they dispute. See id. Finally, petitioners in both cases were all apprehended "outside the sovereign territory of the United States." See id. at 2260.

The Supreme Court spent little time on these three factors in Boumediene. After identifying citizenship as a relevant criterion, the Court made no further reference to it during the Suspension Clause analysis. As to the status factor, the Court noted that petitioners contested their status as enemy combatants whereas the petitioners in Eisentrager did not deny that they were "enemy alien[s]." Id. at 2259. But rather than exploring how an enemy combatant determination figures into the Suspension Clause calculus, the Court focused on the process by which the status determination was made. Id. at 2259-60. Finally, with regard to the site of apprehension, the Boumediene Court simply noted that the petitioners, like those in Eisentrager, were captured outside the United States. Id. at 2260. Although the Court recognized that "this is a factor that weighs against finding [petitioners] have rights under the Suspension Clause," it immediately moved on to a different factor -- the site of detention. Id. It is evident from the rather cursory analysis of these three factors that the remaining three factors -- site of detention,

adequacy of process, and practical obstacles -- were the primary drivers of the Supreme Court's decision in Boumediene.

This Court, then, has little guidance as to what the citizenship factor means after Boumediene. United States citizenship plainly is not a litmus test -- otherwise Boumediene would not have come out the way it did. To be sure, a habeas petitioner's U.S. citizenship weighs strongly in favor of a finding that habeas corpus rights apply abroad. See Munaf v. Geren, 128 S. Ct. 2207, 2216 & n.2 (2008); Eisentrager, 339 U.S. at 769-70. But as Boumediene's comparison of Reid and Ross demonstrates, U.S. citizenship does not, by itself, guarantee extraterritorial application. 128 S. Ct. at 2256-57. Petitioners argue that Boumediene can be read to support an approach that would differentiate between U.S. citizens, citizens of friendly nations, and citizens of enemy nations. Tr. at 70-72. Citizens of friendly nations, petitioners suggest, should be treated like U.S. citizens; only if a detainee is a citizen of a nation with which the United States is at war should this factor weigh against them. This approach, however, is unworkable. The terrorist "enemy" the United States is currently combating is not a "nation." See Authorization for Use of Military Force § 2(a), Pub. L. No. 107-40, 115 Stat. 224 (2001) (authorizing President "to use all necessary and appropriate force against those nations, organizations, or persons he determined planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001") (emphasis added). Yet capturing and holding enemy fighters is a "fundamental incident" of conducting the ongoing armed conflict. Hamdi, 542 U.S. at 518-19. Petitioners concede that under their approach, the U.S. government would be required to treat all such detainees as if they were U.S. citizens because none of them are citizens of an enemy nation. Tr. at 71-72. That result would be unprecedented. After Boumediene, the most this

Court can say with any certainty is that U.S. citizenship helps petitioners whereas foreign citizenship does not.[10] Because, as in Boumediene, none of petitioners here are U.S. citizens, this factor weighs against a finding that they may invoke the protections of the Suspension Clause -- just as it did in Boumediene.

Boumediene also provides little guidance on how to analyze the "status of the detainee" factor. Here, petitioners (as in Boumediene) contest their classification as "enemy combatants." Indeed, the parties even dispute what it means to be an enemy combatant. In Boumediene, the Supreme Court was able to resolve the Suspension Clause issue without ruling on the appropriate definition of enemy combatant, and that issue has not been fully briefed here, either. Hence, this Court will not, at this time, resolve the issue. But accepting respondents' definition for the sake of argument, it becomes clear that the most fertile ground for inquiry is not the detainee's status itself, but rather the process used to make that determination. Until recently,[11] respondents used a "substantially similar" definition of enemy combatant for detainees no matter where they are held. Tr. at 45. Respondents previously described their definition of "enemy combatant" in the Guantanamo habeas cases as follows:

_____

[10] A detainee's citizenship can also create friction with a host government. The Court discusses this aspect of citizenship under the "practical obstacles" factor.

[11] On March 13, 2009, respondents filed a memorandum refining their definition of "enemy combatant" for Guantanamo detainees, and abandoning that term. See, e.g., Hamlily v. Obama, Civ.A.No. 05-763 (dkt ent. #175). Respondents were careful to note that their new "position is limited to the authority upon which the Government is relying to detain the persons now being held at Guantanamo Bay. It is not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts." Id. at 2. Indeed, on February 20, 2009, respondents declined an opportunity to refine their position in these cases involving Bagram detainees. See, e.g., Al Maqaleh v. Gates, Civ.A.No. 06-1669 (dkt ent. #30). Hence, for detainees at Bagram, respondents apparently adhere to the definition of "enemy combatant" that they previously proposed in the habeas cases involving Guantanamo detainees.

> At a minimum, the President's power to detain includes the ability
> to detain as enemy combatants those individuals who were part of,
> or supporting, forces engaged in hostilities against the United
> States or its coalition partners and allies. This includes individuals
> who were part of or directly supporting Taliban, al-Qaida, or
> associated forces, that are engaged in hostilities against the United
> States, its coalition partners or allies. This also includes any
> persons who have committed a belligerent act or supported
> hostilities in aid of enemy forces.

See, e.g., Hamlily v. Obama, Civ.A.No. 05-763, Mem. in Support of Gov't Definition of Enemy

Combatant at 2 (dkt ent. #126).

This is a broad definition, under which mere "support" of forces engaged in hostilities can

justify an "enemy combatant" designation. Respondents maintain that a broad definition is

necessary to provide the Executive with the kind of operational flexibility needed in the ongoing

armed conflict. Whatever the merits of such a broad definition, however, a necessary corollary is

a robust process to ensure that only detainees who pose the kind of threat that warrants detention

are designated as enemy combatants. Hence, while this Court, like the Supreme Court in

Boumediene, finds little in the "status of the detainee" factor to counsel in favor of or against

extension of the Suspension Clause to Bagram detainees, the breadth of the definition of "enemy

combatant" utilized by respondents underscores the need for a meaningful process to ensure that

detainees are not improperly classified as enemy combatants.

The third factor is the site of apprehension. Although Boumediene did not analyze this

factor in depth, the case law provides some insight. Apprehension within U.S. territory suggests

that one may invoke the protections of the Constitution, see Yick Wo v. Hopkins, 118 U.S. 356,

369 (1886), but it does not guarantee it, see Ex parte Quirin, 317 U.S. 1, 15 (1942). And

apprehension outside U.S. territory cuts against a detainee claiming a right to habeas review, see

Eisentrager, 339 U.S. at 768, but it does not preclude that claim entirely, see Boumediene, 128 S. Ct. at 2261. Here, as in Boumediene, all petitioners were captured outside the United States, and hence the site of apprehension "is a factor that weighs against a finding that they have rights under the Suspension Clause." See id.

At first glance, it may seem that the site of apprehension factor, like the citizenship and status factors, should play little role in the ultimate disposition of these cases because the Court is simply applying the teaching of Boumediene to similarly situated petitioners. But in fact the site of apprehension plays a more important, albeit more subtle, role than the citizenship and status factors. Guantanamo detainees have all been rendered there -- that is, they were apprehended in one country and eventually brought to the Guantanamo Bay U.S. military facility in Cuba, with which they had no previous connection. The four petitioners in these cases, too, have all been rendered to the U.S. military facility at Bagram in Afghanistan. All four claim to have been captured outside of Afghanistan and brought there to be detained by the United States. Three of the four petitioners had no prior connection with Afghanistan at all. Petitioners like these, however, constitute only a very small fraction of the Bagram detainee population. In respondents' most recent classified filing, they represented that as of March 10, 2009, there were 597 detainees at Bagram. See Al Maqaleh v. Gates, Civ.A.No. 06-1669 (dkt ent. #32). ██████████████

██████████████████████████████████████████████

██

Bagram detainees captured in Afghanistan are qualitatively different than Bagram detainees who, like petitioners, were captured elsewhere.[12] The Boumediene Court was motivated in no small part by the concern that the Executive could, under its argument, shuttle detainees to Guantanamo "to govern without legal constraint." 128 S. Ct. at 2259. In pronouncing that "[o]ur basic charter cannot be contracted away like this," the Supreme Court concluded that the Executive does not have "the power to decide when and where [the Constitution's] terms apply." Id. It is one thing to detain those captured on the surrounding battlefield at a place like Bagram, which respondents correctly maintain is in a theater of war. It is quite another thing to apprehend people in foreign countries -- far from any Afghan battlefield -- and then bring them to a theater of war, where the Constitution arguably may not reach. Such rendition resurrects the same specter of limitless Executive power the Supreme Court sought to guard against in Boumediene -- the concern that the Executive could move detainees physically beyond the reach of the Constitution and detain them indefinitely.[13] There is, then, a meaningful distinction between Bagram detainees captured outside Afghanistan -- like the petitioners here -- and Bagram detainees who were captured on the battlefield in Afghanistan. The site of apprehension factor, therefore, is of more importance here than it was for the Guantanamo detainees in Boumediene, and for these petitioners cuts in their favor because, for purposes of respondents' current motion, all were apprehended outside of Afghanistan.

---

[12] There is no comparable situation for Guantanamo detainees who, of course, could not have been captured in Cuba.

[13] See also Hamdi, 542 U.S. at 535-36 ("We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.") (internal citations omitted).

In sum, for these three factors, petitioners are not much different than the petitioners in Boumediene. None are U.S. citizens or were apprehended in U.S. territory, so these factors cut against them. While the status of the detainee factor neither helps nor hurts petitioners, the "enemy combatant" determination is so broad -- it could easily ensnare someone who cannot justifiably be detained as an incident of war -- as to underscore the need for a robust process for making that determination. These petitioners have a stronger claim to habeas rights through application of the Suspension Clause than would Bagram detainees captured in Afghanistan, but that does not materially distinguish them from the detainees at Guantanamo. The primary comparison of these cases and Boumediene, then, rests on an analysis of the remaining three factors: the site of detention; the process used to make the status determination; and the practical obstacles of litigating a petitioner's entitlement to the writ.

### B. Site of Detention

The touchstone of the site of detention factor is the "objective degree of control" the United States has over Bagram. See Boumediene, 128 S. Ct. at 2252. In assessing the objective degree of control, one question is whether Bagram is more like Guantanamo Bay, the site at issue in Boumediene, or like Landsberg Prison in post-World War II Germany, the site at issue in Eisentrager. The Supreme Court held in Eisentrager that the Suspension Clause did not reach detainees at Landsberg. 339 U.S. at 785. In Boumediene, however, the Court held that the Suspension Clause has "full effect" at Guantanamo Bay. 128 S. Ct. at 2262. Yet the Boumediene Court did not see fit to overrule Eisentrager, noting several "critical differences" between Guantanamo and Landsberg. Id. at 2260. The United States has "complete control and

jurisdiction" over Guantanamo, see Rasul, 542 U.S. at 471,[14] but did not have such control at

Landsberg, which "was under the jurisdiction of the combined Allied Forces." Boumediene, 128

S. Ct. at 2260.  Moreover, U.S. control over Guantanamo is "indefinite," whereas the Allied

Forces "had not planned a long-term occupation of Germany." Id. This Court, then, must

examine both the degree and duration of U.S. "control" at Bagram to determine where Bagram

falls on the Guantanamo-Landsberg spectrum.

The U.S. presence in Afghanistan is governed by both a lease and a Status of Forces

Agreement ("SOFA").  Read together, the United States appears to have near-total operational

control at Bagram.  For instance, paragraph 9 of the lease grants the United States exclusive use

of the premises at Bagram.  See Accommodation Consignment Agreement for Lands and

Facilities at Bagram Airfield ¶ 9 ("Bagram Lease") (attached as Exhibit A to Tennison Decl.,

supra).  The SOFA allows U.S. personnel to enter and leave Afghanistan without a passport and

exempts U.S. vehicles, imports, and exports from taxation, regulation, or inspection.  See

Diplomatic Note No. 202 ¶¶ 2, 5-6 (attached as Exhibit 2 to Resps.' Maqaleh Mot.).  Indeed,

---

[14] The Supreme Court has summarized the key terms of the U.S. lease at Guantanamo as
follows:

> The United States occupies the base [at Guantanamo], which comprises 45 square
> miles of land and water along the southeast coast of Cuba, pursuant to a 1903
> Lease Agreement executed with the newly independent Republic of Cuba in the
> aftermath of the Spanish-American War.  Under the agreement, "the United States
> recognizes the continuance of the ultimate sovereignty of the Republic of Cuba
> over the leased areas," while "the Republic of Cuba consents that during the
> period of the occupation by the United States the United States shall exercise
> complete jurisdiction and control over and within said areas."  In 1934, the parties
> entered into a treaty providing that, absent an agreement to modify or abrogate the
> lease, the lease would remain in effect "so long as the United States of America
> shall not abandon the naval station of Guantanamo."

Rasul, 542 U.S. at 471 (internal ellipses and brackets omitted).

unlike the U.S. lease at Guantanamo, the Bagram lease provides the United States with assignment and reversion authority. See Bagram Lease ¶ 4.  Such operational control over Bagram is unsurprising because, as respondents note, "that's going to be basically true of any military facility that the United States runs anywhere in the world." Tr. at 39.

Yet there are several differences between the degree of U.S. control at Bagram and at Guantanamo. A SOFA governs the terms of the U.S. presence in Afghanistan, and the very existence of a SOFA is a "manifestation of the full sovereignty of the state on whose territory it applies." Resps.' Maqaleh Rep. at 13-15 (quoting U.N. Mandates and Forces Agreements, Comm. Testimony, Statement of Ruth Wedgwood, Feb. 28, 2008, House Foreign Affairs Comm., Subcomm. on Int'l Orgs., Human Rights, and Oversight); see also Resps.' Maqaleh Mot. at 6 n.5. The United States operates in Guantanamo without a SOFA.  Nor does the mere existence of a lease serve to transfer sovereignty over leased land to the United States. See, e.g., United States v. Spelar, 338 U.S. 217, 221-22 (1949).  Moreover, there is a considerable non-U.S. presence at Bagram -- in addition to the U.S. allies who operate out of the base, a sizable population of Afghan workers and contractors is there.  Tennison Decl. ¶¶ 7-8; see also Tr. at 37. In contrast, aside from a "handful" of Cuban workers who were "grandfathered" in, access to Guantanamo is confined to U.S. personnel.  See Tr. at 128.[15]  This almost-exclusive U.S. presence at Guantanamo contributed to the Supreme Court's conclusion that "[i]n every practical sense Guantanamo is not abroad." Boumediene, 128 S. Ct. at 2261.

------

[15] Petitioners also represent that Filipino, Jamaican, and Ecuadorian contractors are permitted onto the military base at Guantanamo.  Tr. at 101.  Petitioners have not entered anything into the record to substantiate that representation.

Another potential difference between Bagram and Guantanamo concerns U.S. "jurisdiction." The Guantanamo lease provides the United States with "complete jurisdiction and control" over the military base. Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418 ("Guantanamo Lease") (attached as Exhibit 23 to Maqaleh Opp'n). Of course, the term "jurisdiction" is nebulous and can mean many things. See United States v. Rodgers, 466 U.S. 475, 479-80 (1984) (examining numerous potential definitions of "jurisdiction"); see also Black's Law Dictionary 867-71 (8th ed. 2004) (setting forth over fifty meanings of "jurisdiction," ranging from "[a] government's general power to exercise authority . over all persons and things within its territory" to "[a] court's power to decide a case or issue a decree"). Petitioners take it to mean an amalgam of "civil jurisdiction" and "criminal jurisdiction." See Maqaleh Opp'n at 48-49. Even accepting for the sake of argument petitioners' interpretation, it is clear that U.S. jurisdiction at Bagram is not quite as plenary as at Guantanamo. Although the Bagram lease is silent with regard to jurisdiction, the SOFA addresses it. Under the SOFA, the United States has criminal jurisdiction over U.S. personnel. SOFA ¶ 7. Criminal jurisdiction over Afghan workers or over allied personnel is beyond U.S. authority. The SOFA further provides that the United States and Afghanistan waive civil claims against one another, but it does not provide the United States with jurisdiction over civil claims brought by individuals. Id. ¶ 9. To be sure, these provisions grant the United States some limited jurisdiction at Bagram -- but there are no limits on U.S. jurisdiction at Guantanamo. There is, then, lesser U.S. "jurisdiction" at Bagram than at Guantanamo.

But the differences in control and jurisdiction set forth above do not significantly reduce the "objective degree of control" the United States has at Bagram. The existence of a SOFA and

the presence of non-U.S. personnel does not affect the actual control the United States exercises

at the Bagram detention facility, which is practically absolute. See Resps.' Maqaleh Mot. at 22

("[T]he United States would not detain enemy combatants on any long-term basis at a facility

that it did not control."). Nor do the differences in jurisdiction drastically undercut the objective

degree of control at Bagram. "Jurisdiction," like "sovereignty," is merely a label, and

Boumediene rejected the argument that a label like "sovereignty" is determinative in assessing

the reach of the Suspension Clause. See 128 S. Ct. at 2253.[16] Perhaps the difference in

jurisdiction precludes the United States from operating at Bagram, as it does at Guantanamo,

entirely free from the scrutiny of the host country. As a practical matter, however, when

assessing day-to-day activities at Bagram, the lack of complete "jurisdiction" does not

appreciably undermine the conclusion that the United States exercises a very high "objective

degree of control."

This conclusion is reinforced when comparing the control the United States exercises at

Bagram to U.S. control at Landsberg Prison. The Court cannot, on the record before it, offer an

item-by-item comparison of Bagram and Landsberg. But it is apparent that the combined Allied

Forces operating in post-World War II Germany provided a more meaningful check on one

another than U.S. allies in the current conflict have on U.S. control at Bagram. For example, the

Declaration made at the close of World War II does not provide the United States with any

special role among the four "Allied Representatives" -- the United States, the Soviet Union, the

---

[16] Just as Cuba "effectively has no rights as a sovereign" under the Guantanamo lease, see
id. at 2252, under the lease and SOFA at Bagram, Afghanistan retains few if any rights as a
sovereign relating to the detention facility and the detainees held there. In Eisentrager, the Court
used "sovereignty" in the sense of the control asserted by the U.S. military over the detention
facility, see id. at 2257, which is effectively as complete at Bagram as at Guantanamo and more
complete at Bagram than at Landsberg.

-30-

United Kingdom, and France. See Declaration Regarding the Defeat of Germany and the

Assumption of Supreme Authority with Respect to Germany, June 5, 1945, 60 Stat. 1649,

T.I.A.S. No. 1520. Similarly, the Agreements on Germany four years later established that the

United States and its allies would work together in exercising their retained powers over the three

western zones of Germany. See Agreements Respecting Basic Principles for Merger of the Three

Western German Zones of Occupation, and Other Matters, Apr. 8, 1949, 63 Stat. 3819, T.I.A.S.

No. 2066. To be sure, the United States is supported by allies in Afghanistan. But the

relationship is not the same as that of the Allied Forces after World War II. Compare Agreement

on Control Machinery in Germany, arts. 1-3, Nov. 14, 1944, 5 U.S.T. 2062, T.I.A.S. No. 3070

(describing "joint" control of allies and requiring action by unanimous decision), with Bagram

Lease ¶ 9 (providing United States with "exclusive" control at Bagram). And it is the United

States, not U.S. allies, that detains people at the Bagram Theater Internment Facility and that

operates (and hence fully controls) that prison facility and its occupants, which was not the case

at Landsberg. See Hirota v. MacArthur, 338 U.S. 197, 198 (1948) (per curiam) (noting that the

post-World War II military tribunals in Germany were created by General MacArthur as "the

agent of the Allied Powers" and were therefore not "tribunal[s] of the United States"). Thus,

although U.S. control over Bagram is not quite as absolute as over Guantanamo, the United

States exercises a significantly greater "objective degree of control" over Bagram than it did over

Landsberg in post-World War II Germany.

Comparing the objective degree of control the United States has exercised at sites of

detention separated by time and space is necessarily an exercise in rough approximation. United

States control and jurisdiction at Bagram is slightly less complete than at Guantanamo. But on

the record before the Court, the United States does not share control at Bagram the way the Allied Forces shared control at Landsberg. On the Guantanamo-Landsberg spectrum, then, the objective degree of control the United States has at Bagram resembles U.S. control at Guantanamo more closely than U.S. control at Landsberg.

In assessing the site of detention, Boumediene also referenced the duration of the U.S. presence there. 128 S. Ct. at 2261. The United States has occupied Guantanamo for over 100 years. Id. at 2258. For much of that time, the occupation has been in the face of a hostile host country -- the United States is at Guantanamo despite its relationship with Cuba, not because of it. The U.S. presence at Landsberg Prison stands in stark contrast. At the time of Eisentrager, the U.S. presence in Germany was of a recent vintage. The Allied Forces declared the defeat of Germany in June 1945 -- thereby initiating the U.S. occupation -- and Eisentrager was decided in June 1950. Similarly, the United States has been at Bagram for less than a decade. The United States began operations in Afghanistan in 2001 and executed diplomatic arrangements in 2002. That is a far cry temporally from the century-long U.S. presence at Guantanamo.

But the Court must consider the future intentions of the United States at Bagram as well. Since the Insular Cases more than a century ago, the Supreme Court has looked to future intentions in deciding whether the Constitution reaches distant lands. See Boumediene, 128 S. Ct. at 2254 (citing Dorr v. United States, 195 U.S. 138 (1904), and Downes v. Bidwell, 182 U.S. 244 (1901)) (explaining doctrine of "territorial incorporation"). In Boumediene, the Supreme Court distinguished between Guantanamo, where the United States has evidenced an intent to stay indefinitely, and Landsberg, where the Allies did not plan a long-term occupation. Id. at 2261. At Bagram, the United States has declared that it only intends to stay until the current

military operations are concluded and Afghan sovereignty is fully restored. See Joint Declaration

of the United States-Afghanistan Strategic Partnership (attached as Exhibit A to Resps.' Maqaleh

Rep.); see also Tennison Decl. ¶ 2. That promise may be no more than a distant hope given the

indefinite nature of our global efforts against terrorism and recent developments in Afghanistan,

but it remains the declared intent of the United States. In that respect, U.S. intentions at Bagram

differ from those at Guantanamo.

Petitioners take issue with the stated intentions of the United States. They argue that the

lease provides the United States with exclusive control over when it expires. Petitioners also

maintain that extensive construction and expansion at Bagram evidences an intent to remain

indefinitely. See Maqaleh Opp'n at 8. Taking the latter argument first, the construction of sturdy

structures and familiar amenities does not weigh into the constitutional analysis. This Court is in

no position to tell the military what materials to use in its buildings and what amenities are likely

to maintain morale for U.S. personnel. During other recent periods of "wartime" presence in

foreign lands, particularly Vietnam, similar extensive facility construction efforts occurred. As

to the lease, petitioners rightly point out that the United States absolutely controls the duration of

the U.S. presence at Bagram. See Bagram Lease ¶ 4 ("[T]his Agreement . . . shall continue until

the United States or its successors determine that the Premises are no longer required for its

use.").[17] The same is true at Guantanamo. See Guantanamo Lease, Art. III (providing that the

lease "shall continue in effect . . . [s]o long as the United States of America shall not abandon the

---

[17] Although the preamble of the Bagram Lease provides that it is entered "in consideration of the mutual benefits to be derived therefrom," the normal rules of contractual interpretation give express terms of a contract precedence over text from a preamble. See, e.g., Crowell v. Gould, 96 F.2d 569, 573 (D.C. Cir. 1938).

said naval station of Guantanamo . . . ."). But according to respondents, long-term leases for military bases are not uncommon.[18] See Tr. at 38 ("[I]f you look at some leases from the World War II era, yes, they made note that there are specific durations, like 99 years, which is practically forever."). Petitioners' contention that U.S. intentions at Bagram are not what respondents say they are might carry more weight if hostilities had ended and the United States still remained at Bagram. That is not the case now. Hostilities are ongoing and petitioners have not set forth persuasive evidence suggesting that the United States does not intend to quit Bagram once those hostilities have abated, even though the end of hostilities in Afghanistan remains well in the future.

In sum, several elements enter into the site of detention analysis. In assessing the "objective degree of control," Bagram lies much closer to Guantanamo than to Landsberg. As to the duration of the U.S. presence, on the other hand, Bagram appears to be closer to Landsberg than Guantanamo -- the United States has been at Bagram for less than a decade and has disavowed any intention of a permanent presence there. Therefore, although Bagram does not align squarely with either Landsberg or Guantanamo, this Court cannot conclude that Bagram, like Guantanamo, is "not abroad." See Boumediene, 128 S. Ct. at 2261. Whereas the site of detention factor in Boumediene plainly supported application of the Suspension Clause (and hence habeas rights) to the Guantanamo detainees, it does not favor petitioners to quite the same extent here. Nonetheless, it is still fair to say that the United States has a high objective degree of control at Bagram.

_____

[18] The parties have not entered the Landsberg lease into the record.

C. *Adequacy of Process*

The adequacy of process factor requires an assessment of the process used to make status determinations at Guantanamo and the process provided to petitioners in Eisentrager. Once those two points of comparison are established, the Court can compare the process used to make status determinations at Bagram. Before commencing with that analysis, however, the Court must resolve a threshold issue. Respondents argue that adequacy of process does not factor into the analysis of whether the Suspension Clause applies. See Resps.' Maqaleh Rep. 19-20. Rather, they maintain, adequacy of process is only relevant to the second part of the Suspension Clause analysis: whether Congress has provided an adequate substitute for habeas. Although respondents are correct that adequacy of process lies at the center of the "adequate substitute" prong, they are incorrect that adequacy of process is irrelevant to the first part of the inquiry. In Boumediene, the Supreme Court clearly enumerated "adequacy of the process" as one of the factors that determine whether the Suspension Clause applies. 128 S. Ct. at 2259. Indeed, unlike the cursory analysis of the first three factors discussed earlier, the Supreme Court devoted several paragraphs of analysis to this factor, comparing the process used in Eisentrager to that at Guantanamo. Id. at 2259-60. Hence, this Court concludes that under Boumediene, it must consider adequacy of process in determining the reach of the Suspension Clause.

In Boumediene, the Supreme Court described the following process used to determine petitioners' status as "enemy aliens" in Eisentrager:

> The records from the Eisentrager trials suggest that, well before the
> petitioners brought their case to this Court, there had been a
> rigorous adversarial process to test the legality of their detention.
> The Eisentrager petitioners were charged by a bill of particulars
> that made detailed factual allegations against them. See 14 United

> Nations War Crimes Commission, Law Reports of Trials of War
> Criminals 8-10 (1949) (reprint 1997).  To rebut the accusations,
> they were entitled to representation by counsel, allowed to
> introduce evidence on their own behalf, and permitted to cross-
> examine the prosecution's witnesses.  See Memorandum by
> Command of Lt. Gen. Wedemeyer, Jan. 21, 1946 (establishing
> "Regulations Governing the Trial of War Criminals" in the China
> Theater), in Tr. of Record in Johnson v. Eisentrager, O.T.1949, No.
> 306, pp. 34-40.

128 S. Ct. at 2259-60.  The Supreme Court went on to note that the Combatant Status Review

Tribunal ("CSRT") hearings at Guantanamo "are far more limited, and . . . fall well short of the

procedures and adversarial mechanisms that would eliminate the need for habeas corpus review."

Id. at 2260.  The Supreme Court described the following deficiencies in the CSRT process:

> Although the detainee is assigned a "Personal Representative" to
> assist him during CSRT proceedings, . . . that person is not the
> detainee's lawyer or even his "advocate."  The Government's
> evidence is accorded a presumption of validity.  The detainee is
> allowed to present "reasonably available" evidence, but his ability
> to rebut the Government's evidence against him is limited by the
> circumstances of his confinement and his lack of counsel at this
> stage.  And although the detainee can seek review of his status
> determination in the Court of Appeals, that review process cannot
> cure all defects in the earlier proceedings.

Id. (internal citations omitted).

The process used to determine a detainee's status at Bagram is described in the Tennison

Declaration.  The initial "enemy combatant" determination is made "in the field."  Tennison Decl.

¶¶ 11-12.  For detainees at Bagram, the initial determination is reviewed within 75 days, and then

every six months thereafter.[19]  Id. ¶ 13.  The reviewing body is the Unlawful Enemy Combatant

Review Board ("UECRB"), a panel of three commissioned officers.  The UECRB reviews "all

---

[19] The process is slightly different for individuals captured in Afghanistan but not
detained at Bagram.  See Tennison Decl. ¶ 12.

relevant information reasonably available," and detainees have the opportunity to make a written statement.[20] Id. ¶¶ 12-13. The UECRB then makes a recommendation by majority vote to the Commanding General as to the detainee's status. Id. ¶ 13. There is no recourse to a neutral decision-maker.

Respondents concede, as they must, that the process used for status determinations at Bagram is less comprehensive than the CSRT process used for the Guantanamo detainees. Tr. at 53. Focusing the inquiry on the flaws Boumediene identified in the CSRT process, the UECRB process is plainly less sophisticated and more error-prone. Unlike a CSRT, where a petitioner has access to a "personal representative," Bagram detainees represent themselves. Obvious obstacles, including language and cultural differences, obstruct effective self-representation by petitioners such as these. Detainees cannot even speak for themselves; they are only permitted to submit a written statement. But in submitting that statement, detainees do not know what evidence the United States relies upon to justify an "enemy combatant" designation -- so they lack a meaningful opportunity to rebut that evidence. Respondents' far-reaching and ever-changing definition of enemy combatant, coupled with the uncertain evidentiary standards, further undercut the reliability of the UECRB review. And, unlike the CSRT process, Bagram detainees receive no review beyond the UECRB itself.

This Court need not determine how extensive process must be to stave off the reach of the Suspension Clause to Bagram. It suffices to recognize that the UECRB process at Bagram falls well short of what the Supreme Court found inadequate at Guantanamo. See Boumediene, 128

---

[20] Since April 2008, detainees being screened for the first time may appear before UECRB in person. See Tennison Decl. ¶ 13. Because all petitioners in these cases began their detention long before April 2008, this provision is inapplicable to them.

S. Ct. at 2260. Hence, while the important adequacy of process factor strongly supported extension of the Suspension Clause and habeas rights in Boumediene, it even more strongly favors petitioners here.

*D. Practical Obstacles*

Finally, the Court must consider the practical obstacles involved in extending the Suspension Clause to Bagram. The Supreme Court devoted significant attention to this factor in Boumediene, focusing on the impact that habeas review would have on the military mission and on whether litigating habeas cases would cause friction with the host government. 128 S. Ct. at 2261-62. In concluding that habeas review would not raise substantial practical obstacles in the way of the military mission, the Court noted that the arguments might "have more weight" if Guantanamo "were located in an active theater of war." Id. at 2262.

Habeas review could conceivably impact the military mission in several ways. The security of the detention facility is relevant. Habeas review is not impractical when detainees are held at secure military facilities, like the U.S. facility at Guantanamo. Boumediene, 128 S. Ct. at 2261. Still, the practical difficulties of providing habeas review are enhanced in an active war zone. For example, as noted in Eisentrager, the Allied Forces administering Landsberg Prison were threatened by "enemy elements, guerilla fighters, and 'were-wolves.'" Boumediene, 128 S. Ct. at 2261 (quoting Eisentrager, 339 U.S. at 784). In this regard, Bagram resembles Landsberg more than Guantanamo, since it, like Landsberg, is under constant threat by suicide bombers and other violent elements. See, e.g., Bomber Strikes Outside Main U.S. Base in Afghanistan, Voice Am. Press Releases & Documents, 2009 WLNR 4173359 (Mar. 4, 2009); see also Tr. at 20.

United States control over the detention facility is also relevant. As discussed in greater detail earlier, the United States exercises near-total control over Bagram even if it does not have complete "jurisdiction" there. Indeed, the military exercises such control at any military base it establishes, Tr. at 39, which has allowed the United States to convene wartime tribunals during previous conflicts. Those tribunals have provided detainees with far greater process than the UECRB process at Bagram. For example, counsel for petitioners represented that during the first Persian Gulf War, 1,200 detainees had their status determined by "competent tribunals" within the meaning of the Geneva Conventions. Tr. at 81. But the Court need not rely on that representation alone because, even in Eisentrager, the petitioners received a "rigorous adversarial process to test the legality of their detention" before a military tribunal in Nanking, China Theater, shortly after the Japanese surrender in World War II. See Boumediene, 128 S. Ct. at 2259; see also Eisentrager, 339 U.S. at 766 (describing military tribunal constituted before petitioners were transferred to Landsberg). If such a "rigorous adversarial process" was provided at a hastily-constituted military tribunal in post-war China, then it strains credulity to believe that it is impractical to provide meaningful process to detainees held at a large, secure military base, like Bagram, under complete U.S. control.

Respondents argue that there are significant practical difficulties in gathering evidence and providing detainees with access to counsel. They are correct that Eisentrager was in no small part concerned with the difficulties of producing the petitioner himself for a habeas hearing. See id. at 778-79. But those concerns are significantly mitigated today by technological advances. Real-time video-conferencing provides a workable substitute for an in-court appearance. Indeed, that is the process being used in scores of Guantanamo habeas proceedings now taking place in

this District Court, in which no Guantanamo detainee has been physically transferred here. Although logistical issues have certainly been presented, the hearings and related proceedings are going forward with the burdens on the government falling mainly on the lawyers and administrative personnel involved, not on those who would otherwise be on the battlefield. Moreover, to the extent that respondents are alarmed by the prospect of pulling potential witnesses from the battlefield, it is again worth noting that all four petitioners in these cases claim to have been captured outside Afghanistan, far removed from any battlefield -- and were apprehended six or more years ago. It is unlikely, and pure speculation, that relevant witnesses are now located in Afghanistan given these circumstances and that three of these petitioners lack any nexus to that country aside from the fact of their detention there. And even if access by counsel should prove necessary -- something the Court does not, at this stage, decide -- counsel for petitioners have represented that access is not so difficult as to be dispositive. Tr. at 83-84. Hence, while these cases may pose more practical difficulties than the normal habeas case, just as the Guantanamo habeas cases also do, the Court is not persuaded that those difficulties rise to a level that precludes application of the Suspension Clause or bars petitioners from access to habeas review.

The number of detainees who might be entitled to habeas review also factors into the analysis of practical obstacles. Petitioners all claim to have been captured outside Afghanistan.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ See Karen DeYoung and Del

Quentin Wilber, <u>Britain Acknowledges 2 Detainees Are in U.S. Prison in Afghanistan</u>, Wash.

Post, Feb. 27, 2009, at A04 (estimating that 650 detainees are in U.S. custody at Bagram, with

roughly 30 detainees captured outside Afghanistan). The practical obstacles of providing habeas

review would be amplified if access to habeas corpus were to extend to the entire Bagram

detainee population. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

The right to invoke the privilege of habeas corpus does not accrue from the day a

petitioner is captured. <u>Boumediene</u> held that the Executive must have a "reasonable amount of

time" before the Suspension Clause applies. 128 S. Ct. at 2275-76. The Court expressly noted

that "it likely would be both an impractical and unprecedented extension of judicial power to

assume that habeas corpus would be available at the moment the prisoner is taken into custody."

<u>Id.</u> Practical obstacles related to the military mission might loom large absent this buffer, but by

providing a "reasonable amount of time" before meaningful review is required, those obstacles

become more manageable. Such a reasonable time period elapsed for these detainees, like those

at Guantanamo, many years ago.

The impact on the military mission is not the only practical obstacle that may stand in the

way of the Suspension Clause reaching Bagram. In <u>Boumediene</u>, the Supreme Court also noted

the possibility of friction with the host government. <u>See</u> 128 S. Ct. at 2261. There was no such

friction at Guantanamo, the Supreme Court reasoned, because "[n]o Cuban court has jurisdiction

over . . . the enemy combatants detained there . . . . [T]he United States is, for all practical purposes, answerable to no other sovereign for its acts on the base." Id.

At Bagram, however, there is a real possibility of friction with the Afghan government with respect to Afghan detainees. "[P]ursuant to a diplomatic arrangement reached with the Government of Afghanistan, a significant percentage of the Afghan detainees at [Bagram] is expected to be transferred to the Government of Afghanistan." Tennison Decl. ¶ 16. The Afghan government has renovated a prison to house such detainees, id., and respondents represent that the transfer has already begun, see Resps.' Maqaleh Rep. at 19. Hence, Afghan detainees now in U.S. custody are subject to transfer to Afghan custody. Friction with the Afghan government could arise if a U.S. court were to entertain Afghan detainees' habeas petitions. It is by no measure unlikely that a federal court -- sitting in the United States and applying the standards used in analogous habeas cases involving Guantanamo detainees -- would arrive at a different result than an Afghan court applying an entirely different process and legal standards. Moreover, if granted, the habeas remedy -- release -- could create substantial friction with the Afghan government. If a U.S. court were to order the release of an Afghan detainee, the prime destination for such release would be Afghanistan -- the country of that detainee's citizenship and detention. Such unilateral releases of Bagram detainees by the United States could easily upset the delicate diplomatic balance the United States has struck with the host government.

In the cases now before the Court, only Wazir is an Afghan citizen, and hence only he is subject to such transfer. Al Bakri and al-Najar have no connection whatever with Afghanistan aside from the fact of their detention there. Al Maqaleh claims to have been captured outside Afghanistan, though respondents contest that claim. For the purpose of this motion to dismiss,

-42-

however, the Court must accept the facts alleged by al Maqaleh as true. Al Bakri, al-Najar and al Maqaleh are, for all practical purposes, no different than the detainees at Guantanamo. No Afghan court has jurisdiction to hear the claims they raise here. They are not subject to transfer to Afghan custody, so the United States is "answerable to no other sovereign" for their detention, as at Guantanamo. See Boumediene, 128 S. Ct. at 2261. For Wazir, however, the United States may be answerable to Afghanistan to some degree. And, as discussed above, it is possible -- if not likely -- that review of Wazir's habeas petition by this Court could cause friction with the Afghan government. Hence, the practical obstacles factor affects Wazir differently than it does the other three petitioners.

Lastly, in evaluating the practical obstacles relevant to the extension of the Suspension Clause to Guantanamo, the Supreme Court noted that "if the detention facility were located in an active theater of war, arguments that issuing the writ would be 'impracticable or anomalous' would have more weight." Boumediene, 128 S. Ct. at 2261-62. Bagram is in such an "active theater of war" and the Court recognizes that the path to providing habeas review for these petitioners is likely strewn with more practical obstacles than was the case for detainees at Guantanamo. But this Court is not persuaded that the impact will be as dire as respondents maintain. The United States has firm control over the Bagram detention facility, and the United States has provided detainees with far greater wartime process in past settings. Practical difficulties of gathering evidence and managing the habeas process are mitigated by technological advances and the fact that these petitioners were not captured on the Afghan battlefield. Only a limited subset of detainees -- non-Afghans captured beyond Afghan borders -- will be affected by this ruling, and practical obstacles are diminished further because the

Executive has had a reasonable amount of time before meaningful review will be required --

indeed, it is more than six years since these petitioners were first apprehended. And for three of

the four petitioners, there is no possibility of friction with the host government because the

Afghan government has no interest in their detention. Only as to the fourth, Wazir, is there a

possibility of such friction.[21]

In sum, this Court is sensitive to the Supreme Court's observation that practical obstacles

could make habeas review "impracticable and anomalous" for detainees held in an active theater

of war. Yet respondents' repeated reliance on this dictum cannot shield the Executive's detention

of these petitioners at Bagram entirely from review. The only reason these petitioners are in an

active theater of war is because respondents brought them there. And it would be far more

anomalous to allow respondents to preclude a detainee's habeas rights by choosing to put him in

harm's way through detention in a theater of war. Providing habeas review for petitioners al

Bakri, al-Najar and al Maqaleh is not so onerous, so fraught with danger, or so likely to cause

friction with the Afghan government as to warrant depriving them of the protections of the Great

Writ.

*E. Balancing of Factors*

Based on this assessment, the Court must determine whether, on balance, considering all

the Boumediene factors, these four petitioners may invoke the Suspension Clause. If so, then

MCA § 7(a), which strips this Court of jurisdiction to consider habeas petitions filed by enemy

combatants, is unconstitutional as applied to them. The Court has discussed each factor at length

---

[21] Of course, if respondents are truly concerned about the logistical obstacles and burdens associated with affording habeas review to these few petitioners at Bagram, transfer to a non-battlefield location remains an option.

and will not repeat that analysis here. For three of the factors -- citizenship, site of apprehension, and status -- the analysis for these petitioners is roughly the same as it was for the petitioners in Boumediene. For the site of detention factor, Bagram is subject to more complete U.S. control than was true for Landsberg Prison in Eisentrager, yet the Court does not conclude that Bagram, like Guantanamo, is "not abroad." Still, the United States has a high "objective degree of control" over Bagram, which is the standard articulated in Boumediene for assessing the site of detention factor. This factor, then, cuts somewhat less in favor of extension of the Suspension Clause to Bagram than it did in Boumediene, but does not weigh strongly against extension. As to the adequacy of process factor, the United States provides less process at Bagram than at Guantanamo and far less process at Bagram than it did for the petitioners in Eisentrager. This factor, then, strongly favors petitioners' claim for habeas protection. Lastly, with respect to practical obstacles, the sixth and final factor, there may be greater practical obstacles to litigating habeas cases for detainees at Bagram than for detainees at Guantanamo, although modern technology mitigates the concerns. Nonetheless, for detainees who are Afghan citizens, the possibility of friction with the host country cannot be discounted and constitutes a significant practical obstacle to habeas review. But for detainees at Bagram who are not Afghan citizens and who were not captured within Afghanistan, the practical obstacles are not so substantial as to defeat their invocation of the Suspension Clause -- especially when it is considered that these petitioners were apprehended elsewhere more than six years ago and are only in the Afghan theater of war because the United States chose to send them there.

Respondents have repeatedly cautioned that such a conclusion is tantamount to a holding that the Constitution "applies to the four corners of the earth." See Tr. at 6. That is an

overstatement. To begin with, the Court's holding is limited to the Suspension Clause, as is true of Boumediene, and is narrowly drawn to these specific petitioners at Bagram  The result here is reached through a rigorous application of the multi-factor test dictated by the Supreme Court. The Suspension Clause only applies where the United States has the degree of control over a site that would permit meaningful review of an individual's detention following a "reasonable amount of time." See Boumediene, 128 S. Ct. at 2276.  And even then, if practical obstacles, like the possibility of friction with the host government, are too great, then detainees may not claim the protections of the writ. Moreover, if the Executive decides to provide greater process in determining the status of detainees, the balance of factors could shift against extension of the Suspension Clause. This Court is convinced that this is the kind of practical, functional analysis the Supreme Court has mandated in Boumediene.

It is worth repeating that the Bagram detainees in these cases are virtually identical to the Guantanamo detainees in Boumediene, and the circumstances of their detention are quite similar as well. While noting those very features of the detainees and their detention, the Supreme Court in Boumediene observed that "the cases before us lack any precise historical parallel" although that "is no barrier to our holding." 128 S. Ct. at 2262. Here, of course, there is a very close historical precedent -- Boumediene itself, which compels this outcome.

*F.  Whether Congress Has Provided An Adequate Substitute*

The remaining question in the Suspension Clause analysis is whether Congress has provided an adequate substitute for habeas. See Boumediene, 128 S. Ct. at 2262.  In Boumediene, the Supreme Court conducted a thoughtful and detailed analysis of this question, holding that the process set forth in the Detainee Treatment Act was not an adequate substitute

for habeas review.  See 128 S. Ct. 2262-74.  Here, this question is not even presented.

Respondents do not claim, nor could they after Boumediene, that the process Bagram detainees

receive is an adequate substitute for habeas corpus.  Bagram detainees receive substantially less

process than Guantanamo detainees do.  Hence, this Court's inquiry begins and ends with the first

part of the analysis, and the Court's conclusion that the Suspension Clause extends to three of the

four petitioners at Bagram compels the determination that MCA § 7(a) is unconstitutional as

applied to them.

### III.  Petitioners' Remaining Arguments

Petitioners maintain that there are four other grounds to deny respondents' motions to

dismiss: the MCA constitutes a usurpation of the Judiciary's Article III powers; the MCA

amounts to a permanent suspension of the writ of habeas corpus; the jurisdiction-stripping

provisions of the MCA do not apply to them; and respondents are violating petitioners' rights

under constitutional, statutory, and international law.  Although the Court holds today that three

of the four petitioners may seek habeas review based on the Suspension Clause analysis

explained above, the Court will consider these remaining arguments to determine whether they

provide Wazir -- the sole petitioner who is not entitled to habeas review under the Suspension

Clause analysis -- with an alternate route to habeas review in this Court.  The Court rejects three

of these four arguments because of their circularity.  They only provide an alternate vehicle for

habeas review if MCA § 7(a) is otherwise unconstitutional, and the Court has already determined

under the Boumediene test that MCA § 7(a) is not unconstitutional as applied to Wazir.  As to

the fourth argument -- the usurpation of Article III powers -- the Court requires further briefing.

*A. Usurpation of Article III Powers*

Petitioners assert that the MCA constitutes an unconstitutional usurpation of the

Judiciary's Article III powers. See Wazir Opp'n at 20-22. They argue that by labeling detainees

as "enemy combatants" with one hand, while stripping federal court jurisdiction over habeas

cases filed by enemy combatants with the other, the political branches' actions violate the

principle set out in United States v. Klein, 80 U.S. (13 Wall.) 128 (1871), and its progeny. In

Klein,

> the executor of the estate of a Confederate sympathizer[] sought to
> recover the value of property seized by the United States during the
> Civil War, which by statute was recoverable if Klein could
> demonstrate that the decedent had not given aid or comfort to the
> rebellion. In United States v. Padelford, 9 Wall. 531, 542-543
> (1869), [the Supreme Court] held that a Presidential pardon
> satisfied the burden of proving that no such aid or comfort had
> been given. While Klein's case was pending, Congress enacted a
> statute providing that a pardon would instead be taken as proof that
> the pardoned individual had in fact aided the enemy, and if the
> claimant offered proof of a pardon the court must dismiss the case
> for lack of jurisdiction.

Miller v. French, 530 U.S. 327, 348 (2000). Klein held that the statute was unconstitutional

because Congress may not "prescribe rules of decision to the Judicial Department of the

government in cases pending before it." Klein, 80 U.S. at 146. Petitioners maintain that the

factual determination by the Executive that a detainee is an enemy combatant, combined with

Congress's enactment of MCA § 7(a), which strips federal courts of jurisdiction to consider

enemy combatants' habeas petitions, runs afoul of Klein.

Respondents devote a total of two paragraphs to this argument in their reply. See Resps.'

Maqaleh Rep. at 5-6. Rather than addressing Klein, respondents argue that the MCA is a proper

exercise of Congress's power to define the jurisdiction of Article III courts. But <u>Klein</u> itself involved an improper exercise of that same power, so respondents' cursory invocation of it does not resolve the argument. <u>See Klein</u>, 80 U.S. at 146. Moreover, many courts have provided a gloss on the core <u>Klein</u> principle, thus complicating a straightforward application of <u>Klein</u> to this case. <u>See, e.g.</u>, <u>Miller</u>, 530 U.S. at 347-48. And it is apparent that <u>Klein</u> maintains vitality today. <u>See id.</u> (considering argument that 18 U.S.C. § 3626(e)(2) is an unconstitutional "rule of decision" under <u>Klein</u>). This Court, then, will order further briefing on the applicability of <u>Klein</u> and its progeny to Wazir's case.

*B. Permanent Suspension of the Writ*

Petitioners also maintain that the MCA is unconstitutional because it works a <u>permanent</u> suspension of the writ of habeas corpus. <u>See</u> Wazir Opp'n at 22-29. Although petitioners raise this argument separately from the primary Suspension Clause issue, resolution of the two issues is the same. If the Suspension Clause does not extend to a detainee, then the detainee cannot claim its protections. For the reasons explained above, the Court holds today that petitioners al Maqaleh, al Bakri, and al-Najar may invoke the protection of the Suspension Clause but that petitioner Wazir may not. Hence, for Wazir it does not matter whether Congress has permanently suspended the writ or whether Congress has neglected to provide an adequate substitute for review. Petitioners' argument that MCA § 7(a) constitutes an unlawful permanent suspension of the writ, then, does not affect the outcome of these cases, including Wazir's.

*C. Status Determinations by a Competent Tribunal*

According to petitioners, MCA § 7(a) does not apply to them because they have not properly been determined to be "enemy combatants." <u>See</u> Wazir Opp'n at 29-31. That provision

strips courts of jurisdiction to consider a habeas petition filed by an alien "who has been determined by the United States to have been properly detained as an enemy combatant." According to petitioners, MCA § 3 requires status determinations to be made by a CSRT or by "another competent tribunal," but the only tribunal these petitioners have had access to is the UECRB. The UECRB, the argument goes, is not a "competent tribunal," so no Bagram detainee has been "properly detained as an enemy combatant." Respondents counter that MCA § 3 is irrelevant to the interpretation of MCA § 7(a). See Resps.' Maqaleh Rep. at 4-5. Section 3 of the MCA created a new chapter of the U.S. Code, 10 U.S.C. § 948a, which governs trials of unlawful enemy combatants by military commission. Section § 7(a), on the other hand, amended an entirely different statute -- the federal habeas statute, 28 U.S.C. § 2241.

Respondents have the better of this argument. The jurisdiction-stripping provision of the federal habeas statute is not limited to enemy combatants who have been designated as such by a "competent tribunal." Only when an enemy combatant is facing a military commission does the "competent tribunal" requirement of MCA § 3 apply. None of the petitioners here have been subjected to a military commission. On its face, § 2241(e) provides the United States with discretion as to who may be "properly detained" as an enemy combatant. That discretion is cabined not by MCA § 3, but by the DTA, which requires the Department of Defense to report to Congress on "its procedures for determining the status of enemy combatants . . . ." Tr. at 56; see also DTA § 1005. Under MCA § 7(a), then, U.S. courts lack jurisdiction over habeas cases filed by Bagram detainees unless that provision is unconstitutional. And although MCA § 7(a) is unconstitutional as applied to some detainees, it is not unconstitutional as applied to Wazir. Hence, MCA § 3 does not provide him with a viable alternate vehicle for habeas review.

D. *Constitutional, Statutory, and International Rights*

Petitioners' final argument is that respondents have violated their constitutional, statutory, and international rights. See Wazir Opp'n at 55-62. The constitutional provision they point to is the Due Process Clause. Petitioners rely in large part on Hamdi, which held that U.S. citizens are entitled to the protections of the Due Process Clause. But none of these petitioners are U.S. citizens, and the D.C. Circuit has recently observed that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." Kiyemba v. Obama, 555 F.3d 1022, 1026 (D.C. Cir. 2009). Moreover, to the extent petitioners seek the substantive protections of the Due Process Clause, that question is not now before this Court. At this stage, the question presented is whether the Court has jurisdiction, not whether their due process rights have been violated. And Boumediene only addresses the extension of the Suspension Clause, and hence habeas jurisdiction, to detainee petitioners. Petitioners' argument that their detention violates the "rule of law" is similarly unavailing. They do not point to a "law" that has been violated that would give rise to this Court's jurisdiction, but instead invoke broad separation-of-powers themes. This Court has already addressed those themes throughout its Suspension Clause analysis.

Finally, petitioners argue that their detention violates international law. But whatever treaties or norms might otherwise find their way into domestic law, the MCA unambiguously, and subsequently, removed federal court jurisdiction to consider habeas cases filed by petitioners such as these. See Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 878 (D.C. Cir. 2006) ("[T]he Supreme Court has long recognized that a later-enacted statute trumps an earlier-enacted treaty to the extent the two conflict. This is known as the last-in-time rule."). The question, then,

is again whether the MCA is constitutional as applied to these petitioners. And, as explained throughout this opinion, for three of the four petitioners, it is not. But for Wazir, as to whom MCA § 7(a) is constitutional, the last-in-time enactment of MCA § 7(a) overrides the international law principles on which petitioners rely, and hence his international law arguments do not provide a separate means for testing the legality of his detention.

## IV. Conclusion

This Court lacks statutory jurisdiction to entertain these four habeas petitions. But MCA § 7(a), the statute stripping habeas jurisdiction, is unconstitutional as to three of the four petitioners. Under Boumediene, Bagram detainees who are not Afghan citizens, who were not captured in Afghanistan, and who have been held for an unreasonable amount of time -- here, over six years -- without adequate process may invoke the protections of the Suspension Clause, and hence the privilege of habeas corpus, based on an application of the Boumediene factors. Three petitioners are in that category. Because there is no adequate substitute for the writ of habeas corpus for Bagram detainees, those petitioners are entitled to seek habeas review in this Court.[22] Accordingly, respondents' motions to dismiss the habeas petitions of petitioners al Maqaleh, al Bakri, and al-Najar are denied. As to the fourth petitioner, Wazir, the Court concludes that the possibility of friction with Afghanistan, his country of citizenship, precludes

---

[22] This holding applies only to petitioners' habeas petitions seeking release; it does not apply to petitioners' challenges to their conditions of confinement. See, e.g., Maqaleh Am. Habeas Pet. ¶¶ 36-40, 42-47. Challenges to conditions of confinement are barred by the MCA. See 28 U.S.C. § 2241(e)(2). In Boumediene, the Supreme Court specifically noted that it did not address "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement." 128 S. Ct. at 2274. In another context, this Court has concluded that § 2241(e)(2) continues to strip federal courts of jurisdiction over challenges to conditions of confinement at Guantanamo. See Khadr v. Bush, 587 F. Supp. 2d 225, 235-37 (D.D.C. 2008). But this Court will not reach, at this stage, whether § 2241(e)(2) continues to strip federal courts of jurisdiction over challenges to conditions of confinement at Bagram.

his invocation of the Suspension Clause under the Boumediene balance of factors.  Although the

Court is not persuaded that any of petitioners' other arguments provide an alternate vehicle for

habeas review for Wazir, the arguments regarding Klein and its progeny are at present

insufficiently developed.  Hence, the Court will defer ruling on respondents' motion to dismiss

his habeas petition.  A separate order accompanies this opinion.

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
United States District Judge

Date: ___April 2, 2009___